GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
THOMAS H. FELL, ESQ.
Nevada Bar No. 3717
E-mail: tfell@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Debtors

E-Filed ___7/12/10___

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

In re:

RIVIERA HOLDINGS CORPORATION

☐ Affects this Debtor.

☒ Affects all Debtors.

☐ Affects RIVIERA OPERATING CORPORATION

☐ Affects RIVIERA BLACK HAWK, INC.

Case No.: **10-22910-LBR**;
**Chapter 11 Jointly Administered with:**

10-22913-LBR    Riviera Operating Corp.
10-22915-LBR    Riviera Black Hawk, Inc.

Date:    OST Pending
Time:    OST Pending

## OMNIBUS DECLARATION OF PHILLIP B. SIMONS IN SUPPORT
## OF DEBTORS' FIRST DAY MOTIONS

I, Phillip B. Simons, hereby declare as follows:

1.      I am over the age of 18 and am mentally competent.  I make this declaration (the "Declaration") in support of the motions and applications requesting various types of immediate relief (collectively, the "First Day Motions") filed on the Petition Date by the Debtors (as such terms are hereinafter defined) in the above-captioned cases (collectively, the "Chapter 11 Cases").[1]

2.      The Debtors in these Chapter 11 Cases are as follows:  Riviera Holdings Corporation, a Nevada corporation ("Riviera"), Riviera Operating Corporation, a Nevada corporation ("ROC") and Riviera Black Hawk, Inc., a Colorado corporation ("RBH" and

---

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant First Day Motions and the Joint Plan of Reorganization (defined herein), all of which are being filed contemporaneously herewith.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

together with ROC, the "Subsidiaries" and the Subsidiaries together with Riviera, the "Debtors").

3.        I am the Treasurer and Chief Financial Officer of Riviera and the Treasurer and Vice President of Finance of ROC, and Treasurer and Director of RBH, and have served in those capacities since May 2008.  Prior to joining Riviera and ROC, I was Vice President of Finance and Chief Financial Officer for Wheeling Gaming, Inc., a wholly owned subsidiary of Delaware North Companies.  Prior to my employment with Wheeling Gaming, Inc., I spent ten years leading the financial divisions at various large resorts and casinos with Wyndham International, Carlson Hospitality Worldwide, Destination Hotels and Resorts, and the Villa Group.  Prior to my experience in the hospitality and gaming industry, I spent three years employed in public accounting and consulting and several years in a senior financial role with a real estate developer.  I am a certified public accountant.  Through the various capacities in which I am employed with Riviera and ROC, I am familiar with the Debtors' daily business, operational, and financial affairs.

4.        Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' various business and legal advisors.  If called upon to testify as to the content of this Declaration, I could and would do so.

5.        This Declaration is filed on the same date (the "Petition Date") that each of the Debtors has filed a voluntary petition for relief under Chapter 11, Title 11 of the U.S. Code (the "Bankruptcy Code").  The Debtors have filed their various First Day Motions on the Petition Date to allow them to operate effectively in their respective Chapter 11 Cases. The relief sought in the First Day Motions is critical to the Debtors' business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that the Debtors are provided the opportunity to reorganize successfully.

6.        This Declaration provides the Court with background information regarding the Debtors as well as the context for the initial relief sought by the Debtors.  Accordingly, the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

2

Declaration is organized into two parts: (a) an overview of the Debtors, their businesses, their organizational structure, their capital structure, and the events leading up to the Chapter 11 Cases; and (b) an explanation of the relief sought in the First Day Motions, which relief I believe is critical to the Debtors' reorganization.

# I.
# BACKGROUND

## A.    The Debtors' Businesses

### 1.    Corporate Structure

7.    Riviera was incorporated in Nevada on January 27, 1993.  Riviera's wholly-owned subsidiary, ROC, owns and operates the Riviera Hotel & Casino ("Riviera Las Vegas")[2] located on Las Vegas Boulevard (the "Strip") in Las Vegas, Nevada.  Riviera Las Vegas originally opened in 1955 under different ownership.  RBH, which is a wholly-owned subsidiary of ROC, owns and operates the Riviera Black Hawk Casino ("Riviera Black Hawk"), a casino in Black Hawk, Colorado.  Riviera Black Hawk opened on February 4, 2000.

### 2.    Operations

8.    The Debtors collectively form a gaming company that owns and manages two gaming operations:  Riviera Las Vegas and Riviera Black Hawk.

#### a.    Riviera Las Vegas

9.    Riviera Las Vegas is located on the Strip, and occupies approximately 26 acres.  Riviera Las Vegas has a long history as one of the oldest and most famous casinos on the Strip having opened originally, though, as previously stated, not through its current ownership, on April 20, 1955.  The casino has approximately 850 slot machines, 30 gaming tables, a poker room, and a race and sports book.  The hotel has 2,075 guest rooms, a convention, meeting and banquet space totaling 160,000 square feet as well as various bars and restaurants located on the premises.

10.    Riviera Las Vegas's convention center is one of the larger convention facilities in

---

[2] For clarification, Riviera retains ownership of the real property and related improvements, including the buildings. ROC, however, owns all the personal property, including but not limited to the equipment and furnishings, related to the operation of Riviera Las Vegas.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

3

1    Las Vegas and is an important feature that attracts customers. The facility can be reconfigured

2    for multiple meetings of small groups or large gatherings of up to 5,000 people. The convention

3    center offers ample convention, meeting and banquet facilities, in addition to teleconferencing,

4    wireless internet, satellite uplink capabilities, and 12 skyboxes.

5        11.    Riviera Las Vegas's casino marketing is directed at mid-level stakes gaming

6    customers (customers that wager less on average) as opposed to high stakes customers

7    (customers that wager more on average). Mid-level stakes gaming customers tend to provide the

8    Debtors with a less volatile, more consistent gaming revenue stream. Consistent with its focus

9    on mid-level stakes gaming customers, Riviera Las Vegas offers lower table game limits,

10   implements stricter credit policies, and emphasizes slot machine play. Riviera Las Vegas's

11   principal strategy is to continue to invest in its slot machines and table game products, market to

12   its customer base primarily through a multi-tiered players' club program ("Club Riviera"), and to

13   offer slot machine and poker tournaments and other special events and promotions.

14       12.    Riviera Las Vegas's hotel marketing focuses on its convention customers. To

15   better market to these customers, most of the hotel rooms in Riviera Las Vegas were upgraded

16   during 2007 and 2008. The convention market consists of two groups:    (1) the trade

17   organizations and groups that hold their events in the banquet and meeting space provided by a

18   single hotel; and (2) those attending city-wide events, usually held at the Las Vegas Convention

19   Center. The Debtors target convention business because it typically provides patrons willing to

20   pay higher room rates and allows the Debtors to capitalize on certain advance planning benefits

21   because conventions are often booked one to two years in advance of the event date. The

22   Debtors also benefit from Riviera Las Vegas's proximity to the Las Vegas Convention Center as

23   customers stay at Riviera Las Vegas to avoid the congestion that occurs during a major

24   convention, particularly at the south end of the Strip. In 2009, Riviera Las Vegas derived

25   approximately 22% of its hotel occupancy and approximately 35% of its room revenues from

26   convention customers. Accordingly, the Debtors consider convention customers to be a critical

27   component of their customer base.

28       13.    The Debtors focus capital expenditures for Riviera Las Vegas toward

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

4

1    maintaining the hotel rooms and amenities in sufficient condition to compete for customers in the

2    convention and mature adult markets.    Room rental rates and slot revenues are the primary

3    factors driving operating margins.

4          14.    The Debtors use technology to maintain labor costs at a reasonable level,

5    including kiosks for hotel check-in, slot club activities, and slot ticket redemptions.

6                b.    <u>Riviera Black Hawk</u>

7          15.    Riviera Black Hawk, which opened on February 4, 2000, is located in Black

8    Hawk, Colorado, approximately 40 miles west of Denver.    Black Hawk is the largest casino

9    market in Colorado, and Riviera Black Hawk is the first casino encountered by visitors arriving

10   from Denver on Highway 119.    Riviera Black Hawk is comprised of a casino with approximately

11   750 slot machines and 9 gaming tables, a buffet, a delicatessen, a casino bar, and a ballroom with

12   seating for approximately 200 people.    Its casino features the fourth largest number of gaming

13   devices in the market.

14         16.    Riviera Black Hawk caters primarily to the "locals" slot customer.    The Debtors

15   attract customers to Riviera Black Hawk by implementing marketing strategies and promotions

16   designed specifically for the Black Hawk/Central City market.    The Debtors utilize a player's

17   club at Riviera Black Hawk, which was modeled after Club Riviera used at Riviera Las Vegas.

18   With the players' club program, players earn points based on gaming play, which can be

19   redeemed for cash, food, beverages, and various other items.    Riviera Black Hawk's players'

20   club is the Debtors' primary tool for building customer loyalty in Black Hawk.

21         17.    Riviera Black Hawk benefits from strong walk-in traffic, which is primarily the

22   result of its proximity to the Colorado Central Station and Isle of Capri casino properties.    The

23   Debtors have and continue to develop specific marketing programs designed to attract these

24   walk-in customers.

25         18.    Until recently, only limited stakes gaming, which is defined as a maximum single

26   bet of $5, was legal in the Black Hawk market.    However, on November 4, 2008, the citizens of

27   Colorado approved Amendment 50 to the Colorado Constitution, which allowed residents of

28   Black Hawk to vote to extend casino hours, approve additional games, and increase the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

5

maximum bet limit.[3]

19.    On January 13, 2009, residents of Black Hawk voted to enable Black Hawk casino operators to extend casino hours, add craps and roulette gaming and increase the maximum betting limit to $100.

20.    On July 2, 2009, the first day permissible to implement the changes associated with the passage of Amendment 50, the Debtors increased betting limits, extended hours, and commenced roulette gaming.[4]

21.    The Debtors focus capital expenditures for Riviera Black Hawk toward maintaining slot machines and the casino's amenities to remain competitive in the "locals" market.  The Debtors also have made limited capital expenditures toward Riviera Black Hawk associated with the implementation of increased betting limits, extended hours, and new games in accordance with the approval of Amendment 50, as referenced above.

**3.    The Debtors' Prepetition Equity Interests**

22.    Prior to June 2009, Riviera's common stock had been traded on the NYSE Amex (the "Exchange") under the symbol "RIV."  Riviera's stock reached its highest price in its history at over $36 per share in June 2007.  Riviera's high stock price was largely attributable to the significant increases in real estate values along the Strip throughout the past decade until stock values peaked in 2007.  At such peak, a number of hotel and casino properties along the Strip had estimated real estate values in excess of $30 million per acre.

23.    However, as discussed below, real estate values along the Strip, including that of Riviera's approximately 26 acres, have significantly declined since 2007.  Corresponding with declining property values, stock prices have plummeted as well.  Indeed, for the 52-week period ending March 23, 2009, the daily closing sale prices of Riviera's stock ranged from $1.05 to $21.99 per share, substantially down from the $36 per share high less than two years earlier.

24.    On June 1, 2009, Riviera received a deficiency letter (the "Deficiency Letter")

---

[3] See Colo. Const. art. XVIII, § 9.

[4] See Div. of Gaming, Dep't. of Revenue, State of Colorado, *available at*: http://www.colorado.gov/cs/Satellite/Rev-Gaming/RGM/1218795716371.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

6

from the Exchange stating that Riviera did not meet certain of the Exchange's continued listing standards because Riviera had sustained losses, which were so substantial in relation to its overall operations or its existing financial resources, or its financial condition had become so impaired that it appeared questionable, in the opinion of the Exchange, as to whether Riviera would be able to continue operations and/or meet its obligations.

25.    In order to maintain its listing on the Exchange, Riviera was required to submit a plan of compliance to the Exchange by July 1, 2009, advising the Exchange of action it had taken, or would take, that would bring Riviera into compliance with the Exchange's standards by November 27, 2009. As Riviera did not believe that it could take the steps necessary to satisfy the continued listing criteria of the Exchange within the prescribed time frame, the Debtors' Board of Directors approved a plan to voluntarily withdraw Riviera's common stock from trading on the Exchange. On June 5, 2009, Riviera provided notice to the Exchange of its intent to voluntarily delist its common stock from the Exchange, and on June 15, 2009, Riviera filed a Form 25 with the Securities and Exchange Commission (the "SEC") to inform the SEC of such decision. Trading of the Riviera's common stock on the Exchange was suspended as of the close of trading on June 25, 2009. Effective June 26, 2009, Riviera's common stock became available for quotation on Pink OTC Markets, Inc. (the "Pink Sheets"), an over-the-counter electronic quotation system, under the symbol "RVHL."

26.    Riviera's stock price has continued to decline over the past year. During the 52 weeks ending January 6, 2010, the average closing price for Riviera's stock has fluctuated from a high of $4.79 per share to a low of $0.30 per share. As of July 7, 2010, there were 12,447,555 outstanding shares of common stock, $.001 par value per share. The closing sale price of Riviera's stock as of the business day prior to the Petition Date was $0.25.

27.    There were approximately 2,140 stockholders as of March 11, 2010. Riviera's last meeting of stockholders was held on May 28, 2008.

**4.    <u>Management Structure</u>**

28.    On April 18, 2010, William L. Westerman, Riviera's Chief Executive Officer ("CEO"), President and Chairman of its Board, passed away. Mr. Westerman also served as

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

7

04555-013/957657_6

Chairman of the Board of Directors and CEO of ROC and as Chairman of the Board of Directors, CEO, and President of RBH.

29.    On April 19, 2010, the Board of Directors announced the creation of the Office of the CEO on an interim basis to perform the functions held by the Debtors' CEO.  The Office of the CEO is jointly held by Tullio J. Marchionne, Riviera's Secretary and General Counsel and ROC's Secretary and Executive Vice President; Robert A. Vannucci, the President and Chief Operating Officer of ROC; and myself, Riviera's Treasurer and Chief Financial Officer ("CFO") and ROC's Treasurer, CFO and Vice President of Finance.  Messrs. Marchionne and Vannucci, and I each continue in our current positions with the Debtors.  Additionally, Vincent L. DiVito, a current member of the Board of Directors, was elected Chairman of the Board effective April 19, 2010.  Mr. DiVito is also Chairman of the Debtors' Audit Committee.  In his additional capacity as Chairman of the Board, Mr. DiVito oversees the restructuring process on behalf of the Board of Directors of Riviera (the "Riviera Board") and interfaces with the Office of the CEO and the professionals retained by the Debtors.  Prior to being elected as Chairman of the Board, Mr. DiVito's annual compensation for being a member of the Board of Directors and Chairman of the Audit Committee was $75,000.  Upon becoming Chairman of the Board, Mr. DiVito's annual compensation increased by $125,000 to a total of $200,000 due to the expanded services he would be performing.

30.    In addition to Mr. DiVito, the Riviera Board is comprised of Paul A. Harvey and James N. Land, Jr.  The Board of Directors of ROC (the "ROC Board" and together with the Riviera Board, the "Board") is comprised of the same three individuals.  Mr. Harvey is paid $62,000 annually in fees for services as a member of the Board and as Chairman of the Compensation Committee and Chairman of the Nominating and Governance Committee, consisting of a $50,000 annual fee for services as a member of the Board, $10,000 for services as Chairman of the Compensation Committee, and $2,000 for services as Chairman of the Nominating and Governance Committee.  Mr. Land is paid a $50,000 annual fee for services as a member of the Board.

31.    Mr. Vannucci serves as President and COO of ROC.  The Debtors entered into an

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

1  employment agreement with Mr. Vannucci effective September 1, 2006. The agreement is for a

2  one-year term and automatically renews for successive one-year terms. Mr. Vannucci's base

3  compensation is $400,000 and he is entitled to participate in the Debtors' Incentive

4  Compensation Program (discussed below). Mr. Vannucci or the Debtors may terminate the

5  agreement at any time upon 30 days' prior written notice, but if the Debtors terminate it without

6  cause, then Mr. Vannucci will be entitled to one year's salary, a prorated award under the

7  Incentive Compensation Program, two years of health insurance benefits and a one-year

8  automobile allowance of $6,000, plus reimbursement of all reasonable automobile expenses

9  (excluding lease or loan payments).

10       32.    On June 1, 2010, the Compensation Committee of the Board (a) increased the

11  annual salary of Mr. Marchionne from $250,000 to $300,000 and (b) increased my annual salary

12  from $200,000 to $250,000. These salary increases are retroactive to April 19, 2010, the date on

13  which the Board appointed me and Mr. Marchionne to the Office of the CEO.

14       **5.**     **Executive Officer and Significant Employee Salary Continuation Agreements**

15       33.    For many years, numerous potential purchasers have attempted to acquire the

16  Riviera Las Vegas. Additionally, during the general expansion of Las Vegas during the prior

17  two decades, retaining key individuals critical to the Debtors' operations became increasingly

18  difficult. As a result, for many years, Riviera and ROC have entered into salary continuation

19  agreements with various executive officers and certain employees. The Board deems such

20  measures appropriate to ensure continuity in the Debtors' operations by retaining key individuals

21  and avoiding disruptive departures. The most recent salary continuation agreements were

22  entered into on August 4, 2009.

23       34.    On August 4, 2009, Riviera and ROC entered into salary continuation agreements

24  (the "2009 Agreements") with three named executive officers and 53 other employees. The

25  2009 Agreements are effective upon execution and delivery by each officer or employee and will

26  expire on December 31, 2010.

27       35.    The 2009 Agreements entitle such officers and employees to certain

28  compensation and benefits in the event of a Company Termination within a specified time period

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

9

1  after change in control of the Debtors.

2      36.    The 2009 Agreements were entered into by Riviera and ROC with Westerman,

3  Marchionne, myself, and one other employee, and Riveria and RBH with one employee.

4  Excluding Mr. Westerman due to his recent death, the 2009 Agreements entitle each such named

5  executive officer or employee to 12 months of base salary and 24 months of health insurance

6  benefits in the event of a Company Termination within 24 months after a change in control of the

7  Company, subject to the terms provided therein.

8      37.    The 2009 Agreements entered into by Riviera and ROC with other ROC

9  employees entitle each such employee to six months of base salary and health insurance benefits

10  in the event of a Company Termination within 12 months after a change in control of the

11  Debtors, subject to the terms provided therein.

12      38.    Substantially similar agreements were also entered into with certain RBH

13  employees, which include in such 2009 Agreements the definition of a "change of control" as the

14  sale of RBH by Riviera and/or ROC to a non-affiliate of either Riviera or ROC.  As of March 31,

15  2010, the estimated total amount payable under the 2009 Agreements excluding Mr. Westerman

16  is $3.1 million including benefits.

17      **6.    Management Incentive Compensation Plan**

18      39.    The Debtors maintain an annual Incentive Compensation Program for executives

19  and key employees to encourage and reward achievement of the Debtors' business goals and to

20  assist in attracting and retaining key personnel.  The Compensation Committee of the Board

21  annually develops and approves specific performance targets for the following year under the

22  Incentive Compensation Program, in which Messrs. Vannucci, Marchionne, and I participate

23  along with approximately 60 other key employees.

24      40.    Participants in the Incentive Compensation Program are eligible to receive

25  quarterly and annual cash awards based on achievement of predetermined financial targets at

26  Riviera, ROC, and RBH, as applicable.  The Debtors pay cash awards under this Program only

27  when the performance goals that the Compensation Committee established for the applicable

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

10

fiscal year are achieved. The award formula is based on the EBITDA[5] of Riviera, ROC, and RBH. Accordingly, any awards paid for any given fiscal year will vary depending on actual performance.

41. Under the discretionary portion of the Incentive Compensation Program, the Board established three milestones related to the Debtors' debt restructuring efforts, each of which, upon achievement, will trigger the right of myself and Messrs. Marchionne and Vannucci to receive a payment of 25% of the eligible participant's annual salary. The first milestone is achieved upon receipt by the Debtor of a mutually agreed upon executed lock-up agreement and accompanying plan of reorganization with Senior Secured Creditors (defined below) holding a majority in face amount of the Senior Debt of the Debtors. The second milestone is obtained upon confirmation of the plan. The third milestone is achieved upon substantial consummation of the plan.

**B.    The Debtors' Prepetition Capital Structure**

**1.    Senior Credit Facility**

42. On June 8, 2007, Riviera, as borrower, and ROC, RBH, and Riviera Gaming Management of Colorado, Inc., a Colorado corporation, as guarantors (collectively, the "Guarantors" and together with Riviera, the "Obligors"), entered into that certain Credit Agreement with the lenders party thereto (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Prepetition Secured Lender" and, collectively, as the "Prepetition Secured Lenders"), with Wachovia Bank, National Association (the "Original Agent"), as administrative agent[6] (as the same may from time to time be amended, modified, extended, restated, replaced or supplemented in accordance with the terms thereof, the "Credit Agreement" and, the credit facility evidenced thereby, the "Senior Credit Facility"), which prior to the Petition Date provided for, among other things, a revolving

---

[5] EBITDA, meaning earnings before income, taxes, depreciation and amortization, is a non-GAAP measurement which is commonly used in the gaming industry to measure operational performance and profits and losses.

[6] On February 22, 2010, the Debtors received a notice from Wachovia informing the Debtors that Wachovia was resigning as administrative agent. The Debtors executed a Successor Agent Agreement with Cantor Fitzgerald Securities, the Debtors' new administrative agent (the "Agent"), effective April 12, 2010.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

11

credit facility of up to a maximum of $20,000,000 and a $225,000,000 term loan. As of the Petition Date, the Debtors' principal obligations outstanding under the Senior Credit Facility were $2,500,000 in respect of the revolving loans made under the revolving credit facility and $225,000,000 in respect of the term loan, plus accrued and unpaid interest, fees, costs and expenses under the Credit Agreement to the Petition Date in the amount of $20,271,522.54 (collectively, the "Senior Secured Claims). A true and correct copy of the Senior Credit Facility is attached hereto as <u>Exhibit "1."</u>

43. The Senior Credit Facility contains affirmative and negative covenants customary for financings of its nature including, but not limited to restrictions on Riviera's incurrence of other indebtedness.

44. The Senior Credit Facility contains events of default customary for financings of its nature including, but not limited to nonpayment of principal, interest, fees or other amounts when due; violation of covenants; failure of any representation or warranty to be true in all material respects; cross-default and cross-acceleration under Riviera's other indebtedness or certain other material obligations; certain events under federal law governing employee benefit plans; a "change of control" of Riviera; dissolution; insolvency; bankruptcy events; material judgments; uninsured losses; actual or asserted invalidity of the guarantees or the security documents; and loss of any gaming licenses. Some of these events of default provide for grace periods and materiality thresholds.

45. For purposes of these default provisions, a "change in control" of Riviera includes: a person's acquisition of beneficial ownership of 35% or more of Riviera's stock coupled with a gaming license and/or approval to direct any of Riviera's gaming operations, a change in a majority of the members of Riviera's Board other than as a result of changes supported by Riviera's current Board members or by successors who did not stand for election in opposition to Riviera's current Board, or Riviera's or any Guarantor's failure to maintain 100% ownership of its Subsidiaries.

46. The Senior Credit Facility is guaranteed and secured by first priority security interests and liens as discussed below.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

12

47.     I am informed and believe that the enterprise value of the Debtors' businesses as a going concern as of the Petition Date is less than the total amount owed under the Senior Credit Facility.  I am also informed and believe that the enterprise value of the Debtors' businesses will not diminish subject to the businesses continuing to operate in the ordinary course and the expenditure of capital expenditures as proposed in the Budget attached to the proposed Stipulation Authorizing Use Of Cash Collateral By The Debtors And Granting Adequate Protection (the "Cash Collateral Stipulation"), all gaming licenses and permits remaining in place, and present management remaining in place.

48.     The estimated value of the Prepetition Collateral (defined below) securing the Senior Credit Facility is less than the amount due under the Senior Credit Facility as of the Petition Date.

**C.      Secured Hedging Agreement**

49.     On March 31, 2007, Riviera and Wachovia Bank, National Association ("Wachovia"), entered into that certain ISDA Master Agreement (together with all amendments, supplements, or modifications, the "Secured Hedging Agreement"), pursuant to which such parties entered into an interest rate swap effective May 31, 2007.  Prior to the Petition Date, Wachovia terminated the Secured Hedging Agreement and participated its position thereunder to Cerberus Series Four Holdings, LLC (the "Prepetition Secured Counterparty" and together with the Prepetition Secured Lenders, the "Senior Secured Creditors").  As of the Petition Date, the Debtors owed obligations outstanding under the Secured Hedging Agreement in the amount of $27,861,251.57 (the "Swap Obligation" and together with the Senior Secured Claims, the "Secured Creditor Claims").  A true and correct copy of the Secured Hedging Agreement is attached hereto as Exhibit "2."

**D.      Senior Credit Facility Security Documents**

50.     The Senior Secured Claims are secured by first priority security interests and liens (subject only to certain Permitted Liens, as that term is used in the Credit Agreement) (the "Senior Secured Liens") granted pursuant to the following:

a)      that certain Security Agreement, dated as of June 8, 2007, among the Obligors

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

13

and the Original Agent (as the same may from time to time be amended, modified, extended, restated, replaced or supplemented in accordance with the terms thereof, the "Senior Credit Facility Security Agreement"),[7] executed for the benefit of the Senior Secured Creditors, in substantially all of the Debtors' existing and after-acquired personal property, including without limitation all (i) accounts; (ii) cash and cash equivalents; (iii) chattel paper (including electronic chattel paper); (iv) commercial tort claims; (v) copyright licenses; (vi) copyrights; (vii) deposit accounts; (viii) documents; (ix) equipment; (x) fixtures; (xi) general intangibles; (xii) goods; (xiii) instruments; (xiv) inventory; (xv) investment property; (xvi) letter-of-credit rights; (xvii) assigned agreements, including without limitation, (A) all rights of an Obligor to receive moneys due and to become due under or pursuant to the assigned agreements, (B) all rights of an Obligor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the assigned agreements, (C) claims of an Obligor for damages arising out of or for breach of or default under the assigned agreements and (D) the right of an Obligor to terminate the assigned agreements, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder; (xviii) patent licenses; (xix) patents; (xx) payment intangibles; (xxi) trademark licenses; (xxii) trademarks; (xxiii) securities accounts; (xxiv) software; (xxv) supporting obligations; (xxvi) books, records, ledger cards, files, correspondence, computer programs, tapes, disks, and related data processing software (owned by each Obligor or in which it has an interest) that at any time evidence or contain information relating to any collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon; (xxvii) other personal property of any kind or type whatsoever owned by such Obligor; and (xxviii) to the extent not otherwise included, all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing (collectively, the "Prepetition Personal Property Collateral");

---

[7] A true and correct copy of the Senior Credit Facility Security Agreement is attached hereto as Exhibit "3."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

14

b)      that certain Gaming Pledge Agreement, dated as of June 8, 2007, between Riviera and the Original Agent (as the same may from time to time be amended, modified, extended, restated, replaced or supplemented in accordance with the terms thereof, the "Gaming Pledge Agreement"),[8] executed for the benefit of the Senior Secured Creditors, whereby Riviera pledged 100% of its equity interests in ROC (the "ROC Pledged Equity Interests");

c)      that certain Pledge Agreement, dated as of June 8, 2007, among the Obligors, Riviera Gaming Management, Inc., a Nevada corporation ("RGM"), and the Original Agent (as the same may from time to time be amended, modified, extended, restated, replaced or supplemented in accordance with the terms thereof, the "Credit Party Pledge Agreement"),[9] executed for the benefit of the Senior Secured Creditors, whereby the Obligors and RGM pledged (i) 100% (or, if less, the full amount owned by such pledgor) of the issued and outstanding equity interest owned by such pledgor of each of its domestic subsidiaries (other than the equity interests of ROC pledged under the Gaming Pledge Agreement) and (ii) 65% (or, if less, the full amount owned by such pledgor) of each class of the issued and outstanding equity interest entitled to vote and 100% (or, if less, the full amount owned by such pledgor) of each class of the issued and outstanding equity interest not entitled to vote, in each case owned by such pledgor of each first-tier foreign subsidiary of such pledgor (collectively, the "Other Pledged Equity Interest"); and

d)      (i) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of June 8, 2007, by and between Riviera and the Original Agent (the "Riviera Deed of Trust")[10] and (ii) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of

---

[8] A true and correct copy of the Gaming Pledge Agreement is attached hereto as Exhibit "4."

[9] A true and correct copy of the Credit Party Pledge Agreement is attached hereto as Exhibit "5."

[10] A true and correct copy of the Riviera Deed of Trust is attached hereto as Exhibit "6."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

15

June 8, 2007, by and between RBH and the Original Agent (the "RBH Deed of Trust"[11] and together with the Riviera Deed of Trust, as each may from time to time be amended, modified, extended, restated, replaced or supplemented in accordance with the terms thereof, the "Mortgage Instruments", and, together with the Senior Credit Facility Security Agreement, Gaming Pledge Agreement and Credit Party Pledge Agreement, the "Senior Credit Facility Security Documents" and, together with the Credit Agreement, the Secured Hedging Agreement and all loan documents identified in the Credit Agreement and the Secured Hedging Agreement or pertaining thereto, the "Senior Credit Facility Loan Documents"), in each case, for the benefit of the Senior Secured Creditors (the collateral thereunder, collectively, the "Prepetition Real Property Collateral" and together with the Prepetition Personal Property Collateral, the ROC Pledged Equity Interests, and the Other Pledged Equity Interest, the "Prepetition Collateral").

**E.    Events Leading To These Chapter 11 Cases**

**1.    Economic Pressures**

51.    The Senior Credit Facility and the Secured Hedging Agreement, both entered into during the first half of 2007, left the Debtors highly but not unreasonably leveraged. Under the business circumstances prevailing at the time of these transactions, such leverage would not have hindered the Debtors' business operations or precipitated their filing of the Chapter 11 Cases. Shortly after these transactions, however, the economy in the United States sharply declined affecting virtually every business sector especially the hotel and gaming industry. Since then, the United States economy has gone into a severe recession, with gaming revenues in both of the Debtors' gaming markets falling dramatically and sources of financing for the hotel and gaming industry limited, if not disappearing altogether.

52.    Nevada, as a whole, and, particularly, Las Vegas, has been deeply affected by the current recession given their reliance on tourism and construction. Nevada's foreclosure and

---

[11] A true and correct copy of the RBH Deed of Trust is attached hereto as Exhibit "7."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

unemployment rates are the highest in the country.[12]    Moreover, Nevada has experienced dramatic decreases in tourism, convention, and gaming revenues.

53.    According to the Abbreviated Revenue Release from the State of Nevada, Gaming Control Board, Tax and License Division (the "Revenue Release") for April 2010, which provides the most current figures available, Nevada gaming win has continued to drop sharply for the current fiscal year to date over already substantially depressed figures reported in 2009, with statewide win decreasing 4.05%, and Clark County decreasing 2.95%.

54.    According to the Las Vegas Convention and Visitors' Authority (the "LVCVA"), visitor statistics for 2009 reflect a decrease in visitor volume from 37,481,552 in 2008 to 36,351,469 in 2009, a decrease of 3.0%.[13]    The number of convention delegates, as well as the number of conventions held in Las Vegas in 2009 have also decreased 23.9% and 13.6%, respectively, over figures reported in 2008.[14]    Furthermore, hotel occupancy rates have fallen from 86.0% in 2008 to 81.5% in 2009.[15]

55.    Riviera Las Vegas is located on the north end of the Strip in Las Vegas, Nevada. Apart from the economic challenges discussed above facing Las Vegas and Nevada, as a whole, and the gaming industry, in particular, Riviera Las Vegas's difficulties have been compounded by other factors.    One of the primary challenges Riviera Las Vegas faces is its increasing isolation given the recent changes along the north end of the Strip.  Only a few years ago, Riviera Las Vegas was immediately surrounded by established and legendary casino properties such as the Stardust, the New Frontier, and Westward Ho.  During the recent economic boom, those properties and several other north Strip hotel and casino properties were sold and demolished to make way for new high-end resorts.    However, as the economy rapidly declined, these

---

[12] See "Nevada still tops nation in foreclosures," June 10, 2010, *available at*: http://www.fox5vegas.com/news/23859325/detail.html; "Nevada leads the nation in unemployment," Las Vegas Review-Journal, June 18, 2010, *available at*: http://www.lvrj.com/business/nevada-_x92-s-unemployment-rate-tops-in-nation-96647594.html.

[13] Historical Las Vegas Visitors Statistics, Las Vegas Convention and Visitors' Authority, Feb. 11, 2009, *available at*: http://www.lvcva.com/press/statistics-facts/index.jsp.

[14] Id.

[15] Id.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

17

anticipated new projects either halted construction or failed to start altogether.

56.     Adjacent to Riviera Las Vegas sits the empty and unfinished Fontainebleau Las Vegas. Construction was stopped on the 68-floor hotel and casino in April 2009 with the project still needing additional exterior work and virtually all of its interior to be completed. No plans have been announced for resuming construction on the Fontainebleau Las Vegas, and it presently remains a shell pending hundreds of millions of dollars of costs to complete.

57.     In June 2007, Boyd Gaming Corporation started construction on the estimated $4.8 billion Echelon project where the Stardust once stood. One year later, at a time when only three of the five hotel towers were steel and concrete skeletons reaching no more than eight floors, the company announced that it was stopping construction of the Echelon. The Echelon project remains in its largely unfinished condition as of the Petition Date.

58.     The New Frontier was yet another neighboring hotel and casino property with a long and storied history that was recently demolished to make way for a new project. In May 2007, a real estate investment group purchased the New Frontier for $1.2 billion, or $33 million an acre, to make room for an estimated $5 billion development modeled after New York City's Plaza Hotel. In November 2007, the New Frontier was imploded and construction on the new project was set to commence in 2008. As of the Petition Date, the new project has not commenced, and the lot where the New Frontier once stood remains vacant.

59.     The effects of such nearby vacant lots and uncompleted projects have been considerable. Although Riviera Las Vegas has fewer neighboring competitors, there are also fewer reasons for customers to venture to the north end of the Strip. Overall, the transformation of legendary casino resorts into vacant lots and inactive construction zones has greatly reduced the vitality of the area, and the attractions and synergies that such competitors once provided have been completely eliminated. Compounding these difficulties is that Riviera Las Vegas has always relied on walk-in traffic by capitalizing on its Strip location, and its close proximity to several major casino properties as well as the Las Vegas Convention Center and several timeshare and condominium projects. Not only has walk-in traffic diminished due to the reduction in casinos and other attractions along the north end of the Strip, but any remaining foot

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

18

1    traffic near Riviera Las Vegas is further reduced due to inaccessibility to the property due to

2    construction hazards at nearby properties, streets or walkways.

3    　　　　60.　　　Moreover, Riviera Las Vegas, like many of its remaining north Strip hotel and

4    casino competitors such as Circus Circus, the Sahara, and the Stratosphere, focuses on the mid-

5    level budget market - a market which has become increasingly competitive during this recession.

6    Budget properties more centrally located on the Strip, such as the Excalibur, are currently

7    posting operating profits due to their increased walk-in traffic and proximity to higher-end casino

8    resorts and attractions.  Further, to attract customers, high-end and luxury properties along the

9    Strip are competing in the mid-level market by dramatically reducing room rates.

10   　　　　61.　　　Like Riviera Las Vegas, Riviera Black Hawk has experienced its own set of

11   economic challenges.  Riviera Black Hawk is located in Colorado, a state that also has been

12   affected dramatically by the current recession.  Colorado's foreclosure rate ranked 10th highest in

13   the country for 2009 and the first quarter of 2010.  Colorado's 2009 foreclosure total, while up

14   less than a quarter of a percent from 2008, was 28.2% higher than 2007's total.  Additionally, the

15   unemployment rate in Colorado more than doubled from 3.8% in July 2007 to 7.8% in July

16   2009.  As of May 2010, the unemployment rate was 8.0%.  These statewide economic indicators

17   are particularly relevant in the case of the Riviera Black Hawk because it relies so heavily on the

18   "locals" clientele.

19   　　　　62.　　　With respect to gaming revenues, the Colorado Gaming Commission reported a

20   notable statewide 12.3% decrease in revenues for the 2008 calendar year as compared to the

21   2007 calendar year.[16]  Specifically, in the Black Hawk market, from where the bulk of the

22   statewide gaming revenues are derived, the Colorado Gaming Commission reported a 12.5%

23   decrease in revenues in the 2008 calendar year as compared to calendar year 2007.[17]  In 2009,

24   however, the Colorado Gaming Commission reported a moderate comeback from the previous

25   year's decline, as the statewide gaming revenue increased by 2.6 percent and the Black Hawk

26

27   [16] See Colorado Gaming Comm., Dep't of Revenue, Colorado Casino Revenues & Taxes By Fiscal Year, *available
      at*:  http://www.colorado.gov/cs/Satellite/Rev-Gaming/RGM/1213781235354.

28   [17] Id.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

1    market gaming revenue increased 4.2 percent.[18]

2          63.    Also impacting Riviera Black Hawk was the smoking ban for Colorado casinos,

3    which became effective on January 1, 2008.  See CRS § 25-14-204(1)(n).  Similar smoking bans

4    have lead to reduced revenues at casinos in other states, and the smoking ban enacted in

5    Colorado has in fact had an adverse effect on Riviera Black Hawk's results of operations.

6    Indeed, revenue at Colorado casinos fell 10.7% in the months after the smoking ban became

7    effective, which represents the worst drop in the industry's history.

8          64.    Riviera Black Hawk also faces ever increasing competition in the gaming and

9    entertainment markets.  Riviera Black Hawk currently competes with other forms of gaming in

10    Colorado, including neighboring casinos, the state lottery, horse and dog racing, as well as other

11    forms of entertainment.  And given that the casino/hotel industry largely depends on tourism,

12    Riviera Black Hawk also competes with different casino operators around the country and world

13    for tourists' business.  Amendment 50 went into effect July 2, 2009.  It increased hours of

14    operation to twenty-four hours a day, and limits to $100, and allowed for craps and roulette table

15    games.

16          65.    As a whole, the gaming and hotel industry has faced challenges recently

17    stemming from declining revenues and property values in addition to other factors, as evidenced

18    by at least six large casino businesses filing for Chapter 11 protection recently: the Greektown

19    Casino in Detroit, Michigan, see In re Greektown Holdings, LLC, et al., Case No. 08-53104-

20    WSD (Bankr. E.D. Mich. 2008); the Tropicana casino group, see In re Tropicana Entertainment,

21    LLC, et al., Case No. 08-10856-KJC (Bankr. D. Del. 2008), which owns hotel and casino

22    properties throughout the country including properties in Atlantic City, New Jersey; Trump

23    Entertainment Resorts, see In re TCI 2 Holdings, LLC, et al., Case No. 09-13654-JHW (Bankr.

24    D. N.J. 2009), which involves a property in Atlantic City, New Jersey; the privately held Station

25    Casinos, Inc., a major locals hotel and casino company in Nevada, see In re Station Casinos, Inc.,

26    Case No. 09-52477-GWZ (Bankr. D. Nev. 2009); the Herbst Gaming company, see In re Zante,

27

28    ―――――――――――――
[18] Id.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

20

Inc., et al., Case No. 09-50746-GWZ (Bankr. D. Nev. 2009), which owns hotel and casino properties in Nevada, Iowa and Missouri, as well as slot route companies operating in Nevada; and Black Gaming, see In re Black Gaming, LLC., et al., Case No. 10-13301-BAM (Bankr. D. Nev. 2010), which involves hotels and casinos located in Mesquite, Nevada.

66.    Finally, and in addition to the particular challenges facing the Debtors' properties described above, the Debtors were faced with declining hotel and casino revenues based on reduced consumer spending, a tightening credit market, and an overall weakening economy. Most of these market-driven challenges manifested after the Debtors leveraged themselves with the Senior Credit Facility and the Secured Hedging Agreement, thus leaving the Debtors in a highly precarious position at a time when they most needed robust financial performance.

### 2. **Financial Performance**

#### a.    Riviera Las Vegas

67.    The economic pressures described above have predictably reduced the Debtors' financial performance over the past several years. Riviera Las Vegas has been particularly affected by declines in its convention and hotel business, which in turn have hurt its casino business. Riviera Las Vegas' net revenues in 2009 were $91.9 million, a decrease of $36.1 million, or 28.2%, from $128.0 million in 2008. Its revenues for the three months ended March 31, 2010 were $20.5 million, a decrease of $4.0 million, or 16.2%, from $24.5 million for the comparable period in 2009.

68.    Riviera Las Vegas's casino revenues in 2009 were $41.2 million, a decrease of $9.4 million, or 18.6%, from $50.6 million in 2008. Its revenues for the three months ended March 31, 2010 were $8.7 million, a decrease of $1.6 million, or 15.0%, from $10.3 million for the comparable period in 2009. Casino revenues are comprised primarily of slot machine and table game revenues. Slot machine and table game revenues decreased primarily due to less wagering as a result of the slower economy, reduced hotel occupancy and less walk-in business. Slot machine win per unit per day in 2009 was $94.84, a decrease of $20.16, or 17.5%, from $115.00 in 2008.

69.    Riviera Las Vegas's room revenues in 2009 were $35.5 million, a decrease of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

21

04555-013/957657_6

$16.9 million, or 32.4%, from $52.4 million in 2008. Room revenues for the three months ending March 31, 2010 were $8.4 million, a decrease of $1.9 million, or 18.4%, from $10.3 million for the comparable period in 2009. The decrease in room rental revenues was primarily due to a decrease in average daily room rates. The average daily room rate ("ADR") was $60.60 in 2009, a decrease of $22.21, or 26.8%, from $82.81 in 2008. For the three months ending March 31, 2010, ADR had decreased to $55.69. Convention segment ADR was $96.41 in 2009, a decrease of $11.77, or 10.9%, from $108.18 in 2008. For the three months ending March 31, 2010 convention segment ADR was $86.49. The decrease in ADR was due mostly to lower leisure segment rates and a shift in the occupied room mix from higher rated convention segment occupancy to lower rated leisure segment occupancy. Leisure and convention segment demand continues to soften due largely to increased competition as a result of additional hotel room and convention space supply and the weak economy.

70. Finally, hotel room occupancy per available room at Riviera Las Vegas in 2009 was 77.4% compared to 83.8% in 2008. The 6.4% decrease in hotel room occupancy resulted in a $3.7 million decrease in room revenues. Revenue per available room ("RevPar") is total revenue from hotel room rentals divided by total hotel rooms available for sale. In 2009, Riviera Las Vegas' RevPar was $46.93, a decrease of $22.47, or 32.4%, from $69.40 in 2008. For the three months ending March 31, 2010, RevPar was $45.77, a decrease of $7.46, or 14.0%, from $53.23 for the comparable period in 2009. The decrease in RevPar was the result of decreases in total occupied rooms and decreases in ADR as described above.

      b.    Riviera Black Hawk

71. Riviera Black Hawk's revenues are mainly derived from its casino operations as it does not have a convention center or a hotel. Its casino revenues are comprised of revenues from slot machines and table games. Riviera Black Hawk's net revenues in 2009 were $42.2 million, an increase of approximately $500,000, or 1.1%, from $41.7 million 2008. Net revenues for the three months ending March 31, 2010 were $10.3 million, an increase of approximately $100,000, or 1.1%, from $10.2 million for the comparable period in 2009. The increases were primarily due to stronger casino revenues in the second half of 2009 as a result of the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

22

implementation of changes permitted with the passage of Amendment 50 to the Colorado Constitution as described above.

72.    Slot machine revenues at Riviera Black Hawk in 2009 were $39.4 million, a decrease of approximately $200,000, or 0.6%, from $39.6 million in 2008.  For the three months ending March 31, 2010, slot machine revenues decreased approximately $100,000 to $9.7 million from $9.8 million for the comparable period in 2009.  Slot machine revenues have decreased primarily as a result of higher deductions for cash incentives to high-value slot machine players and higher deductions for slot machine participation distributions.

73.    Table game revenues at Riviera Black Hawk increased approximately $500,000 to $1.6 million in 2009 from $1.1 million in 2008.  For the three months ending March 31, 2010, table game revenues increased approximately $300,000 - to approximately $500,000 - compared to the roughly $200,000 earned during the same period in 2009.  The increases in table game revenues were mainly due to increased revenues in the second half of 2009 as a result of the implementation of increased betting limits, extended hours and roulette gaming as permitted with the passage of Amendment 50 to the Colorado Constitution as discussed above.

c.    Consolidated Figures

74.    The Debtors' recent financial performance on a consolidated basis has been as follows:

|  | Year Ended 12/31/09[19] | 3 Mos. Ended 3/31/10[20] |
|---|---|---|
| Revenues | | |
|    Casino | $82,186,000 | $18,850,000 |
|    Rooms | $35,452,000 | $8,433,000 |
|    Food & Beverage | $23,427,000 | $5,350,000 |
|    Entertainment | $7,988,000 | $876,000 |
|    Other | $5,453,000 | $1,045,000 |
| Total Revenues | $154,506,000 | $34,554,000 |
| Net Revenues | $134,049,000 | $30,814,000 |

[19] Source:  Debtors' Form 10-K for the year ended December 31, 2009.

[20] Source:  Debtors' Form 10-Q for the first quarter ended March 31, 2010.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

23

| | | |
|---|---|---|
| Depreciation & Amortization | $14,870,000 | $3,466,000 |
| Total Costs and Expenses | $135,700,000 | $31,443,000 |
| Income From Operations | ($1,651,000) | ($629,000) |
| Total Interest Expense, net | ($23,208,000) | ($3,903,000) |
| Net Income (Loss) | ($24,859,000) | ($4,532,000) |
| Earnings Per Share – Loss per share, basic and diluted | ($1.99) | ($.36) |

| EBITDA | | |
|---|---|---|
| | **Year Ended 12/31/09** | **3 Mos. Ended 3/31/10** |
| Casino Gaming EBITDA[21] | | |
| Riviera Las Vegas | $ 9,635,000 | $ 1,426,000 |
| Riviera Black Hawk | $ 9,892,000 | $ 2,461,000 |
| Other & Corporate EBITDA | ($ 3,496,000) | ($ 850,000) |
| Total EBITDA | $16,031,000 | $ 3,037,000 |

### 3.    Defaults on Agreements

a.    February Default Notice

75.    On February 26, 2009, the Debtors received a notice of default from the Original Agent (the "February Default Notice") with respect to the Senior Credit Facility in connection with the Debtors' failure to provide a Deposit Account Control Agreement, or DACA, from each of the Debtors' depository banks per a request made by the Original Agent to the Debtors on October 14, 2008. The DACA that the Original Agent requested the Debtors to execute was in a form that the Debtors ultimately determined to contain unreasonable terms and conditions as it would enable the Original Agent to access all of the Debtors' operating cash and order it to be transferred to a bank account specified by the Original Agent.

76.    On March 25, 2009, the Debtors engaged XRoads Solutions Group, LLC ("XRoads") as its financial advisor. Based on an extensive analysis of the Debtors' current and projected liquidity, the Debtors determined that it was in their best interest to not pay the accrued interest related to the Senior Credit Facility and the Secured Hedging Agreement of

---

[21] Casino Business segment EBITDA consists of net income plus depreciation and amortization, interest expense, net of capitalized interest, impairment charges and costs associated with the retirement of assets. Casino Business segment EBITDA for both Riviera Las Vegas and Riviera Black Hawk are calculated before allocation of overhead.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

24

approximately $4 million, which was due on March 30, 2009, and $6 million, which was due on June 30, 2009. Consequently, the Debtors elected not to make the payments.

77.    The Debtors' failure to pay interest due on the due date was an event of default under the Senior Credit Facility. As a result of the event of default, the Senior Secured Creditors have the right to seek to charge additional default interest on the Debtors' outstanding principal and interest under the Credit Agreement, and automatically charge additional default interest on any overdue amount under the Secured Hedging Agreement.

### b.    April Default Notice

78.    On April 1, 2009, the Debtors received an additional notice of default from the Original Agent (the "April Default Notice"). The April Default Notice alleged that subsequent to the Debtors' receipt of the February Default Notice, additional defaults and events of default had occurred and were continuing under the terms of the Credit Agreement including, but not limited to: (i) the Debtors' failure to deliver to the Original Agent audited financial statements without a going concern modification; (ii) the Debtors' failure to deliver to the Original Agent a certificate of an independent certified public accountant in conjunction with the Debtors' financial statement; and (iii) the occurrence of a default or breach under the Secured Hedging Agreement. The April Default Notice also stated that in addition to the foregoing events of default that there were additional potential events of default.

### c.    Hedging Agreement Default Notice

79.    On April 1, 2009, the Debtors also received a Notice of Event of Default and Reservation of Rights ("Hedging Agreement Default Notice") in connection with an alleged event of default under the Secured Hedging Agreement. The Hedging Agreement Default Notice alleged that: (i) an event of default exists due to the occurrence of an event of default under the Credit Agreement; and (ii) that the Debtors failed to make payments to Wachovia with respect to one or more transactions under the Secured Hedging Agreement.

80.    The Debtors have not paid such overdue amounts and the applicable grace period to make payments has expired.

81.    Any default under the Secured Hedging Agreement automatically results in an

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

25

1   additional default interest of 1% on any overdue amounts under the Secured Hedging

2   Agreement. This default rate is in addition to the interest rate that would otherwise be applicable

3   under the Secured Hedging Agreement.

4                        d.    Early Termination Notice

5          82.    On July 23, 2009, the Debtors received a Notice of Early Termination for Event

6   of Default (the "Early Termination Notice") from Wachovia in connection with an alleged event

7   of default that occurred under the Secured Hedging Agreement. A true and correct copy of the

8   Early Termination Notice is attached hereto as Exhibit "8." The Early Termination Notice

9   alleged that an event of default had occurred and was continuing pursuant to Section 5(a)(i) and

10  5(a)(vi)(1) of the Secured Hedging Agreement. Section 5(a)(i) of the Secured Hedging

11  Agreement addressed payments and deliveries specified under the Secured Hedging Agreement,

12  and Section 5(a)(vi)(1) of the Secured Hedging Agreement addressed cross defaults. The Early

13  Termination Notice provided that Wachovia designated an early termination date of July 27,

14  2009 in respect of all remaining transactions governed by the Secured Hedging Agreement,

15  including an interest rate swap transaction with a trade date of May 31, 2007.

16         83.    On July 28, 2009, in connection with the Early Termination Notice, the Debtors

17  received a Notice of Amount Due Following Early Termination from Wachovia that claimed the

18  amount due and payable to Wachovia under the Secured Hedging Agreement was $26.6 million,

19  which included $4.4 million in accrued interest. A true and correct copy of the Notice of

20  Amount Due Following Early Termination is attached hereto as Exhibit "9". As of March 31,

21  2010, the interest rate swap liability was $22.1 million, which equals the mark to market amount

22  reflected as due and payable on the Notice of Amount Due Following Early Termination

23  described above. Additionally, accrued interest as of March 31, 2010 included $5.3 million in

24  accrued interest related to the interest rate swap comprised of $4.4 million in accrued interest as

25  reflected on the Notice of Amount Due Following Early Termination, plus $0.9 million in default

26  interest pursuant to the Secured Hedging Agreement termination.

27  / / /

28  / / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

26

**F.    Prenegotiated Plan of Reorganization with Requisite Majority of Consenting Lenders**

84.    On July 12, 2010, a restructuring and lock-up letter agreement (the "Lockup"), was entered into by the (i) Debtors and (ii) certain Senior Secured Creditors holding more than 66.67% of the face amount of the Secured Creditor Claims (the "Designated Consenting Lenders). Below is a non-exhaustive overview of the financial terms associated with the prenegotiated plan of reorganization.

**1.    Treatment of Pre-Petition Claims**

85.    Priority Senior Secured Claims: Each existing holder of such a claim shall receive on the Substantial Consummation Date in full and final satisfaction of such claim a portion of the new Series A Term Loan (to be issued by Reorganized Debtors) in a face amount equal to the amount of the First Priority Senior Secured Claims held.

86.    Senior Secured Claims: Each existing holder of such a claim shall receive on the Substantial Consummation Date in full and final satisfaction of such claim: i) a portion of the new Series A Term Loan in a face amount up to such holders pro rata share of $50,000,000 less the portion of Series A Term Loan received by the holders of the Priority Senior Secured Claims; and ii) a pro rata share of 80% (subject to dilution) of the Class B Shares to be issued by Reorganized Debtors.

87.    General Unsecured Claims: Each existing holder of such a claim, other than with respect to deficiency claims arising from the Senior Secured Claims, shall receive on the Substantial Consummation Date in full and final satisfaction of such claim, payment in full thereof, but in no event shall the total payment of holders of General Unsecured Claims exceed $3,000,000.00.

88.    Existing Equity Interests: To be cancelled and extinguished.

**2.    New Money Investment**

89.    Designated New Money Investment: On the Designated New Money Election Date and subject to the Budget Contingency being satisfied, holders of Senior Secured Claims who so elect will fund their pro rata share of a $20,000,000 loan. In consideration for funding

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

the Designated New Money Investment, participating holders of Senior Secured Claims shall receive: i) a pro rata share of the Series B Term Loan; ii) 8% of the Class B Shares to be issued by Reorganized Debtors, subject to dilution by the Warrants (as defined below); and iii) penny warrants to purchase up to 10% of the Class B Shares ("Warrants") to be issued by Reorganized Debtors.

90.    Working Capital Facility:  On the Substantial Consummation Date, holders of Senior Secured Claims who so elect will fund their pro rata share of a $10.0 million working capital facility which facility shall be pari passu with the $50.0 million Series A Term Loan.  In consideration for funding the Working Capital Facility, participating holders of Senior Secured Claims shall receive: i) notes evidencing revolving credit loans outstanding at any time under the Working Capital Facility; and ii) 7% of the Class B Shares to be issued by Reorganized Debtors, subject to dilution by the Warrants.

### 3.    Backstop Commitment Agreement

91.    To provide assurance that the Designated New Money Investment (solely to the extent the Budget Contingency is satisfied) shall be fully funded in the aggregate amount of $20.0 million and the Working Capital Facility (irrespective of whether the Budget Contingency is satisfied) shall be fully committed in the aggregate principal amount of $10.0 million, certain Designated Consenting Lenders (individually, a "Backstop Lender" and collectively, the "Backstop Lenders") will commit, severally and not jointly, to fund its pro rata share of the Designated New Money Investment and its pro rata share of the Working Capital Facility.

92.    Backstop Commitment Fees:  (a)(i) if the Budget Contingency is satisfied, (ii) the Total New Money Investment Alternative is effectuated under the Plan, (iii) the Substantial Consummation Date occurs; and (iv)  the Series B Term Loan is fully funded and the entire Working Capital Facility is made available as provided for in the Plan, 5.0% of the Class B Shares (subject to dilution only under those certain conditions specified in the Plan) shall be fully earned,  payable and non-refundable to the Backstop Lenders, (b) if the Budget Contingency is satisfied, but either the Backstop Commitment Agreement is terminated pursuant to its terms  or the Substantial Consummation Date does not occur, $1,000,000 in cash shall be fully earned,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

28

payable and non-refundable upon such date to the Backstop Lenders; provided, however, that to the extent (i) the Backstop Commitment Agreement is materially breached by any Backstop Lender (ii) the Backstop Commitment Agreement is terminated in connection with the Lockup Agreement having been terminated solely as a result of a breach thereof by any Backstop Lender in its capacity as a Designated Consenting Lender, or (iii) the Substantial Consummation Date does not occur other than as a result of the actions and/or inactions of the Debtors that are in breach of the Lockup Agreement, the Debtors shall not be required to pay the Backstop Lenders the $1,000,000 cash fee described in this clause (b), and (c)(i) if either the Budget Contingency is not satisfied or the Budget Contingency is satisfied but the Designated New Money Election is not made, (ii) the Partial New Money Investment Alternative is effectuated under the Plan, (iii) the Substantial Consummation Date occurs and (iv) the entire Working Capital Facility is made available as provided for in the Plan, $300,000 in cash shall be fully earned, non-refundable and payable to the Backstop Lenders.

## II.
## FIRST DAY MOTIONS

93.    The Debtors have commenced their Chapter 11 Cases in response to their debt obligations and the aforementioned market challenges. The Debtors' transition into Chapter 11 proceedings must be comprehensively and effectively organized to ensure that they will be able to operate smoothly in bankruptcy and be afforded the opportunity to successfully emerge from their Chapter 11 Cases. Accordingly, it is critical that the Debtors maintain strong relationships with their customers, employees, partners, vendors, creditors, gaming regulators and other governmental entities, and such other parties that enable the Debtors to conduct their business. To maintain and foster these relationships, it is important to minimize the distractions to the Debtors' business operations that could result from the Debtors' petitioning for Chapter 11 relief.

94.    I have reviewed and am generally familiar with the contents of each of the First Day Motions. Based on that familiarity and information supplied to me by other members of the Debtors' management and the Debtors' various business and legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

their Chapter 11 Cases with minimal disruption or loss of productivity or value.  I also believe that the First Day Motions are vital to the Debtors' successful reorganization and are in the best interests of the Debtors and their creditors.

95.    The First Day Motions include the following pleadings filed by the Debtors in their respective Chapter 11 Cases:

(a) Riviera's Emergency Motion For Order Directing Joint Administration Of The Debtors' Chapter 11 Cases Under Federal Rule Of Bankruptcy Procedure 1015(b) ("Riviera's Joint Administration Motion"); ROC's Emergency Motion For Order Directing Joint Administration Of The Debtors' Chapter 11 Cases Under Federal Rule Of Bankruptcy Procedure 1015(b) ("ROC's Joint Administration Motion"); and RBH's Emergency Motion For Order Directing Joint Administration Of The Debtors' Chapter 11 Cases Under Federal Rule Of Bankruptcy Procedure 1015(b) ("RBH's Joint Administration Motion," and collectively, the "Joint Administration Motions");

(b) Debtors' Emergency Motion For Interim Approval Of The Stipulation Authorizing Use Of Cash Collateral By Debtors, And Granting Adequate Protection (the "Interim Cash Collateral Stipulation Motion");

(c) Debtors' Emergency Application For Order Permitting Debtors To Honor Hotel Room And Other Customer Deposits And To Honor Travel Agent Commissions (the "Customer Deposits Motion");

(d) Debtors' Emergency Motion For Order Authorizing The Debtors To Honor Casino Chips And Other Gaming Liabilities (the "Casino Chips Motion");

(e) Debtors' Emergency Motion For Order (I) Authorizing The Debtors To Pay Wages, Salaries, Benefits, Reimbursable Expenses, And Employee Obligations, And (II) Authorizing And Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations (the "Wages and Employee Obligations Motion");

(f) Debtors' Emergency Motion Pursuant To 11 U.S.C. §§ 105(a) And 366 For An Order Determining That Adequate Assurance Has Been Provided To The Utility Companies (the "Utilities Motion");

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

30

(g) Debtors' <u>Emergency Motion For Order Authorizing Maintenance Of Prepetition Cash Management System And Maintenance Of Prepetition Bank Accounts</u> (the "Cash Management Motion");

(h) Debtors' <u>Application For Order Approving Employment Of The Garden City Group, Inc. As Claims And Noticing Agent</u> (the "Garden City Employment Application");

(i) Debtors' <u>Emergency Motion For Order Authorizing Debtors To Pay Pre-Petition Taxes And Fees Pursuant To 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), And 541(d)</u> (the "Taxes Motion");

(j) Debtors' <u>Emergency Motion For An Order: (I) Allowing Administrative Expense Status For Goods Received Within The Twenty Day Period Before The Petition Date, And (II) Authorizing, But Not Directing, The Debtors To Pay Such Obligations</u> (the "20 Day Administrative Expense Motion"); and

(k) Debtors' <u>Motion For Order And Approving Debtors To Employ And To Compensate Certain Professionals In The Ordinary Course Of Business</u> ("Ordinary Course Professionals Motion") and Debtors' <u>Motion For Administrative Order Establishing Procedures For Interim Monthly Compensation And Reimbursement Of Expenses Of Professionals</u> ("Professionals Interim Compensation Motion");[22]

**A.    Joint Administration Motions.**

96.    The affiliated nature of the Debtors' financial and operational relationships will enable joint administration of these Chapter 11 Cases to provide significant administrative convenience.  Moreover, the Debtors form a consolidated gaming company that focuses on gaming and associated operations.  They share the same management and are owned by the same shareholders.  The Debtors also maintain consolidated books and records, and they are generally

---

[22] Debtors acknowledge the fact that the Ordinary Course Professionals Motion and the Professionals Interim Compensation Motion do not constitute First Day Motions.  In the interest of judicial efficiency and economy, however, Debtors have determined it best to file the Ordinary Course Professionals Motion and the Professionals Interim Compensation Motion along with the First Day Motions and, as such, include in this Omnibus Declaration pertinent statements to support the Ordinary Course Professionals Motion and the Professionals Interim Compensation Motion.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

31

1    viewed as one business enterprise.

2    97.    The financial and operational relationships between the Debtors are sufficiently

3    complex that joint administration of these Chapter 11 Cases will benefit the Debtors' estates by

4    obviating the necessity of filing duplicate motions and applications, entering duplicate orders,

5    and preparing and providing duplicate notices to creditors and parties-in-interest, thus avoiding

6    unnecessary time and expense.    Additionally, given the joint and several liability of the Debtors

7    under the Senior Credit Facility and the Secured Hedging Agreement, any reorganization of

8    these Debtors will require a joint and coordinated approach including, in all probability, a jointly

9    proposed plan of reorganization.

10    **B.    Interim Cash Collateral Stipulation Motion.**

11    98.    The Debtors have an emergency need for use of the Cash Collateral and the

12    Disputed Cash Collateral in accordance with the Budget attached to the Cash Collateral

13    Stipulation, and request Court authorization on an emergency interim basis for such use in order

14    to avert an immediate closure of its businesses, which require use of all such Cash Collateral and

15    Disputed Cash Collateral for operations.    The Budget was formulated after review of the

16    Debtors' normal and ordinary course cash needs in the operation of its businesses and has the

17    approval of the Agent and the Designated Consenting Lenders.

18    99.    The Debtors, the Agent, and the Designated Consenting Lenders negotiated the

19    Cash Collateral Stipulation at arms' length and in good faith.    The Cash Collateral Stipulation is

20    in the best interests of the Debtors and their Estates.

21    100.    The Debtors are informed and believe that the enterprise value of the Debtors'

22    businesses as a going concern as of the Petition Date is less than the total amount owed under the

23    Senior Credit Facility.    The Debtors believe that the enterprise value of the Debtors' businesses

24    will not diminish provided the Debtors' businesses continue to operate in the ordinary course, the

25    Debtors are permitted to make capital expenditures as proposed in the Budget, and all gaming

26    licenses and permits, and present management remain in place.

27    101.    The Agent and the Senior Secured Creditors are the only parties with a properly

28    perfected security interest in the Cash Collateral and the Disputed Cash Collateral, and the Agent

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

32

and the Designated Consenting Lenders consent to the Debtors' use thereof, subject to the terms and conditions set forth in the Cash Collateral Stipulation. Moreover, the Debtors' immediate use of the Cash Collateral and the Disputed Cash Collateral is essential to their ongoing operations and ability to reorganize.

102.    An integral aspect of maintaining the Debtors' relationships, compliance with applicable gaming laws and regulations, and their business operations is the Debtors' ability to use the Cash Collateral and the Disputed Cash Collateral to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to their employees, customer programs, vendors, and taxing authorities, to pay for necessary ordinary course property maintenance and projects, and to maintain minimum bankroll requirements as determined by the Nevada and Colorado Gaming Authorities.

103.    The Cash Collateral Stipulation allows for the use of both Cash Collateral and Disputed Cash Collateral in accordance with the Budget attached to the Cash Collateral Stipulation while preserving the claims of the Debtors and the Agent regarding the Disputed Cash Collateral and the use of Cash Collateral. The Cash Collateral Stipulation allows the Debtors to effectively operate and maintain their businesses during the Chapter 11 Cases and is essential to an effective reorganization. By the very nature of the Debtors' gaming businesses, the amounts of cash and cash equivalents provided for in the Budget are required.

**C.    Customer Deposits Motion.**

104.    As of the Petition Date, the Debtors had hotel room reservation deposits for post-petition dates. Numerous prospective guests and other customers had placed deposits for hotel rooms they intended to occupy or facilities they intended to use. In addition, some of these hotel room reservations had been placed by travel agencies, which pursuant to commission agreements, are entitled to receive commissions when such sites are occupied and the customers pay their bills. The Debtors request that the Court enter an order permitting them without further order of this Court to honor all prepetition Customer Deposits and Travel Agent Commissions.

105.    Maintaining the satisfaction and goodwill of prospective guests and other customers is imperative to the success of any reorganization by the Debtors. If the Debtors are

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

33

1    unable to honor advance deposits for hotel room reservations, their operations will be severely

2    affected.

3        106.    Likewise, travel agents will be unlikely to direct their future customers to the

4    Debtors if prepetition deposits and commission agreements are not honored.  This would have a

5    substantial chilling effect on the operation of the Debtors' businesses.    Consequently,

6    maintaining the satisfaction and confidence of travel agents is imperative to the Debtors' on-

7    going business operations and the success of any reorganization by the Debtors.

8        107.    As of the Petition Date, the Debtors estimate that they are holding Customer

9    Deposits and Travel Agent Commissions payable for the Riviera Las Vegas in the amount of

10   $942,000, which sums are related to the hotel and convention center located at that property.

11   With respect to the Riviera Black Hawk, which operation does not include a hotel or a

12   convention center, the Debtors hold no Customer Deposits or Travel Agent Commissions.

13       108.    The Debtors have sufficient cash on hand to honor all of the foregoing obligations

14   for Customer Deposits and payable Travel Agent Commissions.  The Debtors' operations are

15   currently cash flow positive, prior to debt service, and the Debtors presently have approximately

16   $23 million either in cash or in their bank accounts as of the Petition Date.

17       109.    The relief requested in the Customer Deposits Motion is in the best interests of the

18   Debtors' estates, as it will have little, if any, economic impact on the Debtors' creditors, while

19   preserving for the creditors invaluable customer goodwill and travel agent confidence.   It is

20   necessary that this Court grant the relief requested in the Customer Deposits Motion to facilitate

21   continued operation of the Debtors' business.  The importance of the Debtors' customer loyalty

22   and the need to encourage travel agents to continue booking business for customers is critical.

23   **D.    Casino Chips Motion.**

24       110.    As Debtors derive a significant portion of their revenue from their casino

25   operations, it would be extremely detrimental to the Debtors' casino operations, and therefore, to

26   their overall results of operation if they are required to distinguish between pre and post-Petition

27   Date gaming liability and related types of liability.

28       111.    Most critically, Debtors' failure to honor all of its Gaming Liabilities would

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

34

jeopardize the Debtors' gaming licenses without which the Debtors' casino operations would cease entirely depriving the Debtors of any potential revenue generating opportunity from that aspect of their businesses.

112.    In this regard, as of the moment of the filing of the Debtors' Petitions on the Petition Date, the Gaming Liabilities included:

a.    Prepetition casino chips and tokens in the public domain, with amounts from Riviera Las Vegas being an estimated $200,000, and amounts from Riviera Black Hawk being an estimated $42,000, for a total estimated amount of $242,000 as of the Petition Date;

b.    Progressive slot liability on various gaming devices through the casinos, which represents a portion of pre-petition wagering on the applicable gaming devices that will be paid post-petition when a customer wins the appropriate jackpot, and contractual obligations with third parties operating wide area progressive systems; and

c.    Deposits placed by customers with casino cages to cover wagers, which deposits typically range from $0 to $15,000 at each property, as well as any checks[23] such as jackpots issued from the casino cage accounts, which checks on average total $5,000 at each property.

113.    Moreover, it would be extremely detrimental to the Debtors' casino operations and customer loyalty if their customer programs (the "Customer Programs") were interrupted or discontinued. Such Customer Programs include but are not limited to, player cards and slot machine player cards (such as Club Riviera discussed above), whereby individual participants accumulate points in proportion to the individual customer's wagers; as these points accumulate, participants become eligible to redeem the points for various prizes, including cash, complimentary show tickets, and complimentary meals.

114.    The requested relief is in the best interests of the Debtors' estates as it will have little, if any, economic impact upon their creditors, while preserving the value of more viable

---

[23] The Debtors undertook measures prepetition to ensure that substantially all of such outstanding checks had cleared the Debtors' accounts prepetition.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

casino operations for the creditors, as well as customer goodwill.

115.    It would be extremely harmful to the Debtors casino operations if they are required to distinguish between pre-petition and post-petition casino chips, tokens, wagers, promotions, and progressive liability. In addition to the expenses that would arise from devising and implementing a system for making such distinctions, there undoubtedly would be a chilling effect on casino operations if each such claim had to be examined for the purpose of ascertaining whether the claim arose pre or post-petition. Finally, Debtors' failure to honor Gaming Liabilities would also likely cause substantial regulatory compliance issues with their applicable gaming authorities.

116.    Especially with respect to Riviera Black Hawk, however, also true with Riviera Las Vegas, the importance of the Debtors' customer loyalty cannot be underestimated. The Debtors operate in a competitive environment where there are many casinos and slot machines open for customers to patronize. If the Debtors do not honor immediately their Gaming Liabilities incurred in the ordinary course of their businesses and continue their Customer Programs, the Debtors' customers will simply turn to the Debtors' numerous competitors to gamble. Those customers will gamble where collecting on casino chips or otherwise redeeming assets owing to them from gaming activity does not present an issue. Any such customer defection and losses in customer loyalty would be disastrous to the Debtors' prospects to successfully reorganize.

117.    The Gaming Liabilities and Customer Programs represent but a small percentage of the Debtors' total pre-petition debts, yet their satisfaction will contribute significantly to the Debtors' revenue-generating capability and toward fostering customer goodwill. Furthermore, without the requested relief, the Debtors' gaming operations will be disrupted gravely and the Debtors needlessly will be forced to incur significant expenses implementing a means of distinguishing between pre and post-Petition Date casino chips, tokens, wagers, progressive slot liabilities, deposits, and customer promotion accumulations and similar customer promotions.

118.    If the Debtors are prohibited from honoring and maintaining all casino chips, tokens and wagers in existence as of the Petition date, progressive slot liabilities and deposits,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

36

and all prepetition customer promotion accumulations and similar customer promotions, consistent with their past business practices, then customers' lost confidence will damage the Debtors' businesses to an extent that far exceeds the cost associated with honoring and continuing such practices.

**E.    Wages and Employee Obligations Motion.**

119.    As of the Petition Date, the Debtors employed approximately 1,100 full and part-time employees ("Employees") in the ordinary course of their businesses.  Continued service by the Employees is vital to the Debtors' ongoing operations.

120.    As of the Petition Date, the Employees were owed or had accrued in their favor, various sums from the Debtors for wages and salaries incurred in the ordinary course of the Debtors' business, including any prepetition compensation (collectively, the "Wage Obligations").  The total estimated amount of Wage Obligations that will have accrued, but remain unpaid, as of the Petition Date is approximately $1,025,000.  The Debtors pay their Employees on alternating bi-weekly cycles between Riviera Las Vegas and Riviera Black Hawk, meaning that Employee payroll checks are issued weekly to one of the properties.

121.    In the ordinary course of processing payroll checks for their Employees, the Debtors also withhold certain amounts for various garnishments (such as tax levies, child support, payments to bankruptcy trustees, and student loans) (collectively, the "Garnishments"), which amounts have not been forwarded yet to the respective law firms and government agencies who are tasked with collecting the funds.  As of the Petition Date, the Debtors estimate the total Garnishments withheld at approximately $2,000 per property.

122.    In addition, in the ordinary course of their businesses, the Debtors have accrued amounts for contributions to 401(k) retirement plans, health and benefit programs and voluntary insurance plans, pertaining to services rendered by the Employees prior to the Petition Date (collectively, the "Employee Benefit Plans").  These benefits include health plans (i.e. medical, dental, vision, and life insurance), flexible spending accounts for healthcare and dependent care, various welfare plans (i.e. life insurance, disability insurances, accidental death and dismemberment insurance, long-term care and critical illness insurance), and other employee

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

37

assistance programs. These employee benefit contributions (the "Employee Benefit Contributions") are an integral part of the compensation to which the Employees are entitled. The amount of Employee Benefit Contributions which will have accrued, but will remain unpaid, prior to the Petition Date are estimated to be $262,000 in nonunion contributions and $550,000 in union contributions, for a total of $812,000.

123.    The Debtors also permit Employees to accrue various paid time off, pursuant to which Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation and/or personal days, among other matters (the "Vacation Accruals"). If an Employee does not use the Vacation Accrual and subsequently leaves the Debtors' employment, he or she may receive payment for such unused Vacation Accrual. The amount of Vacation Accrual that will have accrued but will remain unpaid prior to the Petition Date is estimated to be $2,300,000 for Riviera Las Vegas and $330,000 for Riviera Black Hawk, for a total of $2,630,000.

124.    In the ordinary course of their employment, certain authorized Employees may have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of the Debtors ("Reimbursable Business Expenses"). As of the Petition Date, Employees may not have been reimbursed by the Debtors for these Reimbursable Business Expenses. The Debtors cannot provide a definitive amount of Reimbursable Business Expenses as of the Petition Date, but based upon prior business practices, would estimate that amount does not exceed $10,000.

125.    The Debtors' Chapter 11 Cases were filed during the Debtors' normal payroll periods for hourly and salaried Employees and during their normal reimbursement cycle for Employees' expenses. Employees rendered services and incurred Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations are unpaid and unreimbursed.

126.    If the Debtors are unable to take the necessary steps to ensure that wages and taxes are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that large numbers of essential Employees

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

38

1    will resign and that those Employees that remain will be discontented and demoralized.

2    127.    The Debtors' Nevada operation subject to this Motion qualifies as a self-insured

3    employer pursuant to NRS Chapters 616A through 617, and their Employees are covered under

4    their respective Certificate of Qualification for self-insured worker's compensation.    The

5    Debtors' self-insured state results in substantial cost savings to the Debtors.  The Debtors must

6    satisfy several statutory and administrative code conditions to maintain their self-insured status.

7    In particular, the Debtors must administer and pay all workers' compensation claims fairly and

8    promptly, including such claims that arose prepetition, and must maintain with the State of

9    Nevada, Department of Business and Industry, Division of Insurance, a security deposit,

10    evidence of a surety bond, and evidence of excess insurance as more specifically provided by

11    law.  Thus, the settlement and payment of workers' compensation claims, and the maintenance

12    of deposits, surety bonds, and excess insurance, are ordinary course activities for the Debtors.

13    As such, these Debtors seek the authority to settle and to pay workers' compensation claims and

14    maintain deposits, surety bonds and excess insurance.

15    128.    The Debtors have sufficient cash on hand to honor all of the foregoing employee

16    related obligations as set forth herein.  The Debtors' operations are currently cash flow positive,

17    prior to debt service, and the Debtors presently have approximately $23 million either in cash or

18    in their bank accounts as of the Petition Date.    The Debtors maintain separate payroll and

19    workers' compensation accounts (collectively, the "Accounts").  A true and correct copy of a list

20    of the Accounts is attached hereto as Exhibit "10."

21    129.    Continued payment of Wage Obligations, Employee Benefit Contributions and

22    Reimbursable Business Expenses, as well as the honoring of Vacation Accrual, and maintaining

23    the workers' compensation system, are essential to preserve the morale and to maintain positive

24    relations between the Debtors and their Employees.  If the relief requested in the Wages and

25    Employee Obligations Motion is not granted, the success of the Debtors' reorganization will be

26    placed in substantial jeopardy.  Thus, the relief request in the Wages and Employee Obligations

27    Motion is in the best interests of the Debtors' estates, creditors and parties in interest.

28    / / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

39

/ / /

**F.      Utilities Motion.**

130.    In the ordinary course of their businesses, the Debtors incur utility expenses for water, sewer service, electricity, gas, telephone service, internet service, cable television, and waste management.  These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility Providers") limited to those listed on Exhibit "2" (the "Utility Service List") attached to the Utilities Motion.[24]

131.    On average, the Debtors collectively spend approximately $682,000 each month on utility costs.  As of the Petition Date, the Debtors believe they are substantially current on their utility payments as set forth on the Utility Service List.

132.    Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Any interruption of utility services, even for a brief period of time, would disrupt the Debtors' ability to continue servicing their customers, thereby negatively impacting customer relationships, revenues and profits.  Such a result could jeopardize the Debtors' reorganizations efforts and, ultimately, value and creditor recoveries.  It is therefore critical that utility services continue uninterrupted during these Chapter 11 Cases.

133.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner.  The Debtors expect that they will have ample liquidity, based upon cash on hand and cash flow from operations, to pay their postpetition obligations to their Utility Providers.  Specifically, the Debtors' operations are currently cash flow positive, prior to debt service, and the Debtors presently have approximately $23 million either in cash on hand or in their bank accounts as of the Petition Date.

---

[24] Although the Debtors believe that the Utility Service List includes all of their Utility Providers, the Debtors reserve the right, without the need for further order of the Court, to supplement the Utility Service List if any Utility Provider has been omitted.  Additionally, the listing of an entity on the Utility Service List is not an admission that such entity is a utility within the meaning of Section 366, and the Debtors reserve the right to contest any such characterization in the future.  To the extent any of the Utility Providers identified on the Utility Service List provide services to a non-debtor entity, the Debtors do not anticipate that the procedures set forth in this motion would be applicable.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

40

134. To provide additional assurance of payment for future services to the Utility Providers, the Debtors have deposited $341,000 (a sum equal to more than 50% of the Debtors' estimated cost of their monthly utility consumption into a separate, interest-bearing account (the "Utility Deposit Account"). The Utility Deposit Account will provide still further assurance of future payment, over and above the Debtors' ability to pay for future utility services in the ordinary course of business based upon their existing cash on hand and cash flow from operations (collectively with the Utility Deposit Account, the "Proposed Adequate Assurance"). The Debtors submit that the Proposed Adequate Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

135. The proposed Procedures set forth in the Utilities Motion are necessary for the Debtors to carry out their reorganization efforts. If they are not approved, the Debtors could be forced to address a host of requests by their Utility Providers in a disorganized manner during the critical first weeks of their reorganization. Moreover, the Debtors could be blindsided by a Utility Provider unilaterally deciding--on or after the thirtieth day following the Petition Date-- that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service, particularly electricity at the Debtors' hotel and casino properties, could essentially shut down operations, and any significant disruption of operations could put the Debtors' reorganization efforts in jeopardy.

136. Prior to the Petition Date, the Debtors used their best efforts to contact all of their Utility Providers and get specific and personal contact information (i.e., not just the general Post Office box where payments are remitted) where notices of bankruptcy and this Motion could be sent, including but not limited to fax and e-mail addresses to allow for immediate delivery when such information was available.

## G.   Cash Management Motion.

137. To manage their businesses efficiently and seamlessly, the Debtors utilize a centralized cash management system (the "Cash Management System") to collect and transfer funds generated by their operations and disburse those funds to satisfy the obligations required to operate their businesses.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

138.    As part of the Cash Management System, the Debtors propose to maintain their existing bank accounts (collectively, the "Bank Accounts") post-petition.  The Bank Accounts are essential for the Debtors' continued operations.

139.    The Bank Accounts generally include as follows:  (i) main depository accounts ("General Accounts"); (ii) accounts for payment of payroll and payroll related charges ("Payroll Accounts"); (iii) accounts for the deposit of credit card payments ("Credit Card Accounts"); (iv) accounts to cover gaming winnings and jackpots ("Cage Accounts"); (v) accounts for the deposit and disbursement of workers' compensation funds ("Workers' Compensation Accounts"); (vi) accounts required by various administrative and regulatory bodies ("Regulatory Accounts"); and (vii) operating disbursement accounts ("Disbursement Accounts").

140.    The Debtors' primary source of revenue is gaming and hotel revenues.  Many of the Debtors' customers pay their bills by means of credit cards.  Thus, the Debtors also have merchant accounts with various credit card companies, such as Visa, Mastercard, and Discover, which are processed through merchant accounts (the "Merchant Accounts").  A summary detailing the Bank Accounts and the Merchant Accounts is attached hereto as Exhibit "11."  After processing the credit card customer drafts, the proceeds are deposited into the Merchant Accounts.

141.    Post-petition, the Debtors also propose to retain their current Cash Management System, Bank Accounts, and Merchant Accounts which are maintained by each of the Debtors' respective banks (collectively, the "Banks").

142.    The Debtors have been advised that it would take a substantial amount of time to obtain new Merchant Accounts from the credit card companies.  Hence, if the Debtors are not permitted to continue to use the Merchant Accounts as Debtors-in-possession, they could not offer their customers the service of allowing them to pay their bills by credit cards for whatever period of time it would take for the Debtors to obtain new Merchant Accounts.  The absence of credit card services would materially and adversely affect the Debtors' businesses.

143.    To require the Debtors to close the Bank Accounts and Merchant Accounts and to open new bank accounts and merchant accounts would cause substantial disruption and delay in

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

42

the Debtors' ongoing operations and would materially and adversely affect the Debtors' businesses. To avoid such problems and to ensure as smooth a transition into Chapter 11 as possible, it is imperative that the Debtors be permitted to continue using their Bank Accounts and Merchant Accounts.

144.   As of the Petition Date, customer drafts relating to such credit cards were in various stages of collection. To obviate the disruption that might otherwise occur in the collection process, it is in the best interest of the Debtors' estates to be authorized to continue to their ordinary course credit card transactions, rather than to close these accounts and then open new accounts.

145.   The Debtors' Cash Management System is an ordinary, usual and important business practice. The Cash Management System enables the Debtors to maintain control over the receipt and disbursement of cash, and to generate timely and accurate financial information critical to managing during the pendency of these Chapter 11 Cases. If these practices and procedures are disrupted, the Debtors' effort to reorganize may be jeopardized.

146.   The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity. Many corporate enterprises use these cash management systems because such systems provide numerous benefits. Among the most important of these benefits is the ability to control corporate funds and ensure cash availability, to reduce administrative expenses, and to have easy access to timely and accurate financial information.

147.   Establishing a new cash management system would entail significant delay and cost. At a minimum, substantial disruptions to the Debtors' business would occur by, among other things, delaying the payments to vendors, lessees, employees and customers. This would in turn harm trade creditors, consumer confidence, and employee loyalty, and would hinder the Debtors' chance to successfully reorganize.

148.   Further, maintaining the existing Cash Management System would not prejudice any party. The Debtors will maintain strict records with respect to all transfers of cash so that they are able to readily account for all transactions. The Debtors' maintenance of its existing

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

43

1   Cash Management System is not only of critical importance to the Debtors' business operations,

2   but is also in the best interest of the Debtors' estates and their creditors.

3        149.    Because the Debtors process large amounts of cash on a daily basis to facilitate

4   the unique needs of their businesses, any disruption to the Cash Management System, the Bank

5   Accounts, or the Merchant Accounts would seriously harm the Debtors and their estates.

6   **H.**    **Garden City Employment Motion.**

7        150.    The Debtors have determined that in order to carry out their duties as provided for

8   under Sections 1107 and 1108 of the Bankruptcy Code, it is necessary and in the best interest of

9   the estates to employ an experienced claims and noticing agent. The Debtors desire to employ

10   The Garden City Group, Inc. ("GCG") as their claims and noticing agent.

11        151.    The Debtors believe that engaging GCG in such capacity will expedite the service

12   of Rule 2002 notices, streamline the claims administration process, and permit the Debtors to

13   focus on their reorganization efforts.

14        152.    The Debtors respectfully submit that GCG's rates for its services in connection

15   with notice, claims processing, and solicitation services, as set forth in the engagement

16   agreement entered into by the Debtors with GCG, are competitive and comparable to the rates

17   charged by their competitors for similar services.

18   **I.**    **Taxes Motion.**

19        153.    In the ordinary course of business, the Debtors collect and incur various Taxes

20   and Fees, which are payable to the appropriate Authorities. Taxes and Fees are paid at different

21   times depending on the frequency of when each Tax and Fee must be remitted, and are paid to

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1    the relevant Authority in accordance with each Authority's requirements, including payments

2    made by check or by electronic fund transfer.[25]

3        154.    The Debtors own real and personal property located in Nevada and Colorado that

4    is subject to state and local property taxes (collectively, "Property Taxes"). Failure to pay

5    Property Taxes in the ordinary course of business may result in the imposition of statutory liens

6    on the Debtors' real and personal property. The Debtors estimate that as of the Petition Date,

7    approximately $298,000 in Property Taxes are accrued but unpaid.

8        155.    The Debtors collect from customers or incur an assortment of state and local sales

9    taxes (collectively, the "Sales Taxes"), and remit the Sales Taxes to the appropriate Authorities.

10    Sales Taxes accrue as tangible goods and services are invoiced to customers and are calculated

11    based on a statutory percentage of the sale price invoiced to the customer. If such taxes are not

12    remitted to the Authorities on a timely basis, the Authorities often impose personal liability on

13    officers of a corporation. The Debtors remit Sales Taxes on a monthly basis. The Debtors

14    estimate that as of the Petition Date, approximately $156,000 in Sales Taxes are accrued but

15    unpaid.

16        156.    The Debtors may be responsible for payment of use taxes ("Use Taxes") when

17    they purchase certain tangible personal property for use in a jurisdiction where the acquisition of

18    such property is taxable, but Sales Tax was not charged by the vendor. In such instances, the

19    Debtors are responsible for assessing upon themselves and paying the Use Taxes when

20    applicable. If such taxes are not remitted to the Authorities on a timely basis, the Authorities

21    often impose personal liability on officers of a corporation. The Debtors estimate that as of the

22    Petition Date, approximately $30,000 in Use Taxes are accrued but unpaid.

23        157.    The Debtors may be responsible for payment of gross receipts taxes and/or

24    business and occupation taxes (collectively, "Gross Receipts Taxes") which are levied against

25

26    [25] The Debtors do not seek authority to collect and pay state and federal employee withholding taxes under this
      motion, but request such authority as part of the Emergency Motion For Order: (i) Authorizing Debtors To Pay
27    Wages, Salaries, Benefits, Reimbursable Business Expenses, And Other Employee Obligations; And (ii)
      Authorizing And Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such
28    Obligations, filed concurrently herewith.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

45

1  the seller of goods or provider of services. The Debtors estimate that as of the Petition Date,

2  approximately $350,000 in Gross Receipts Taxes are accrued but unpaid, which sum is

3  comprised of approximately $75,000 in business taxes and $275,000 in room taxes.

4   158.  The Debtors may be responsible for payment of certain franchise taxes and

5  income taxes (collectively, "Franchise and Income Taxes") to the Authorities. Franchise and

6  Income Taxes have been paid through December 31, 2009 in accordance with the requirements

7  of the applicable taxing jurisdiction. Thus, the Debtors estimate that as of the Petition Date no

8  Franchise and Income Taxes remain unpaid. However, out of an abundance of caution, the

9  Debtors seek authorization to pay any accrued but unpaid Franchise and Income Taxes that may

10  be assessed during the pendency of the Chapter 11 Cases.

11   159.  The Debtors are required to obtain business licensing and pay corresponding

12  business licenses fees to remain in good standing for the purposes of conducting the Debtors'

13  business. Additionally, taxes are assessed to the Debtors or to the Debtors' customers for

14  services provided in the Debtors' business, including hotel, entertainment, liquor, gaming, and

15  similar taxes. In accordance with applicable authority, these gaming tax obligations are prepaid

16  in three month rolling estimates. Provided such requirements, the Debtors estimate that, as of the

17  Petition Date, they have accrued pre-petition gaming taxes of approximately $1,125,000.

18   160.  Various state and local laws may require the Debtors to obtain and pay fees for a

19  wide range of licenses and permits from a number of local, state, and federal regulatory agencies.

20  The amount owed, if any, for these taxes and fees is de minimis. To the extent there are pre-

21  petition amounts outstanding with respect to these taxes and fees, the Debtors request the

22  authority to pay such amounts.

23   161.  Paying Taxes and Fees will benefit the Debtors and their creditors by allowing

24  business operations to continue without interference or distraction, and to allow the Debtors to

25  operate their respective Chapter 11 Cases without interference from the Authorities. Therefore,

26  there is a valid business justification for payment of Taxes and Fees in the ordinary course of

27  business.

28   162.  Payment of Taxes and Fees will further benefit the Debtors and their creditors by

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

46

1    allowing the Debtors to continue operations without interruption and by reducing the amount and

2    priority of claims to be asserted against the Debtors' estates.  The Debtors submit that the relief

3    requested in the Taxes Motion is integral to the continuing operation of their businesses and their

4    successful reorganization, and is appropriate and consistent with the provisions of the

5    Bankruptcy Code.

6    **J.    20 Day Administrative Expense Motion.**

7    163.    The Debtors depend on a normal and regular supply of goods from various

8    vendors in the ordinary course operations of their businesses, and any interruption of such supply

9    would severely impact the Debtors' businesses and their ability to serve their customers.

10   Moreover, with respect to certain kinds of trade relationships, the Debtors may be unable to

11   obtain the necessary goods elsewhere in the marketplace and/or on competitive terms.

12   164.    In order to minimize the impact and need for this Motion, the Debtors have

13   attempted to pay in full all trade creditors prior to the Petition Date.  Notwithstanding this effort,

14   the Debtors anticipate that there may be some creditors who delivered goods that were received

15   by the Debtors within twenty (20) days before the Petition Date, which goods were sold to the

16   Debtors in the ordinary course of such Debtors' business, all within the meaning of Section

17   503(b)(9) of the Bankruptcy Code (such alleged claims, the "Priority Goods Claims" and the

18   alleged holders, the "Priority Goods Claimants").  In the Cases at hand, the Debtors estimate that

19   they may still owe approximately $300,000 to potential Priority Goods Claimants.

20   165.    The Debtors propose to pay the Priority Goods Claims held by those Priority

21   Goods Claimants that the Debtors wish to continue doing business with and who agree to

22   continue to supply goods to the Debtors on ordinary and acceptable trade terms to the Debtors.

23   If a particular Priority Goods Claimant refuses to continue doing business with the Debtors

24   and/or refuses to do so on the same or better terms as allowed prepetition, the Debtors request

25   that that they be given the discretion not to pay that Priority Goods Claimant pursuant to terms of

26   this Motion.

27   166.    First, this approach preserves the Debtors' valuable trade relationships with its

28   vendors, and allows the Debtors uninterrupted operations and a seamless transition through these

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

47

1    Chapter 11 Cases. Second, by making the payment of trade creditors discretionary, it provides

2    the Debtors with leverage to maintain these ordinary course trade terms and deter trade creditors

3    from attempting to discriminate against the Debtors with alternative trade terms going forward

4    during these Chapter 11 Cases.

5    **K.    Ordinary Course Professionals Motion and Professionals Interim Compensation Motion.**

6    

7    167.    In contrast to the size of the Debtors' business enterprise, prior to the Petition

8    Date, the Debtors employed only one in-house attorney, Tullio J. Marchionne, Esq., Riviera's

9    Secretary and General Counsel, to oversee all of the Debtors' legal matters. Based on

10   experience, the Debtors believe that employing outside counsel is more effective than retaining a

11   large in-house staff, especially because the Debtors operate in two different states. Thus, the

12   Debtors as a matter of course have relied on outside attorneys for various litigation and

13   administrative matters.

14   168.    Prior to these Chapter 11 Cases, the Debtors employed approximately seven (7)

15   outside professionals, including, but not necessarily limited to law firms and accountants, in

16   various non-bankruptcy matters (the "Ordinary Course Professionals") ranging from defending

17   "slip-and-fall" personal injury and workers' compensation suits, to providing advice on various

18   general litigation and corporate related issues, as set forth in Exhibit "2" attached thereto.

19   169.    The Debtors negotiated the financial arrangements with their Ordinary Course

20   Professionals at arm's length, and these arrangements represent the prevailing market rates for

21   such services or, in certain instances, more favorable rates than generally are available for

22   comparable services. Moreover, nearly all of the Ordinary Course Professionals have matters

23   currently pending, and thus have specialized knowledge with respect to such matters.

24   170.    The Debtors believe that none of the Ordinary Course Professionals are a

25   / / /

26   / / /

27   / / /

28   / / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

48

1  "professional person" within the meaning of Section 327 of the Bankruptcy Code, given the

2  limited nature of the services, the minimal effect of the services upon administration of the

3  Debtors' estates, and the ancillary nature of their role to the Debtors' reorganization.

4      171.    Furthermore, seeking the separate employment of each Ordinary Course

5  Professional and having to bear the added administrative cost of compensating these persons or

6  entities only pursuant to fee application procedures would be unnecessarily burdensome on and

7  costly to the Debtors' estates.

8      172.    The Debtors have sought the employment of the professionals that will play a

9  central role in the administration of the Debtors' Chapter 11 Cases and the administration of their

10 estates pursuant to the requirements of Sections 327 and 330 of the Bankruptcy Code.

11     173.    Specifically, the Debtors are in the process of seeking separate approval for the

12 retention of at least the following professionals on behalf of their estates:

| NAME | SERVICES |
|---|---|
| Gordon Silver | Reorganization Counsel |
| XRoads Solutions Group, LLC | Financial and Restructuring Advisors |
| Ernst & Young | Independent Accounting Firm |
| Brownstein Hyatt Farber Schreck | Gaming and Labor and Employment Counsel |
| Garden City Group, Inc. | Claims and Noticing Agent |

I declare under penalty of perjury of the laws of the United States that these facts are true
to the best of my knowledge and belief.

DATED this __12__ day of July, 2010.

PHILLIP B. SIMONS

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

04555-013/957657_6

49