GORDON SILVER                                          E-Filed:      9/17/10
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail:  ggordon@gordonsilver.com
THOMAS H. FELL, ESQ.
Nevada Bar No. 3717
E-mail:  tfell@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

In re:                                          **Case No.:  10-22910-LBR**

RIVIERA HOLDINGS CORPORATION                    **Chapter 11 Jointly Administered with:**

☐ Affects this Debtor.

☒ Affects all Debtors.                          10-22913-LBR     Riviera Operating Corp.
                                                10-22915-LBR     Riviera Black Hawk, Inc.
☐ Affects RIVIERA OPERATING CORPORATION

☐ Affects RIVIERA BLACK HAWK, INC.              Date:   November 8, 2010
                                                Time:  10:30 a.m.

## DISCLOSURE STATEMENT TO ACCOMPANY DEBTORS'
## SECOND AMENDED JOINT PLAN OF REORGANIZATION

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

# TABLE OF CONTENTS

Page No.

I. INTRODUCTION ................................................................................................... 1

II. INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE
    STATEMENT ........................................................................................................ 2

III. OVERVIEW ..................................................................................................... 5

    A.     Lock-up Agreement. ................................................................................ 6
    B.     Backstop Commitment Agreement. ........................................................ 8

IV. SUMMARY OF THE PLAN ........................................................................... 10

V. DISCLAIMER .................................................................................................. 16

VI. SUMMARY OF VOTING PROCESS ............................................................ 17

    A.     Who May Vote to Accept or Reject the Plan. ...................................... 17
    B.     Summary of Voting Requirements. ...................................................... 18

VII. GENERAL INFORMATION ABOUT THE DEBTORS' BUSINESS,
    RESTRUCTURING EFFORTS AND THE FILING OF THE CHAPTER 11 CASES ....... 19

    A.     The Debtors' Businesses ....................................................................... 19

          1.     Corporate Structure. ................................................................. 19

               a.     Riviera Las Vegas. ....................................... 19
               b.     Riviera Black Hawk. .................................... 21

          2.     The Debtors' Prepetition Equity and Management Structure. ........ 22

               a.     Management Structure. ................................ 23

    B.     The Debtors' Prepetition Capital Structure. ......................................... 24

          1.     Secured Hedging Agreement. ................................................... 25
          2.     Senior Credit Facility Security Documents. ............................. 26

    C.     Events Leading to the Chapter 11 Cases. ............................................. 27

          1.     Economic Pressures. ................................................................. 27
          2.     Financial Performance. ............................................................. 31

                a.     Riviera Las Vegas. ....................................... 31
               b.     Riviera Black Hawk. .................................... 32
               c.     Consolidated Figures. ................................... 33

    D.     Senior Credit Facility Defaults. ............................................................ 34

          1.     April Default Notice. ................................................................ 35
          2.     Swap Default Notice. ................................................................ 35
          3.     Early Termination Notice. ......................................................... 36

    E.     Prenegotiated Plan of Reorganization with Requisite Majority of
          Consenting Lenders. ............................................................................. 36
    F.     Backstop Commitment Agreement. ...................................................... 37
    G.     Significant Events During the Chapter 11 Cases. ................................ 37

          1.     First Day Motions. .................................................................... 38
          2.     Other Significant Motions and Post-Petition Events. ............... 39

               a.     Cash Collateral Stipulation. ......................... 39
               b.     Retention and Employment of Professionals. .............. 40

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

i

VIII. DESCRIPTION OF THE PLAN ..................................................................... 40

A.     Overview of Chapter 11................................................................... 40
B.     Treatment of Unclassified Claims Under the Plan. ......................... 42

       1.     Treatment of Administrative Claims. ................................... 42
       2.     Treatment of Priority Tax Claims. ....................................... 43

C.     Classification and Treatment of Claims and Equity Interests Under the Plan. ....................................................................................... 43

       1.     Treatment of Class 1 (Other Priority Claims)........................ 43
       2.     Treatment of Class 2 (Other Secured Claims)....................... 43
       3.     Treatment of Class 3 (General Unsecured Claims). .............. 44
       4.     Treatment of Class 4 (First Priority Senior Secured Claims). .................. 44
       5.     Treatment of Class 5 (Senior Secured Claims)..................... 45
       6.     Treatment of Class 6 (510)(b) Claims. ................................ 46
       7.     Treatment of Class 7 (Intercompany Claims). ...................... 46
       8.     Treatment of Class 8 (Equity Interests In RHC)................... 46
       9.     Treatment of Class 9 (Intercompany Equity Interests). ......... 46
       10.    Class 3 Effective Date Deposit. ........................................... 46

D.     Means For Implementation of the Plan............................................ 47

       1.     Reorganized Debtors............................................................ 47
       2.     Post-Effective Date and Pre-Substantial Consummation Date Management and Operations. ............................................ 47
       3.     The Total New Money Investment Alternative and the Partial New Money Investment Alternative. ...................................... 47
       4.     Substantial Consummation Date Events and Designated New Money Election Date Events. ............................................. 48

              a.     Substantial Consummation Date Event: ..................... 48
              b.     Designated New Money Election Date Events........... 48

       5.     Post-Substantial Consummation Date Management of Reorganized Debtors. ............................................................ 50
       6.     No Corporate Action Required. ........................................... 50
       7.     Effectuation of Transactions................................................ 51
       8.     Debtors' Organizational Documents...................................... 51
       9.     Dissolution. ........................................................................ 51

E.     Executory Contracts and Unexpired Leases. ................................... 51

       1.     Executory Contracts............................................................. 51
       2.     Approval of Assumption or Rejection................................... 52
       3.     Cure of Defaults.................................................................. 53
       4.     Post-Petition Date Contracts and Leases. ............................ 54
       5.     Bar Date. ............................................................................ 54

F.     Manner of Distribution of Property Under the Plan. ........................ 54

       1.     Distributions....................................................................... 54
       2.     No Recourse. ....................................................................... 54
       3.     Reserves. ............................................................................ 55
       4.     Statements. ......................................................................... 55

G.     Conditions to Confirmation of the Plan, the Effective Date and the Substantial Consummation Date. ............................................... 55

       1.     Condition to Confirmation.................................................... 55
       2.     Conditions to the Effective Date........................................... 56

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

3.      Conditions to the Substantial Consummation Date. ................................ 57
4.      Waiver of Conditions. ................................................................................ 57

IX. RISK FACTORS ........................................................................................................ 58

A.      The Debtors Have No Duty to Update. .................................................... 58
B.      Information Presented is Based on the Debtors' Books and Records, and is
        Unaudited. ................................................................................................. 58
C.      Projections and Other Forward-Looking Statements Are Not Assured, and
        Actual Results Will Vary. ......................................................................... 58
D.      This Disclosure Statement Was Not Approved By the SEC. ................... 58
E.      No Legal or Tax Advice is Provided to You By This Disclosure
        Statement. ................................................................................................. 59
F.      No Admissions Made. ................................................................................ 59
G.      No Waiver of Right to Object or Right to Recover Transfers and Estate
        Assets. ....................................................................................................... 59
H.      Bankruptcy Law Risks and Considerations. ............................................ 59
        1.      Confirmation of the Plan is Not Assured. .................................... 59
        2.      The Projected Value of Estate Assets Might Not Be Realized. ..... 60
        3.      Allowed Claims in the Various Classes May Exceed Projections. .......... 60
        4.      No Representations Outside of this Disclosure Statement are
                Authorized. ................................................................................... 60
I.      Gaming Law Risk Factors. ........................................................................ 61
        1.      Multiple Gaming Regulatory Jurisdictions. ................................. 61
        2.      Timely Approvals by Gaming Agencies Not Assured. ............... 61
        3.      Key Employees and Other Individual Licensees. ....................... 61
        4.      Suitability for Licensing. ............................................................. 61
        5.      Licenses Not Transferable. .......................................................... 61
        6.      Expenses of Investigation and Licensing. ................................... 62
        7.      Waivers Not Unavailable. ............................................................ 62
        8.      No Assurance of Favorable Outcome or Timing. ....................... 62
        9.      Adoption of Rules and Regulations. ............................................ 62
        10.     Interference with Debtors' Gaming Operations Prohibited. ........ 62
        11.     Continued Regulatory Supervision. ............................................ 63
        12.     Legality of Gaming. ..................................................................... 63
        13.     Additional Competition. .............................................................. 63
J.      Risks Related to the Debtors' Business Operations. ................................. 63
        1.      Effect of the Chapter 11 Cases. ................................................... 63
        2.      The Volatility and Disruption of the Capital and Credit Markets
                and Adverse Changes in the Global Economy Have Negatively
                Impacted the Debtors' Ability to Access Financing. ................... 65
        3.      The Gaming Industry Has Been Adversely Affected by the
                Economic Downturn. .................................................................... 65
        4.      The Debtors May Experience a Loss of Market Share. ............... 66
        5.      Changes to Applicable Tax Laws Could Have a Material Adverse
                Effect on the Debtors' Financial Condition. ............................... 67
        6.      The Debtors' Gaming Operations May Be Adversely Impacted if
                General Economic Conditions Continue to Decline. ................... 67
        7.      Native American Gaming Operations. .......................................... 68
        8.      Weather Conditions in Colorado. ................................................. 68
        9.      Evolving Gaming Technology. ..................................................... 68

X. CERTAIN GAMING LAW CONSIDERATIONS .................................................... 69

A.      Introduction. .............................................................................................. 69

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

| | | |
|---|---|---|
| B. | Background on Nevada Gaming Regulations. | 69 |
| C. | Relationship of Nevada Gaming Laws to Plan Transactions. | 77 |
| D. | Background on Colorado Gaming Regulations. | 78 |
| E. | Relationship of Colorado Gaming Laws to Plan Transactions. | 89 |
| F. | Summary of Gaming Regulatory Risks Under the Plan. | 90 |

XI. CERTAIN SECURITIES LAW CONSIDERATIONS ... 92

| | | |
|---|---|---|
| A. | U.S. Securities Law Matters. | 92 |
| B. | Section 1145 of the Bankruptcy Code. | 93 |
| C. | Section 4(2) of the Securities Act and Regulation D. | 97 |
| D. | Exchange Act Registration of Class B Shares. | 98 |
| E. | Restrictive Legend. | 98 |

XII. POST-SUBSTANTIAL CONSUMMATION DATE OPERATIONS ... 99

| | | |
|---|---|---|
| A. | Title to Property; Discharge; Injunction. | 99 |

| | | |
|---|---|---|
| 1. | Vesting of Assets. | 99 |
| 2. | Preservation of Litigation Claims. | 99 |
| 3. | Settlement of Litigation Claims. | 99 |
| 4. | Discharge. | 100 |
| 5. | Injunction. | 100 |
| 6. | Debtors' Releases. | 101 |
| 7. | Third Party Release. | 102 |

| | | |
|---|---|---|
| B. | Exculpation. | 103 |
| C. | Director and Officer Liability Insurance | 104 |
| D. | Indemnification. | 104 |

XIII. RETENTION OF JURISDICTION ... 105

| | | |
|---|---|---|
| A. | Jurisdiction. | 105 |

XIV. MODIFICATION AND AMENDMENT OF THE PLAN ... 107

XV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ... 107

| | | |
|---|---|---|
| A. | Introduction. | 107 |
| B. | Tax Consequences to the Debtors. | 109 |

| | | |
|---|---|---|
| 1. | Cancellation of Indebtedness Income. | 109 |

| | | |
|---|---|---|
| a. | COD Income—General Rule. | 109 |
| b. | COD Income—Issue Price and Adjusted Issue Price. | 110 |
| c. | Exceptions to COD Income Inclusion. | 111 |

| | | |
|---|---|---|
| 2. | Limitation of Net Operating Loss Carryovers and Other Tax Attributes. | 112 |

| | | |
|---|---|---|
| a. | General Section 382 Annual Limitation. | 113 |
| b. | Ownership Change. | 114 |
| c. | Bankruptcy Exceptions. | 114 |

| | | |
|---|---|---|
| 3. | Alternative Minimum Tax. | 116 |

| | | |
|---|---|---|
| C. | Tax Consequences to Certain Holders of Claims and Equity Interests. | 117 |

| | | |
|---|---|---|
| 1. | Consequences to Holders of Class 3 Claims (General Unsecured Claims). | 117 |
| 2. | Consequences to Holders of Class 4 Claims (First Priority Senior Secured Claims). | 117 |
| 3. | Consequences to Holders of Class 5 Claims (Senior Secured Claims). | 118 |

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

iv

| | | 4. | Accrued Interest. | 121 |
| | | 5. | Market Discount. | 122 |
| | | 6. | Consequences To Holders Of Class 8 Equity Interests (Equity Interests In RHC). | 123 |
| | | 7. | Consequences of Holding Working Capital Facility Notes. | 123 |
| | | 8. | Consequences of Holding Series B Term Loan Notes | 124 |
| | | 9. | Information Reporting and Backup Withholding. | 125 |

**XVI. CONFIRMATION OF THE PLAN** ............ 126

| | A. | Confirmation of the Plan. | 126 |
| | B. | Objections to Confirmation of the Plan. | 126 |
| | C. | The Best Interest Test and Feasibility of the Plan. | 127 |

| | | 1. | Best Interest of Creditors. | 127 |
| | | 2. | Valuation. | 128 |
| | | 3. | Liquidation Analysis. | 128 |
| | | 4. | Feasibility. | 131 |
| | | 5. | Confirmation of the Plan Without Acceptance By All Impaired Classes: The "Cramdown" Alternative. | 132 |
| | | 6. | Accepting Impaired Class. | 133 |
| | | 7. | Acceptance of the Plan. | 134 |
| | | 8. | Allowed Claims. | 134 |
| | | 9. | Impaired Claims and Impaired Equity Interests. | 134 |
| | | 10. | Voting Procedures. | 135 |

| | | | a. | Submission of Ballots. | 135 |
| | | | b. | Incomplete Ballots. | 135 |
| | | | c. | Withdrawal of Ballots. | 135 |
| | | | d. | Questions and Lost or Damaged Ballots. | 136 |

**XVII. MISCELLANEOUS** ............ 136

| | A. | Post-Effective Date Objections to Claims or Equity Interests. | 136 |
| | B. | Resolution of Objections After Effective Date; Distributions. | 137 |

| | | 1. | Resolution of Objections. | 137 |
| | | 2. | Distributions. | 137 |
| | | 3. | Late-Filed Claims. | 137 |
| | | 4. | Effectuating Documents; Further Transactions; Timing. | 138 |
| | | 5. | Exemption From Transfer Taxes. | 138 |
| | | 6. | Revocation or Withdrawal of the Plan. | 138 |
| | | 7. | Binding Effect. | 139 |
| | | 8. | Governing Law. | 139 |
| | | 9. | Modification of Payment Terms. | 139 |
| | | 10. | Allocation of Plan Distributions Between Principal and Interest. | 140 |
| | | 11. | Means of Cash Payment. | 140 |
| | | 12. | Providing for Claims Payments. | 140 |
| | | 13. | Set-Offs. | 141 |
| | | 14. | Notices. | 141 |
| | | 15. | Statutory Committee. | 142 |
| | | 16. | Severability. | 142 |
| | | 17. | Withholding and Reporting Requirements. | 142 |
| | | 18. | Cramdown. | 143 |
| | | 19. | Quarterly Fees to the United States Trustee. | 143 |

**XVIII. ALTERNATIVES TO THE PLAN** ............ 143

| | A. | Alternative Plans of Reorganization. | 143 |
| | B. | Liquidation Under Chapter 7. | 144 |

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

v

XIX. PREFERENCE AND OTHER AVOIDANCE ACTIONS ................................................ 144

XX. RECOMMENDATION AND CONCLUSION ................................................................ 146

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1

**APPENDIX**

2    EXHIBIT "A":  PLAN OF REORGANIZATION

3    EXHIBIT "B":  LIQUIDATION ANALYSIS

4    EXHIBIT "C":  TERM SHEET

5    EXHIBIT "D":  FINANCIAL PROJECTIONS

6    EXHIBIT "E":  BACKSTOP COMMITMENT AGREEMENT

7    EXHIBIT "F":   CASH RECEIPTS AND USAGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

vii

103000-001/956709_10.doc

# I.
## INTRODUCTION

On July 12, 2010 (the "Petition Date"), Riviera Holdings Corporation, a Nevada corporation ("RHC" or "Riviera"), Riviera Operating Corporation, a Nevada corporation ("ROC") and Riviera Black Hawk, Inc., a Colorado corporation ("RBH" and together with RHC and ROC, the "Debtors") filed petitions for relief (collectively, the "Petition") under Title 11, Chapter 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") commencing their cases (the "Chapter 11 Cases").[1]

The Debtors have prepared this Disclosure Statement in connection with the solicitation of votes on the Second Amended Joint Plan of Reorganization (the "Plan") dated September 16, 2010, proposed by the Debtors to treat the Claims of Creditors and Holders of Equity Interests in the Chapter 11 Cases.

**CAPITALIZED TERMS USED BUT NOT DEFINED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS ASCRIBED TO SUCH TERMS IN THE PLAN. IN THE EVENT OF A CONFLICT OR DIFFERENCE BETWEEN THE DEFINITIONS USED IN THIS DISCLOSURE STATEMENT AND IN THE PLAN, THE DEFINITIONS CONTAINED IN THE PLAN SHALL CONTROL.**

The Exhibits to this Disclosure Statement included in the Appendix are incorporated into, and are a part of, this Disclosure Statement. The Plan is attached as Exhibit A. Any interested party desiring further information should contact:

> Gordon Silver
> Attn: Thomas H. Fell, Esq.
> 3960 Howard Hughes Parkway, 9th Floor
> Las Vegas, Nevada 89169
> Telephone: (702) 796-5555
> Email: tfell@gordonsilver.com

Interested parties may also obtain further information from the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") at the following websites: http://www.nvb.uscourts.gov, or from the Chapter 11 Cases website at:

---

[1] Capitalized terms not otherwise defined herein shall be as defined in the Plan.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

http://www.gardencitygroup.com/cases/riviera.  Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Exhibits hereto including the Plan, and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.

## II.
## INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE STATEMENT

The objective of a case under Chapter 11 of the Bankruptcy Code ("Chapter 11") is the confirmation (i.e. approval by the bankruptcy court) of a plan of reorganization.  A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying claims against, and equity interests in, a debtor.  After a plan has been filed, the holders of claims and equity interests that are impaired (as defined in Section 1124 of the Bankruptcy Code) and receiving some cash or property on account of such claims or equity interests are permitted to vote to accept or reject the plan.  Before a debtor or other plan proponent can solicit acceptances of a plan, Section 1125 of the Bankruptcy Code requires the debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed voting decision about whether to accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtors and the Plan to enable Holders of First Priority Senior Secured Claims, Senior Secured Claims and Unsecured Claims to make an informed voting decision about whether to accept or reject the Plan.  (Holders of other Claims or Equity Interests will be deemed to have accepted or rejected the Plan, as the case may be, without the need for them to vote.)  This Disclosure Statement is being used to solicit acceptances of the Plan.  The Bankruptcy Court has found that this Disclosure Statement provides adequate information and has entered an order approving this Disclosure Statement, in accordance with Section 1125 of the Bankruptcy Code.  Approval by the Bankruptcy Court is not an opinion or ruling on the merits of the Plan and it does not mean that the Plan has been or will be approved by the Bankruptcy Court.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

2

103000-001/956709_10.doc

After the appropriate Holders of Claims and Equity Interests which are impaired and entitled to vote to accept or reject the Plan have voted, there will be a Confirmation Hearing to determine whether the Plan should be confirmed by the Bankruptcy Court.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code.  The Bankruptcy Court will also receive and consider a Ballot summary, which will present a tally of the votes cast by those Classes entitled to vote on the Plan.  Once confirmed, the Plan will be treated essentially as a contract binding on all Holders of Claims and Equity Interests and other parties-in-interest in the Chapter 11 Cases, even if they rejected the Plan.

**THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION THAT ARE INCORPORATED BY REFERENCE HEREIN (COLLECTIVELY, THE "INCORPORATED DOCUMENTS").  THE SUMMARIES CONTAINED HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE INCORPORATED DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE ACTUAL CONTENT OF ANY OF THE INCORPORATED DOCUMENTS, THE INCORPORATED DOCUMENTS SHALL GOVERN FOR ALL PURPOSES.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  THE CONFIRMATION, EFFECTIVENESS AND CONSUMMATION OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE SUBSTANTIAL CONSUMMATION DATE AS PROVIDED FOR IN THE PLAN**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

3

103000-001/956709_10.doc

1    OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS

2    IN, THE DEBTORS (INCLUDING THOSE HOLDERS WHO DO NOT VOTE ON THE

3    PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE

4    TRANSACTIONS CONTEMPLATED THEREBY.

5    THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE

6    WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE

7    3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE

8    SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.

9    THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR

10    DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE

11    COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY

12    OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

13    THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT

14    BE CONSTRUED AS, AN ADMISSION OF FACT OR LIABILITY, A STIPULATION

15    OR A WAIVER.  THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS A

16    STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO

17    CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR

18    THREATENED LITIGATION OR ACTIONS.

19    THE DEBTORS MAKE THE STATEMENTS AND PROVIDE THE FINANCIAL

20    INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF, UNLESS

21    OTHERWISE SPECIFIED.  PERSONS REVIEWING THIS DISCLOSURE

22    STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE

23    NOT CHANGED SINCE THE DATE HEREOF.

24    EACH HOLDER OF AN IMPAIRED CLAIM WHO IS ENTITLED TO VOTE

25    SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT

26    AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE

27    CASTING A BALLOT.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  ALL PERSONS DESIRING SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS ABOUT THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE OR GIVEN TO OBTAIN THEIR APPROVAL OF THE PLAN THAT DIFFER FROM, OR ARE INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.**

**THE MANAGEMENT OF EACH DEBTOR HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE ENDEAVORED TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS OTHERWISE STATED HEREIN**.

### III.
### OVERVIEW

The primary objective of the reorganization and restructuring under the Plan is to maximize returns to those Creditors entitled to recoveries from the Estates.  The Debtors desire to achieve this objective through an expeditious restructuring of both the capital structure and ownership structure of the Debtors. The restructuring is predicated upon the Debtors having determined that the value of Estates, consisting of the operations and assets of the Riviera Hotel & Casino in Las Vegas, Nevada and Riviera Black Hawk Casino in Black Hawk, Colorado, falls within a range of approximately from $207.8 million to $231.1 million as of July 1, 2010.  (See Section XVI.C.2.)

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

5

103000-001/956709_10.doc

**A.**     **Lock-up Agreement.**

On the Petition Date, prior to the commencement of these Chapter 11 Cases, the Debtors entered into a restructuring and lock-up letter agreement (the "Lock-Up Agreement") with holders (the "Consenting Secured Lenders")[2] who state that they hold, in the aggregate, in excess of 66 2/3% in the amount of all of the Senior Secured Claims under the Senior Secured Credit Agreement.    Pursuant to the Lock-Up Agreement, the Consenting Secured Lenders are contractually obligated to support the restructuring of Debtors in accordance with the Joint Plan of Reorganization of Debtors (the "Plan"). A summarization of the material terms to be implemented pursuant to the Plan are as follows:

(a)     On the Substantial Consummation Date, the existing RHC Equity Interests of the shall be cancelled and extinguished, and the Holders of RHC common stock and warrants shall receive nothing;

(b)     Each holder[3] of a First Priority Senior Secured Claim, which are Claims (i) arising under the Senior Secured Credit Agreement for prepetition interest, and (ii) with respect to the periodic payments due under the Secured Hedging Agreement and any interest accrued thereon, shall receive in full and final satisfaction of such claim its pro rata share of a loan in the principal amount of $50 million, the Series A Term Loan, the material terms of which are set forth in the Term Sheet attached hereto as Exhibit C;

(c)     Each holder of a Senior Secured Claim, which are Claims of any kind what-so-ever arising under, or related to, the Senior Secured Credit Agreement and Secured Hedging Agreement, including any unsecured deficiency Claim, other than the First Priority Senior Secured Claims, shall receive: (i) a portion of the Series A Term Loan in a principal amount up to such holder's pro rata share of the Series A Term Loan less the portion of the Series A Term

---

[2] The Consenting Secured Lenders are: SCH/VIII Bonds, LLC, SCH/VIII Bonds II, LLC, SCH/VIII Bonds III, LLC, SCH/VIII Bonds IV, LLC, Strategic Value Special Situations Master Fund LP, Cerberus Series Four Holdings, LLC, and Desert Rock Enterprises LLC.

[3] The holders of First Priority Senior Secured Claims and Senior Secured Claims, in addition to the Consenting Secured Lenders, are: Bank of America, N.A., Del Mar CLO, Ltd., CIT Lending Services Corporation, CIT Middle Market Loan Trust II, CAI Distressed Debt Opportunity Master Fund, Ltd., Community Bank of Nevada, Houssels Family Limited Partnership, Family Partners Limited Partnership, Continental Casualty Company, Plainfield Special Situations Master Fund Limited, Plainfield Special Situations Master Fund II Limited, and R2 Top Hat, Ltd.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

6

Loan received by Holders of the First Priority Senior Secured Claims; and (ii) such holder's pro rata share of 80% of the Class B Shares to be issued by Reorganized RHC;

(d)    Holders of Allowed General Unsecured Claims, other than with respect to any deficiency Claims of Holders of Senior Secured Claims, shall receive in full and final satisfaction of their Allowed General Unsecured Claims, payment in full thereof, but in no event shall the total payment to Holders of Allowed General Unsecured Claims exceed $3,000,000;

(e)    Reorganized Riviera will receive additional funding on the Substantial Consummation Date by way of the $10 Million Working Capital Facility and, subject to an affirmative election being made by Reorganized Riviera within a certain time period and various other conditions, the $20 Million Series B Term Loan, the material terms of which are set forth it the Term Sheet attached hereto as Exhibit C;

(f)    If only the Working Capital Facility is effectuated, Holders of Senior Secured Claims will receive an additional 13.0% of the Class B Shares, and Holders of Senior Secured Claims who so elect to fund their pro rata share of the Working Capital Facility will receive: (i) notes  under the Working Capital Facility; and (ii) 7% of the Class B Shares;

(g)    If both the Working Capital Facility is effectuated and the Series B Term Loan is funded, Holders of Senior Secured Claims participating in making the Series B Term Loan and the Working Capital Credit Facility shall receive: (i) a pro rata share of the Series B Term Loan; and (ii) 15% of the Class B Shares;  and (iii) penny warrants to purchase up to 10.0% of the Class B Shares;

(h)    if both the Working Capital Facility is effectuated and the Series B Term Loan is funded, the Backstop Lenders will receive 5% of the Class B Shares;

(i)    Riviera Voteco, LLC, a Nevada limited liability company, ("Voteco") shall be organized on or before the Substantial Consummation Date for the purpose of receiving the Class A Shares, being 100% of the new fully-voting common stock to be issued by Reorganized RHC pursuant to the Plan; the Holders of Class A Shares shall not be entitled to any economic distributions or other analogous or related rights vis-à-vis Reorganized RHC;

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

7

(j)     The membership interests of Voteco (the "Voteco Interests") will be issued: (i) if the Series B Term Loan is funded and the Working Capital Facility is effectuated, (A) 80.00% of the Voteco Interests ratably to those Holders of the Senior Secured Claims, (B) 15.0% of the Voteco Interests ratably to those Holders of Senior Secured Claims electing to participate in the New Money Investment, and (C) 5.0% of the Voteco Interests ratably to the certain lenders in accordance with the Backstop Commitment Agreement: or (ii) if Series B Term Loan is not funded, (A) 93.0% of the Voteco Interests ratably to Holders of the Senior Secured Claims, and (B) 7.0% of the Voteco Interests ratably to Holders of Senior Secured Claims electing to participate in Working Capital Facility; provided however, the above distributions are subject to first obtaining all applicable licensing from Gaming Authorities; and

(k)     Class B Shares shall consist of 100% of the limited-voting common shares authorized and issued by Reorganized RHC entitling the Holders thereof, in the aggregate, to 100% of the economic distributions made by Reorganized RHC; in any liquidation, dissolution or winding up of Reorganized RHC, all assets of Reorganized RHC will be distributed to holders of the Class B Shares on a pro rata basis; Holders of Class B Shares will be entitled to a separate class vote only with respect to the approval of: (i) any amendment or modification to the certificate of incorporation or bylaws of Reorganized RHC; (ii) any sale, lease or transfer of all or substantially all assets of Reorganized RHC, or any merger or consolidation of Reorganized RHC with or into another person; (iii) any liquidation, dissolution or winding up of Reorganized RHC; and (iv) any decision by Reorganized RHC to exit the gaming business.

**B.      Backstop Commitment Agreement.**

In connection with the Lock-Up Agreement, Debtors and the Backstop Lenders, which are those Senior Secured Lenders that are parties to the Backstop Agreement, executed on the Petition Date prior to the commencement of the Chapter 11 Cases the Backstop Commitment Agreement and on or about September 14, 2010 executed Amendment No. 1 to the Backstop Commitment Agreement (collectively, the "Backstop Agreement") to provide assurance that the Designated New Money Investment (subject to the Backstop Lenders and Debtors agreeing to a budget by a certain date and other conditions (the "Budget Contingency"), will be fully funded.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

8

The Backstop Agreement is attached hereto as Exhibit E.  The Backstop Agreement provides, subject to its terms and conditions, that the Backstop Lenders have committed to fund their pro rata share of the Series B Term Loan and  the Working Capital Facility, and, further, to backstop an additional percentage of the Series B Term Loan and Working Capital Facility to the extent that any Holder of a Senior Secured Claim (other than a Backstop Lender) elects not to participate according to its full pro rata share in funding the Series B Term Loan and the Working Capital Facility.  On or before September 13, 2010, the Agent will make available to the Holders of Senior Secured Claims via the Intralinks website maintained by the Agent (i) the term sheet in respect of the Series B Term Loan and Working Capital Facility (which will be further explained by the Disclosure Statement and Plan) and (ii) an election form that each Holder of Senior Secured Claims seeking to elect to participate according to its full pro rata share in funding the Series B Term Loan and Working Capital Facility must complete and return to the Agent no later than October 12, 2010.

The Backstop Agreement is subject to approval as part of the Plan. If so approved, it provides for the payment of commitment fees by Debtors as follows:

(a)    If the Budget Contingency is satisfied, the Total New Money Investment Alternative is effectuated under the Plan, the Substantial Consummation Date occurs and the Series B Term Loan is fully funded and the entire Working Capital Facility is made available, 5.0% of the Class B Shares (subject to dilution only under those certain conditions specified in the Plan) shall be fully earned, payable and non-refundable to the Backstop Lenders;

(b)    If the Budget Contingency is satisfied, but either the Backstop Agreement is terminated pursuant to its terms or the Substantial Consummation Date does not occur, $1,000,000 in cash shall be fully earned, payable and non-refundable upon such date to the Backstop Lenders; provided, however, that to the extent (i) the Backstop Agreement is materially breached by any Backstop Lender (ii) the Backstop Agreement is terminated in connection with the Lockup Agreement having been terminated solely as a result of a breach thereof by any Backstop Lender in its capacity as a Designated Consenting Lender, or (iii) the Substantial Consummation Date does not occur other than as a result of the actions and/or inactions of the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

9

103000-001/956709_10.doc

Debtors that are in breach of the Lockup Agreement, the Debtors shall not be required to pay the Backstop Lenders the $1,000,000 cash fee; and

(c)    If (i) either the Budget Contingency is not satisfied or the Budget Contingency is satisfied but the Designated New Money Election for the Series B Term Loan is not made, (ii) the Substantial Consummation Date occurs and (iii) the entire Working Capital Facility is made available as provided for in the Plan, $300,000 in cash shall be fully earned, non-refundable and payable to the Backstop Lenders.

## IV.
## SUMMARY OF THE PLAN

The following summary of the Plan is qualified in its entirety by reference to the detailed explanations in this Disclosure Statement and the Plan itself.  For a more detailed description of the Plan, see Article VIII hereof and the Plan.

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims and Priority Tax Claims are not designated as Classes under the Plan.  In general, Allowed Administrative Claims consist of the fees and costs of professionals employed on behalf of the Estates.  The Holders of such unclassified Claims will be paid in full under the Plan consistently with the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code, and they are not entitled to vote on the Plan.

The Distributions under the Plan to each Class are summarized in the following table:

| Class | Description | Treatment | Estimated Amount of Claims[4] |
|-------|-------------|-----------|------------------------------|
| Class 1: | Other Priority Claims | Unimpaired.  Paid in full in Cash.  See Section VIII.C.1. | $0.00 |
| Class 2: | Other Secured Claims | Unimpaired. Paid in full in Cash or otherwise left Unimpaired.  See Section VIII.C.2. | $138,050.50 |

---

[4] These amounts were compiled by combining the undisputed claims listed on the Debtors' bankruptcy schedules on file as of the time of the Debtors' filing of their motion to approve this Disclosure Statement.  As such, these amounts are estimates only, and may change as more proofs of claim are filed, and the adjudication or other resolution of pending contingent, unliquidated or disputed claims.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

| Class 3: | General Unsecured Claims | Impaired. Paid in full in cash not to exceed $3,000,000. See SectionVIII.C.3. | $661,024.03 |
|---|---|---|---|
| Class 4: | First Priority Senior Secured Claims | Impaired. Pro rate share of the $50,000,000 Series A Term Loan.  See Section VIII.C.4. | Up to a maximum of $25,552,044.70 (computed on the basis of the occurrence of a Substantial Consummation Date of March 31, 2010 or earlier) |
| Class 5 | Senior Secured Claims | Impaired. Dependent on whether the Total New Money Investment Alternative is effectuated or the Partial New Money Investment Alternative is effectuated.  Pro rata share of the $50,000,000 Series A Term Loan less the portion received by the First Priority Senior Secured Lenders, and pro rata of a portion of the Class B Shares See Section VIIIC.5. | Up to a maximum of $265,930,573.66 (computed on the basis of a Substantial Consummation Date of March 31, 2010 or earlier) |
| Class 6: | 510(b) Claims | Impaired. No distribution. See Section VIII.C.6. | $0.00 |
| Class 7: | Intercompany Claims | Impaired or Unimpaired; Reinstated, in full or in part or cancelled in full or in part, at the option of the Debtors. See Section VIII.C.7. | $70,000,000.00 |
| Class 8: | Equity Interests in RHC | Impaired.  No Distribution. See Section VIII.C.8. | n/a |
| Class 9: | Intercompany Equity Interests | Unimpaired.  Interests remain unaltered.  See Section VIII.C.9. | n/a |

Other Priority Claims, which consist of any and all Claims accorded priority in right of payment under Section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, are provided for in Class 1.  Allowed Claims in Class 1 ("Allowed Class 1 Claims") will be paid in

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1  full in Cash under the Plan; therefore, Holders of Allowed Class 1 Claims are Unimpaired.

2        Other Secured Claims, which consist of all Secured Claims, except First Priority Senior

3  Secured Claims, and Senior Secured Claims, and Administrative Claims and Priority Tax Claims

4  to the extent any such Claims are Secured Claims, are provided for in Class 2.  Allowed Claims

5  in Class 2 ("Allowed Class 2 Claims"), if any, will be paid in full in Cash or otherwise left

6  Unimpaired, in full and final satisfaction of such Claims.

7        General Unsecured Claims are provided for in Class 3.  Holders of Class 3 Claims are

8  Impaired.  Each Holder of an Allowed Claim that is a General Unsecured Claim ("Allowed

9  General Unsecured Claim"), other than with respect to deficiency clams arising from the Senior

10  Secured Claims, will be paid in full, but in no event shall the total payment to the holders of

11  Allowed General Unsecured Claims exceed $3,000,000 in total; it being understood that if such

12  total payment would exceed $3,000,000, holders of Allowed General Unsecured Claims shall

13  instead receive their pro rata share of $3,000,000 in satisfaction of General Unsecured Claims.

14  As set forth in Section XVI.C.3, the Debtors are projected to have sufficient Cash on hand as of

15  the Substantial Consummation Date to meet all Cash demands under the Plan, including

16  payments to Holders of Class 3 Claims on the Substantial Consummation Date and funding of

17  the Disputed Claim Reserve.

18        Since the Petition Date, Debtors have continued to review and reconcile their books and

19  records regarding unpaid prepetition claims to be paid on the Effective Date of the Plan and the

20  Substantial Consummation Date, and as a result, Debtors filed amended schedules with the Court

21  on August 30, 2010, reflecting Debtors' determination of the universe of Class 3 General

22  Unsecured Claims to be paid on the Substantial Consummation Date .  Debtors believe the

23  amount of Allowed General Unsecured Claims is $661,024.03.  This amount includes sums

24  owed pursuant to executory contracts which must be paid when such contracts are assumed

25  pursuant to the Plan on the Substantial Consummation Date.

26        In addition to these Claims which the  Debtors assume will be allowed, there are various

27  unliquidated and Disputed Claims which have or may be asserted against the Debtors for

28  personal injury or property damage arising out of the operation of Debtors' business.  The

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

12

103000-001/956709_10.doc

Debtors believe the monetary exposure for such Disputed Claims that they are aware of is minimal, and Debtors maintain insurance coverage for amounts in excess of their self insured retention for such Disputed Claims.  Notwithstanding Debtors' estimates regarding the likely damages associated with such Disputed Claims, there can be no certainty regarding the amounts of such Disputed Claims until they are ultimately settled or liquidated in the appropriate forum. Furthermore, at least one such known Holder of a Disputed Claim filed a proof of claim that asserts $2.5 million in damages for personal injuries resulting from intentional acts by employees of the Riviera which may affect the availability of insurance coverage if the Disputed Claim is found to be legitimate.

Finally, as the Bar Date for filing proofs of Claims in these Cases is not until November 24, 2010, neither the Debtors nor  the Holders of Class 3 General Unsecured Claims  can know the full extent of Allowed Claims to be treated in Class 3 until after the Bar Date has passed and the claims objection process is completed.  The proofs of claim already filed as of this date appear to equal or exceed $3.0 million.  However, these Claims include the $2.5 million Claim discussed above that the Debtors dispute and believe will be disallowed pursuant to a Claim objection.  Also, should the Debtors exercise their right to reject executory contracts and/or unexpired leases, additional Allowed Class 3 General Unsecured Claims will likely arise as a result thereof.  Thus, while Debtors believe Holders of Class 3 General Unsecured Claims will be paid 100% of their Allowed Claims, such payment may be less if the total amount of Allowed Claims in Class 3 exceeds $3,000,000 once all Claims have been filed and all Claim objections have been resolved.

For the avoidance of any doubt,  assuming that the Plan were to be confirmed at the hearing tentatively scheduled for October 19, 2010, the Effective Date would occur during the first week of November, 2010.  The Plan provides that the Substantial Consummation Date must occur within 6 months of the Effective Date.  The Designated Consenting Lenders have informed the Debtors that they believe it will take less than 6 months from the Effective Date to obtain all requisite gaming approvals.  As such, the projected Substantial Date of March 31, 2011, as set forth on Exhibit "D" attached to this Disclosure Statement, is realistic.  The projected available

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

13

103000-001/956709_10.doc

Cash on that date is $22,765,000 including the $3.0 million in Cash to be deposited into a separate account (the "Class 3 Reserve Fund") to be established on the Effective Date in consultation with the Committee under the direction and control of Debtors for the exclusive benefit of the Holders of Allowed Class 3 Claims, subject to Debtors and Reorganized Debtors' right to seek Bankruptcy Court approval to withdraw funds from the Class 3 Reserve Fund if the Debtors and/or Reorganized Debtors determine that the Allowed Class 3 Claims aggregate less than $3 million.  See Section VIII C.3. below.

Class 4 consists of First Priority Senior Secured Claims, which are all Claims arising under, or related to, the Senior Secured Credit Agreement for prepetition interest on account of the Term Loans and Revolving Credit Loans and with respect to the periodic payments due under the Secured Hedging Agreement and any interest accrued thereon, are provided for in Class 4, which is an impaired Class.  As explained in Section VIII.C.4, First Priority Senior Secured Claims shall be canceled and each Holder of Allowed First Priority Senior Secured Claims shall receive in full and final satisfaction of such Claims, a portion of the $50,000,000 Series A Term Loan in a principle amount equal to such First Priority Senior Secured Claim. Claim 4 is impaired.

Class 5 consists of Senior Secured Claims, representing all obligations of any kind whatsoever arising under, or related to, the Senior Secured Credit Agreement and Secured Hedging Agreement, other than the First Priority Senior Secured Claims.  As explained in Section VIII.C.5, Holders of Allowed Class 5 Claims will receive in full and final satisfaction of such Claims, depending on whether the Total New Money Investment Alternative is effectuated or the Partial New Money Investment Alternative is effectuated, a portion of the Series A Term Loan in a principal amount of up to such Senior Secured Lenders pro rata share of $50,000,000.00 less the portion of the Series A Term Loan received by the First Priority Senior Secured Lenders and such Senior Secured Lenders pro rata share of a portion of the Class B Shares, as more fully described herein.  Class 5 is impaired.

Section 2.11(b) of the Senior Secured Credit Agreement provides for payment of all accrued interest and fees due on the Senior Secured Claims together with all fees, premiums and

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

scheduled periodic payments  and accrued interest due under the  Secured Hedging Agreement prior to payment of the outstanding principal amount due Senior Secured Claims and any breakage, termination or other payments due under the Secured Hedging Agreement.   The treatment of Allowed Senior Secured Claims in Classes 4 and 5 has been agreed upon by the Consenting Lenders and the Holder of Claims arising under the Secured Hedging Agreement and complies with the provisions of Section 2.11(b).

Class 6 consists of 510(b) Claims, which are any Claims arising from rescission of a purchase or sale of a security of the Debtors or any affiliate of the Debtors, for damages arising from the purchase or sale of such security or for reimbursement or contribution allowed under Section 502 of the Bankruptcy Code on account of such Claim.   As explained in Section VIII.C.6, on the Substantial Consummation Date, Holders of Allowed Claims in Class 6 ("Allowed Class 6 Claims") shall not receive any distribution on account of such Claims.   Class 6 are impaired and will not be entitled to vote on the Plan.

Claims that any Debtor has against another Debtor are classified as Intercompany Claims in Class 7.   On the Substantial Consummation Date, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims of any Debtor against any other Debtor shall either be reinstated, in full or in part, or cancelled and discharged, in full or in part, in which case such cancelled and discharged portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion.   Holders of Class 7 claims shall be either Impaired or Unimpaired, not entitled to vote on the Plan and deemed to have either rejected or accepted the Plan, as applicable.

Holders of Equity Interests in RHC are in Class 8.   Holders of Class 8 Claims are Impaired.   On the Substantial Consummation Date all Equity Interests in RHC will be canceled and Holders of Claims in Class 8 will not receive or retain anything on account of their Claims. Such Holders will be deemed to have rejected the Plan without the need for their vote.

Class 9 consists of any Equity Interest in a Debtor other than RHC that is held by another Debtor or a Subsidiary of another Debtor.   All Intercompany Interests in Class 9 will be retained

/ / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

15

and will remain unaltered.  All such Equity Interests are Unimpaired.  Holders of Intercompany Interests will not be entitled to vote on the Plan.

**V.**
**DISCLAIMER**

In formulating the Plan, the Debtors relied on financial data derived from their books and records as well as the valuation of the Debtors' Assets by X-Roads Solutions Group, LLC ("X-Roads") and William Kimmel ("Kimmel"), as more particularly described in Section XVI.C.2. The Debtors represent that as of the date of this Disclosure Statement, everything stated in this Disclosure Statement is true to the best of their knowledge.  However, the Debtors cannot and do not confirm the current accuracy of the statements appearing in this Disclosure Statement.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward-looking statements," as that term is used in the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than one of historical fact, and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "estimate," "likely," "probable" or "continue" or the negative thereof or other variations thereof or comparable terminology.  All such forward-looking statements are speculative, and there are risks and uncertainties that could cause actual events or results to differ materially form those referred to in such forward-looking statements.   The liquidation analysis and distribution projections are estimates only, and the timing and amounts of actual distributions may be affected by many factors that cannot be predicted.  Therefore, any analysis, estimates or recovery projections may not turn out to be accurate.

**NOTHING IN THIS DISCLOSURE STATEMENT IS, OR SHALL BE DEEMED, AN ADMISSION OR STATEMENT AGAINST INTEREST BY THE DEBTORS FOR PURPOSES OF ANY PENDING OR FUTURE LITIGATION MATTER OR PROCEEDING.**

**ALTHOUGH THE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

16

103000-001/956709_10.doc

INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.  THE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR INFORMATION CONTAINED IN, OR OMITTED FROM, THIS DISCLOSURE STATEMENT.

THE DEBTORS AND THEIR PROFESSIONALS HAVE MADE A DILIGENT EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT AND IN THE PLAN PENDING LITIGATION CLAIMS, PROJECTED CAUSES OF ACTION AND OBJECTIONS TO CLAIMS.  HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM, PROJECTED CAUSE OF ACTION OR OBJECTION TO A CLAIM IS OR IS NOT IDENTIFIED IN THIS DISCLOSURE STATEMENT OR THE PLAN.  THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE LITIGATION CLAIMS AND PROJECTED CAUSES OF ACTION AND OBJECTIONS TO CLAIMS AFTER THE CONFIRMATION DATE, EFFECTIVE DATE OR SUBSTANTIAL CONSUMMATION DATE, IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT OR THE PLAN IDENTIFIES SUCH CLAIMS, CAUSES OF ACTION OR OBJECTIONS TO CLAIMS.

VI.
SUMMARY OF VOTING PROCESS

A.    Who May Vote to Accept or Reject the Plan.

Generally, holders of allowed claims or equity interests that are "impaired" under a plan of reorganization and who are receiving some cash or property on account of such claims or equity interests are permitted to vote on the plan.  A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor; an equity interest represents an ownership stake in a debtor.  In order to vote, a creditor or holder of an equity interest must have

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

17

103000-001/956709_10.doc

an allowed claim. The solicitation of votes on the Plan will be sought only from Holders of Allowed Claims whose Claims are Impaired and who will receive property or rights under the Plan. As explained further below, to be entitled to vote, a Person must be a Holder of a Claim that is both an "Allowed Claim" and "Impaired."

**B.    Summary of Voting Requirements.**

In order for the Plan to be confirmed, it must be accepted by at least one Impaired Class of Claims, excluding the votes of any Insiders within that Class. A Class of Claims is deemed to have accepted the Plan if and when allowed votes representing at least two-thirds in amount and a majority in number of the Claims of the Class actually voting cast votes in favor of the Plan.

A Class of Equity Interests would be deemed to have accepted the Plan if votes representing at least two-thirds in amount of the outstanding Equity Interests of the Class actually voting cast votes in favor of the Plan.

Holders of certain Impaired Classes of Claims or Equity Interests will not receive or retain anything on account of their Claims or Equity Interests. As such, they will be deemed to have voted against the Plan without the need for them to cast votes or receive voting ballots.

The Debtors are soliciting votes only from Holders of Allowed Claims in the following three Classes, which are Impaired under the Plan: Class 3 (General Unsecured Claims); Class 4 (First Priority Senior Secured Claims), and Class 5 (Senior Secured Claims).

The Debtors have the right to supplement this Disclosure Statement as to additional Impaired Classes, if any. The treatment of each Class is described in the Plan and is summarized generally in Articles IV and VIII of this Disclosure Statement.

**A VOTE FOR ACCEPTANCE OF THE PLAN BY HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. THE DEBTORS BELIEVE THAT THE TREATMENT OF HOLDERS OF GENERAL UNSECURED CLAIMS, FIRST PRIORITY SENIOR SECURED CLAIMS, AND SENIOR SECURED CLAIMS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR THEM, AND THE DEBTORS RECOMMEND THAT THE HOLDERS OF THOSE ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

18

103000-001/956709_10.doc

# VII.
## GENERAL INFORMATION ABOUT THE DEBTORS' BUSINESS, RESTRUCTURING EFFORTS AND THE FILING OF THE CHAPTER 11 CASES

**A.    The Debtors' Businesses**

   **1.    Corporate Structure.**

Riviera was incorporated in Nevada on January 27, 1993.  Riviera owns the land and buildings comprising the Riviera Hotel  Casino ("Riviera Las Vegas") and its wholly-owned subsidiary, Riviera Operating Corporation ("ROC"), owns personal property and other assets including working capital at Riviera Las Vegas and operates the Riviera Las Vegas located on Las Vegas Boulevard (the "Strip") in Las Vegas, Nevada.  Riviera Las Vegas originally opened in 1955 under different ownership.  RBH, which is a wholly-owned subsidiary of ROC, owns and operates the Riviera Black Hawk Casino ("Riviera Black Hawk"), a casino in Black Hawk, Colorado.  Riviera Black Hawk opened on February 4, 2000.

The Debtors collectively form a gaming company that owns and manages two gaming operations:  Riviera Las Vegas and Riviera Black Hawk.

   a.    Riviera Las Vegas.

Riviera Las Vegas is located on the Strip, and occupies approximately 26 acres.  Riviera Las Vegas has a long history as one of the oldest and most famous casinos on the Strip having opened originally, though, as previously stated, not through its current ownership, on April 20, 1955.  The casino has approximately 850 slot machines, 30 gaming tables, a poker room, and a race and sports book.  The hotel has 2,075 guest rooms, a convention, meeting and banquet space totaling 160,000 square feet as well as various bars and restaurants located on the premises.

Riviera Las Vegas's convention center is one of the larger convention facilities in Las Vegas and is an important feature that attracts customers.  The facility can be reconfigured for multiple meetings of small groups or large gatherings of up to 5,000 people.  The convention center offers ample convention, meeting and banquet facilities, in addition to teleconferencing, wireless internet, satellite uplink capabilities, and 12 skyboxes.

Riviera Las Vegas's casino marketing is directed at mid-level stakes gaming customers (customers that wager less on average) as opposed to high stakes customers (customers that

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

19

wager more on average).  Mid-level stakes gaming customers tend to provide the Debtors with a less volatile, more consistent gaming revenue stream.  Consistent with its focus on mid-level stakes gaming customers, Riviera Las Vegas offers lower table game limits, implements stricter credit policies, and emphasizes slot machine play.  Riviera Las Vegas's principal strategy is to continue to invest in its slot machines and table game products, market to its customer base primarily through a multi-tiered players' club program ("Club Riviera"), and to offer slot machine and poker tournaments and other special events and promotions.

Riviera Las Vegas's hotel marketing focuses on its convention customers.  To better market to these customers, most of the hotel rooms in Riviera Las Vegas were upgraded during 2007 and 2008.  The convention market consists of two groups:  (1) the trade organizations and groups that hold their events in the banquet and meeting space provided by a single hotel; and (2) those attending city-wide events, usually held at the Las Vegas Convention Center.  The Debtors target convention business because it typically provides patrons willing to pay higher room rates and allows the Debtors to capitalize on certain advance planning benefits because conventions are often booked one to two years in advance of the event date.  The Debtors also benefit from Riviera Las Vegas's proximity to the Las Vegas Convention Center as customers stay at Riviera Las Vegas to avoid the congestion that occurs during a major convention, particularly at the south end of the Strip.  In 2009, Riviera Las Vegas derived approximately 22% of its hotel occupancy and approximately 35% of its room revenues from convention customers.  Accordingly, the Debtors consider convention customers to be a critical component of their customer base.

The Debtors focus capital expenditures for Riviera Las Vegas toward maintaining the hotel rooms and amenities in sufficient condition to compete for customers in the convention and mature adult markets.  Room rental rates and slot revenues are the primary factors driving operating margins.

The Debtors use technology to maintain labor costs at a reasonable level, including kiosks for hotel check-in, slot club activities, and slot ticket redemptions.

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

b.    Riviera Black Hawk.

Riviera Black Hawk, which opened on February 4, 2000, is located in Black Hawk, Colorado, approximately 40 miles west of Denver.  Black Hawk is the largest casino market in Colorado, and Riviera Black Hawk is the first casino encountered by visitors arriving from Denver on Highway 119.  Riviera Black Hawk is comprised of a casino with approximately 750 slot machines and 8 gaming tables, a buffet, a delicatessen, a casino bar, and a ballroom with seating for approximately 200 people.  Its casino features the fourth largest number of gaming devices in the market.

Riviera Black Hawk caters primarily to the "locals" slot customer.  The Debtors attract customers to Riviera Black Hawk by implementing marketing strategies and promotions designed specifically for the Black Hawk/Central City market.  The Debtors utilize a player's club at Riviera Black Hawk, which was modeled after Club Riviera used at Riviera Las Vegas.  With the players' club program, players earn points based on gaming play, which can be redeemed for cash, food, beverages, and various other items.  Riviera Black Hawk's players' club is the Debtors' primary tool for building customer loyalty in Black Hawk.

Riviera Black Hawk benefits from strong walk-in traffic, which is primarily the result of its proximity to the Lady Luck and Isle of Capri casino properties.  The Debtors have and continue to develop specific marketing programs designed to attract these walk-in customers.

Until recently, only limited stakes gaming, which is defined as a maximum single bet of $5, was legal in the Black Hawk market.  However, on November 4, 2008, the citizens of Colorado approved Amendment 50 to the Colorado Constitution, which allowed residents of Black Hawk to vote to extend casino hours, approve additional games, and increase the maximum bet limit.[5]

On January 13, 2009, residents of Black Hawk voted to enable Black Hawk casino operators to extend casino hours, add craps and roulette gaming and increase the maximum betting limit to $100.

/ / /

---

[5] See Colo. Const. art. XVIII, § 9.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

21

On July 2, 2009, the first day permissible to implement the changes associated with the passage of Amendment 50, the Debtors increased betting limits, extended hours, and commenced roulette gaming.[6]

The Debtors focus capital expenditures for Riviera Black Hawk toward maintaining slot machines and the casino's amenities to remain competitive in the "locals" market. The Debtors also have made limited capital expenditures toward Riviera Black Hawk associated with the implementation of increased betting limits, extended hours, and new games in accordance with the approval of Amendment 50, as referenced above.

**2.    The Debtors' Prepetition Equity and Management Structure.**

Prior to June 2009, Riviera's common stock had been traded on the NYSE Amex (the "Exchange") under the symbol "RIV." Riviera's stock reached its highest price in its history at over $39 per share in June 2007. Riviera's high stock price was largely attributable to the significant increases in real estate values along the Strip throughout the past decade until stock values peaked in 2007. At such peak, a number of hotel and casino properties along the Strip had estimated real estate values in excess of $30 million per acre.

However, as discussed below, real estate values along the Strip, including that of Riviera's approximately 26 acres, have significantly declined since 2007. Corresponding with declining property values, stock prices have plummeted as well. Indeed, for the 52-week period ending March 23, 2009, the daily closing sale prices of Riviera's stock ranged from $1.05 to $21.99 per share, substantially down from the $36 per share high less than two years earlier.

On June 1, 2009, Riviera received a deficiency letter (the "Deficiency Letter") from the Exchange stating that Riviera did not meet certain of the Exchange's continued listing standards because Riviera had sustained losses, which were so substantial in relation to its overall operations or its existing financial resources, or its financial condition had become so impaired that it appeared questionable, in the opinion of the Exchange, as to whether Riviera would be able to continue operations and/or meet its obligations.

---

[6]    See Div. of Gaming, Dep't. of Revenue, State of Colorado, *available at*: http://www.colorado.gov/cs/Satellite/Rev-Gaming/RGM/1218795716371.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1    In order to maintain its listing on the Exchange, Riviera was required to submit a plan of

2    compliance to the Exchange by July 1, 2009, advising the Exchange of action it had taken, or

3    would take, that would bring Riviera into compliance with the Exchange's standards by

4    November 27, 2009.  As Riviera did not believe that it could take the steps necessary to satisfy

5    the continued listing criteria of the Exchange within the prescribed time frame, the Debtors'

6    Board of Directors approved a plan to voluntarily withdraw Riviera's common stock from

7    trading on the Exchange.  On June 5, 2009, Riviera provided notice to the Exchange of its intent

8    to voluntarily delist its common stock from the Exchange, and on June 15, 2009, Riviera filed a

9    Form 25 with the Securities and Exchange Commission (the "SEC") to inform the SEC of such

10   decision.  Trading of the Riviera's common stock on the Exchange was suspended as of the close

11   of trading on June 25, 2009.  Effective June 26, 2009, Riviera's common stock became available

12   for quotation on Pink OTC Markets, Inc. (the "Pink Sheets"), an over-the-counter electronic

13   quotation system, under the symbol "RVHL."

14   Riviera's stock price has continued to decline over the past year.  During the 52 weeks

15   ending January 6, 2010, the average closing price for Riviera's stock has fluctuated from a high

16   of $4.79 per share to a low of $0.30 per share.  As of July 7, 2010, there were 12,447,555

17   outstanding shares of common stock, $.001 par value per share.  The closing sale price of

18   Riviera's stock as of the business day prior to the Petition Date was $0.25.

19   a.    Management Structure.

20   On April 18, 2010, William L. Westerman, the Debtors' Chief Executive Officer

21   ("CEO"), President and Chairman of the Riviera Board of Directors (the "Riviera Board"),

22   passed away.  Mr. Westerman also served as CEO and Chairman of the ROC Board of Directors

23   (the "ROC Board") and CEO, President and Chairman of the RBH  Board of Directors (the

24   "RBH Board").  On April 19, 2010, the Riviera Board announced the creation of the Office of

25   the CEO on an interim basis, to perform the functions of the Riviera's CEO which is jointly held

26   by Tullio J. Marchionne, Riviera's Secretary and General Counsel and ROC's Secretary and

27   Executive Vice President; Robert A. Vannucci, the President and Chief Operating Officer of

28   ROC; and Phillip Simons, Riviera's Treasurer and Chief Financial Officer ("CFO") and ROC's

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

23

103000-001/956709_10.doc

1   Treasurer, CFO and Vice President of Finance.  Messrs. Marchionne and Vannucci and Mr.

2   Simons each continue in their current positions with the Debtors.  Additionally, Vincent L.

3   DiVito, a current member of the Riviera Board, was elected as Chairman of the Riviera Board

4   effective April 19, 2010.  Mr. DiVito is also Chairman of the Debtors' Audit Committee.  In his

5   additional capacity as Chairman, Mr. DiVito oversees the restructuring process on behalf of the

6   Riviera Board and interfaces with the Office of the CEO and the professionals retained by the

7   Debtors.

8       In addition to Mr. DiVito, the Riviera Board is comprised of Paul A. Harvey and James

9   N. Land, Jr.  The ROC Board  is comprised of the same three individuals.  The Riviera Board,

10  ROC Board and RHC Board, collectively are referred to as the "Board."

11  **B.    The Debtors' Prepetition Capital Structure.**

12      On June 8, 2007, Riviera, as borrower, and ROC, RBH, and Riviera Gaming

13  Management of Colorado, Inc., a Colorado corporation, as guarantors (collectively, the

14  "Guarantors" and together with Riviera, the "Obligors"), entered into that certain Credit

15  Agreement with the lenders party thereto (such lenders, together with their respective successors

16  and permitted assigns, are referred to hereinafter each individually as a "Prepetition Secured

17  Lender" and, collectively, as the "Prepetition Secured Lenders"), and Wachovia Bank, National

18  Association (the "Original Agent"), as administrative agent  (as the same may from time to time

19  be amended, modified, extended, restated, replaced or supplemented in accordance with the

20  terms thereof, the "Credit Agreement" and, the credit facility evidenced thereby, the "Senior

21  Credit Facility"), which prior to the Petition Date provided for, among other things, a revolving

22  credit facility of up to a maximum of $20,000,000 and a $225,000,000 term loan.  As of the

23  Petition Date, the Debtors' principal obligations outstanding under the Senior Credit Facility

24  were $2,500,000 in respect of the revolving loans made under the revolving credit facility and

25  $225,000,000 in respect of the term loan, plus accrued and unpaid interest, fees, costs and

26  expenses under the Credit Agreement to the Petition Date in the amount of $20,271,522.54

27  (collectively, the "Senior Bank Claims).

28  / / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

24

103000-001/956709_10.doc

The Senior Credit Facility contains affirmative and negative covenants customary for financings of this nature including, but not limited to, restrictions on Riviera's incurrence of other indebtedness.

The Senior Credit Facility contains events of default customary for financings of its nature including, but not limited to, nonpayment of principal, interest, fees or other amounts when due; violation of covenants; failure of any representation or warranty to be true in all material respects; cross-default and cross-acceleration under Riviera's other indebtedness or certain other material obligations; certain events under federal law governing employee benefit plans; a "change of control" of Riviera; dissolution; insolvency; bankruptcy events; material judgments; uninsured losses; actual or asserted invalidity of the guarantees or the security documents; and loss of any gaming licenses.  Some of these events of default provide for grace periods and materiality thresholds.

For purposes of these default provisions, a "change in control" of Riviera includes:  a person's acquisition of beneficial ownership of 35% or more of RHC's stock coupled with a gaming license and/or approval to direct any of RHC's gaming operations, a change in a majority of the members of the RHC Board other than as a result of changes supported by current RHC Board members or by successors who did not stand for election in opposition to the current RHC Board, or RHC's or any Guarantors failure to maintain 100% ownership of its Subsidiaries.

The Senior Credit Facility is guaranteed and secured by valid, binding, enforceable and perfected first priority security interests and liens as discussed below.

As more fully set below, Debtors believe that the enterprise value of the Debtors' businesses as a going concern as of the Petition Date is less than the total amount owed under the Senior Credit Facility. Debtors are also informed and believe that the enterprise value of the Debtors' businesses will not diminish subject to the businesses continuing to operate in the ordinary course during the pendency of these Chapter 11 Cases.

1.    **Secured Hedging Agreement.**

On March 31, 2007, Riviera and Wachovia Bank, National Association ("Wachovia"), entered into that certain ISDA Master Agreement (together with all amendments, supplements,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

25

or modifications, the "Secured Hedging Agreement"), pursuant to which such parties entered into an interest rate swap effective May 31, 2007. Prior to the Petition Date, Wachovia terminated the Secured Hedging Agreement and participated its position thereunder to Cerberus Series Four Holdings, LLC (the "Prepetition Secured Counterparty" and together with the Prepetition Secured Lenders, the "Senior Secured Creditors"). As of the Petition Date, the Debtors owed obligations outstanding under the Secured Hedging Agreement in the amount of $27,861,251.57 (the "Swap Obligation" and together with the Senior Secured Claims, the "Secured Creditor Claims").

> **2.** **Senior Credit Facility Security Documents.**

The Senior Bank Claims are secured by first priority security interests and liens (subject to only to certain Permitted Liens, as that term is used in the Credit Agreement) (the "Senior Secured Liens") granted pursuant to the following:

a. that certain Security Agreement, dated as of June 8, 2007, among the Obligors and the Original Agent (as the same may from time to time be amended, modified, extended, restated, replaced or supplemented in accordance with the terms thereof, the "Senior Credit Facility Security Agreement"), executed for the benefit of the Senior Secured Creditors, in substantially all of the Debtors' existing and after-acquired personal property (collectively, the "Prepetition Personal Property Collateral");

b. that certain Gaming Pledge Agreement, dated as of June 8, 2007, among Riviera and the Original Agent (as the same may from time to time be amended, modified, extended, restated, replaced or supplemented in accordance with the terms thereof, the "Gaming Pledge Agreement"), executed for the benefit of the Senior Secured Creditors, whereby Riviera pledged 100% of its equity interests in ROC (the "ROC Pledged Equity Interests");

c. that certain Pledge Agreement, dated as of June 8, 2007, among the Obligors, Riviera Gaming Management, Inc., a Nevada corporation ("RGM") and the Original Agent (as the same may from time to time be amended, modified, extended, restated, replaced or supplemented in accordance with the terms thereof, the "Credit Party Pledge Agreement"), executed for the benefit of the Senior Secured Creditors, whereby the Obligors and RGM

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

26

103000-001/956709_10.doc

pledged (i) 100% (or, if less, the full amount owned by such pledgor) of the issued and outstanding equity interest owned by such pledgor of each of its domestic subsidiaries (other than the equity interests of ROC pledged under the Gaming Pledge Agreement) and (ii) 65% (or, if less, the full amount owned by such pledgor) of each class of the issued and outstanding equity interest entitled to vote and 100% (or, if less, the full amount owned by such pledgor) of each class of the issued and outstanding equity interest not entitled to vote, in each case owned by such pledgor of each first-tier foreign subsidiary of such pledgor (collectively, the "Pledged Equity Interest"); and

> d.    (i) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of June 8, 2007, by and between Riviera and the Original Agent (the "Riviera Deed of Trust")  and (ii) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of June 8, 2007, by and between RBH and the Original Agent (the "RBH Deed of Trust"  and together with the Riviera Deed of Trust, as each may from time to time be amended, modified, extended, restated, replaced or supplemented in accordance with the terms thereof, the "Mortgage Instruments," and, together with the Senior Credit Facility Security Agreement, Gaming Pledge Agreement and Credit Party Pledge Agreement, the "Senior Credit Facility Security Documents" and, together with the Credit Agreement, the Secured Hedging Agreement and all loan documents identified in the Credit Agreement and the Secured Hedging Agreement or pertaining thereto, the "Senior Credit Facility Loan Documents"), in each case, for the benefit of the Senior Secured Creditors (the collateral thereunder, collectively, the "Prepetition Real Property Collateral" and together with the Prepetition Personal Property Collateral, the ROC Pledged Equity Interests, the Other Pledged Equity Interests, the "Prepetition Collateral").

## C.    **Events Leading to the Chapter 11 Cases.**

### 1.    **Economic Pressures.**

The Senior Credit Facility and the Secured Hedging Agreement, both entered into during the first half of 2007, left the Debtors highly but not unreasonably leveraged.  Under the business circumstances prevailing at the time of these transactions, such leverage would not have hindered

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

27

103000-001/956709_10.doc

the Debtors' business operations or precipitated their filing of the Chapter 11 Cases.  Shortly after these transactions, however, the economy in the United States sharply declined affecting virtually every business sector especially the hotel and gaming industry.  Since then, the United States economy has gone into a severe recession, with gaming revenues in both of the Debtors' gaming markets falling dramatically and sources of financing for the hotel and gaming industry limited, if not disappearing altogether.

Nevada, as a whole, and, particularly, Las Vegas, has been deeply affected by the current recession given its reliance on tourism and construction.    Nevada's foreclosure and unemployment rates are the highest in the country.   Moreover, Nevada has experienced dramatic decreases in tourism, convention, and gaming revenues.

According to the Abbreviated Revenue Release from the State of Nevada, Gaming Control Board, Tax and License Division (the "Revenue Release") for April 2010, which provides the most current figures available, Nevada gaming win has continued to drop sharply for the current fiscal year to date over already substantially depressed figures reported in 2009, with statewide win decreasing 4.05%, and Clark County decreasing 2.95%.

According to the Las Vegas Convention and Visitors' Authority (the "LVCVA"), visitor statistics for 2009 reflect a decrease in visitor volume from 37,481,552 in 2008 to 36,351,469 in 2009, a decrease of 3.0%.   The number of convention delegates, as well as the number of conventions held in Las Vegas in 2009 have also decreased 23.9% and 13.6%, respectively, over figures reported in 2008.   Furthermore, hotel occupancy rates have fallen from 86.0% in 2008 to 81.5% in 2009.

Riviera Las Vegas is located on the north end of the Strip in Las Vegas, Nevada.  Apart from the economic challenges discussed above facing Las Vegas and Nevada, as a whole, and the gaming industry, in particular, Riviera Las Vegas's difficulties have been compounded by other factors.  One of the primary challenges Riviera Las Vegas faces is its increasing isolation given the recent changes along the north end of the Strip.  Only a few years ago, Riviera Las Vegas was immediately surrounded by established and legendary casino properties such as the Stardust, the New Frontier, and Westward Ho.   During the recent economic boom, those

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

28

103000-001/956709_10.doc

properties and several other north Strip hotel and casino properties were sold and demolished to make way for new high-end resorts. However, as the economy rapidly declined, these anticipated new projects either halted construction or failed to start altogether.

Adjacent to Riviera Las Vegas sits the empty and unfinished Fontainebleau Las Vegas. Construction was stopped on the 68-floor hotel and casino in April 2009 with the project still needing additional exterior work and virtually all of its interior to be completed. No plans have been announced for resuming construction on the Fontainebleau Las Vegas, and it presently remains a shell pending hundreds of millions of dollars of costs to complete.

In June 2007, Boyd Gaming Corporation started construction on the estimated $4.8 billion Echelon project where the Stardust once stood. One year later, at a time when only three of the five hotel towers were steel and concrete skeletons reaching no more than eight floors, the company announced that it was stopping construction of the Echelon. The Echelon project remains in its largely unfinished condition.

The New Frontier was yet another neighboring hotel and casino property with a long and storied history that was recently demolished to make way for a new project. In May 2007, a real estate investment group purchased the New Frontier for $1.2 billion, or $33 million an acre, to make room for an estimated $5 billion development modeled after New York City's Plaza Hotel. In November 2007, the New Frontier was imploded and construction on the new project was set to commence in 2008. The new project has not commenced, and the lot where the New Frontier once stood remains vacant.

The effects of such nearby vacant lots and uncompleted projects have been considerable. Although Riviera Las Vegas has fewer neighboring competitors, there are also fewer reasons for customers to venture to the north end of the Strip. Overall, the transformation of legendary casino resorts into vacant lots and inactive construction zones has greatly reduced the vitality of the area, and the attractions and synergies that such competitors once provided have been completely eliminated. Compounding these difficulties is that Riviera Las Vegas has always relied on walk-in traffic by capitalizing on its Strip location, and its close proximity to several major casino properties as well as the Las Vegas Convention Center and several timeshare and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

29

103000-001/956709_10.doc

condominium projects.  Not only has walk-in traffic diminished due to the reduction in casinos and other attractions along the north end of the Strip, but any remaining foot traffic near Riviera Las Vegas is further reduced due to inaccessibility to the property due to construction hazards at nearby properties, streets or walkways.

Moreover, Riviera Las Vegas, like many of its remaining north Strip hotel and casino competitors such as Circus Circus, the Sahara, and the Stratosphere, focuses on the mid-level budget market - a market which has become increasingly competitive during this recession. Budget properties more centrally located on the Strip, such as the Excalibur, are currently posting operating profits due to their increased walk-in traffic and proximity to higher-end casino resorts and attractions.  Further, to attract customers, high-end and luxury properties along the Strip are competing in the mid-level market by dramatically reducing room rates.

Like Riviera Las Vegas, Riviera Black Hawk has experienced its own set of economic challenges.  Riviera Black Hawk is located in Colorado, a state that also has been affected dramatically by the current recession.  Colorado's foreclosure rate ranked 10th highest in the country for 2009 and the first quarter of 2010.  Colorado's 2009 foreclosure total, while up less than a quarter of a percent from 2008, was 28.2% higher than 2007's total.  Additionally, the unemployment rate in Colorado more than doubled from 3.8% in July 2007 to 7.8% in July 2009.  As of May 2010, the unemployment rate was 8.0%.  These statewide economic indicators are particularly relevant in the case of the Riviera Black Hawk because it relies so heavily on the "locals" clientele.

With respect to gaming revenues, the Colorado Gaming Commission reported a notable statewide 12.3% decrease in revenues for the 2008 calendar year as compared to the 2007 calendar year.   Specifically, in the Black Hawk market, from where the bulk of the statewide gaming revenues are derived, the Colorado Gaming Commission reported a 12.5% decrease in revenues in the 2008 calendar year as compared to calendar year 2007.  In 2009, however, the Colorado Gaming Commission reported a moderate comeback from the previous year's decline, as the statewide gaming revenue increased by 2.6 percent and the Black Hawk market gaming revenue increased 4.2 percent.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

Also impacting Riviera Black Hawk was the smoking ban for Colorado casinos, which became effective on January 1, 2008. See CRS § 25-14-204(1)(n). Similar smoking bans have lead to reduced revenues at casinos in other states, and the smoking ban enacted in Colorado has in fact had an adverse effect on Riviera Black Hawk's results of operations. Indeed, revenue at Colorado casinos fell 10.7% in the months after the smoking ban became effective, which represents the worst drop in the industry's history.

### 2. **Financial Performance.**

#### a. Riviera Las Vegas.

The economic pressures described above have predictably reduced the Debtors' financial performance over the past several years. Riviera Las Vegas has been particularly affected by declines in its convention and hotel business, which in turn have hurt its casino business. Riviera Las Vegas' net revenues in 2009 were $91.9 million, a decrease of $36.1 million, or 28.2%, from $128.0 million in 2008. Its revenues for the three months ended June 30, 2010 were $22.1 million, a decrease of $2.8 million, or 11.4%, from $24.9 million for the comparable period in 2009.

Riviera Las Vegas's casino revenues in 2009 were $41.2 million, a decrease of $9.4 million, or 18.6%, from $50.6 million in 2008. Its revenues for the three months ended June 30, 2010 were $10.8 million, a decrease of $1.5 million, or 12.0%, from $12.3 million for the comparable period in 2009. Casino revenues are comprised primarily of slot machine and table game revenues. Slot machine and table game revenues decreased primarily due to less wagering as a result of the slower economy, reduced hotel occupancy and less walk-in business. Slot machine win per unit per day in 2009 was $94.84, a decrease of $20.16, or 17.5%, from $115.00 in 2008. Slot machine win per unit per day for the three months ended June 30, 2010 was $108.22, a decrease of $5.96, or 5.2%, from $114.19 for the comparable period in the prior year.

Riviera Las Vegas's room revenues in 2009 were $35.5 million, a decrease of $16.9 million, or 32.4%, from $52.4 million in 2008. Room revenues for the three months ending June 30, 2010 were $8.5 million, a decrease of $0.2 million, or 1.6%, from $8.7 million for the comparable period in 2009. The decrease in room rental revenues was primarily due to a

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

31

103000-001/956709_10.doc

decrease in average daily room rates.  The average daily room rate ("ADR") was $60.60 in 2009, a decrease of $22.21, or 26.8%, from $82.81 in 2008.  For the three months ending June 30, 2010, ADR had decreased to $54.76.  Convention segment ADR was $96.41 in 2009, a decrease of $11.77, or 10.9%, from $108.18 in 2008.  For the three months ending June 30, 2010 convention segment ADR was $76.47.  The decrease in ADR was due mostly to lower leisure segment rates and a shift in the occupied room mix from higher rated convention segment occupancy to lower rated leisure segment occupancy.  Leisure and convention segment demand continues to soften due largely to increased competition as a result of additional hotel room and convention space supply and the weak economy.

Finally, hotel room occupancy per available room at Riviera Las Vegas in 2009 was 77.4% compared to 83.8% in 2008.  The 6.4% decrease in hotel room occupancy resulted in a $3.7 million decrease in room revenues.  Revenue per available room ("RevPar") is total revenue from hotel room rentals divided by total hotel rooms available for sale.  In 2009, Riviera Las Vegas' RevPar was $46.93, a decrease of $22.47, or 32.4%, from $69.40 in 2008.  For the three months ending June 30, 2010, RevPar was $46.33, an increase of $1.94, or 4.4%, from $44.39 for the comparable period in 2009.  The increase in RevPar was due to a decrease in the number of available rooms: 4.2% of total hotel rooms were unavailable during the three months ended June 30, 2010 in comparison to 1.3% during the same period in the prior year.

b.    Riviera Black Hawk.

Riviera Black Hawk's revenues are mainly derived from its casino operations as it does not have a convention center or a hotel.  Its casino revenues are comprised of revenues from slot machines and table games.  Riviera Black Hawk's net revenues in 2009 were $42.2 million, an increase of approximately $500,000, or 1.1%, from $41.7 million 2008.  Net revenues for the three months ending June 30, 2010 were $10.3 million, an increase of $0.5 million, or 5.5%, from $9.7 million for the comparable period in 2009.  The increases were primarily due to stronger casino revenues beginning in the second half of 2009 as a result of the implementation of changes permitted with the passage of Amendment 50 to the Colorado Constitution as described above.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

32

103000-001/956709_10.doc

Slot machine revenues at Riviera Black Hawk in 2009 were $39.4 million, a decrease of approximately $200,000, or 0.6%, from $39.6 million in 2008.  For the three months ending June 30, 2010, slot machine revenues increased $0.3 million, or 3.0%, to $9.6 million from $9.3 million for the comparable period in 2009.  Slot machine revenues increased largely due to increased slot market wagering, or coin-in, as a result of an overall Black Hawk market slot machine coin-in increase due to the passage of Colorado Amendment 50, as described above, and due to better weather conditions during the three months ended June 30, 2010 in comparison to the same period in the prior year.

Table game revenues at Riviera Black Hawk increased approximately $500,000 to $1.6 million in 2009 from $1.1 million in 2008.  For the three months ending June 30, 2010, table game revenues increased approximately $200,000 - to approximately $400,000 - compared to the roughly $200,000 earned during the same period in 2009.  The increases in table game revenues were mainly due to increased revenues in the second half of 2009 as a result of the implementation of increased betting limits, extended hours and roulette gaming as permitted with the passage of Amendment 50 to the Colorado Constitution as discussed above.

    c.    Consolidated Figures.

The Debtors' recent financial performance on a consolidated basis has been as follows:

|  | 6 Mos. Ended 6/30/10[7] | 6 Mos. Ended 6/30/09[8] |
|---|---|---|
| Revenues |  |  |
|     Casino | $39,707 | $42,064 |
|     Rooms | $16,965 | $19,009 |
|     Food & Beverage | $10,832 | $11,775 |
|     Entertainment | $1,807 | $3,957 |
|     Other | $2,226 | $2,948 |
| Total Revenues | $71,537 | $79,753 |
| Net Revenues | $63,149 | $69,299 |
| Depreciation & Amortization | $6,833 | $7,710 |

---

[7] Source:  Debtors' Form  10-Q for the second quarter ended June 30, 2010.  All figures in thousands except share amounts.

[8] Source:  Debtors' Form  10-Q for the second quarter ended June 30, 2010.  All figures in thousands except share amounts.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

| Total Costs and Expenses | $64,022 | $68,516 |
|---|---|---|
| Income From Operations | ($873) | $783 |
| Total Interest Expense, net | ($7,859) | ($10,149) |
| Net Income (Loss) | ($8,732) | ($14,540) |
| Earnings Per Share – Loss per share, basic and diluted | ($.70) | ($1.16) |

| EBITDA[9] | | |
|---|---|---|
| | **6 Mos. Ended 6/30/10** | **6 Mos. Ended 6/30/09** |
| Property EBITDA[10] | | |
|   Riviera Las Vegas | $3,549 | $6,868 |
|   Riviera Black Hawk | $5,077 | $5,263 |
| Other & Corporate EBITDA | ($17,358) | ($26,671) |
| Total Consolidated EBITDA | ($8,732) | ($14,540) |

## D.    Senior Credit Facility Defaults.

On February 26, 2009, the Debtors received a notice of default from the Original Agent (the "February Default Notice") with respect to the Senior Credit Facility in connection with the Debtors' failure to provide a Deposit Account Control Agreement, or DACA, from each of the Debtors' depository banks per a request made by the Original Agent to the Debtors on October 14, 2008.  The DACA that the Original Agent requested the Debtors to execute was in a form that the Debtors ultimately determined to contain unreasonable terms and conditions as it would enable the Original Agent to access all of the Debtors' operating cash and order it to be transferred to a bank account specified by the Original Agent.

On March 25, 2009, the Debtors engaged XRoads as its financial advisor.  Based on an extensive analysis of the Debtors' current and projected liquidity, the Debtors determined that it was in their best interest to not pay the accrued interest related to the Senior Credit Facility and the Secured Hedging Agreement of approximately $4 million, which was due on March 30, 2009, and $6 million, which was due on June 30, 2009.  Consequently, the Debtors elected not to make the payments.

---

[9] Source:  Debtors' Form   10-Q for the second quarter ended June 30, 2010.  All figures in thousands.

[10] Property EBITDA consists of net income plus depreciation and amortization, interest expense, impairment charges and costs associated with the retirement of assets.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1   The Debtors' failure to pay interest due on the due date was an event of default under the

2   Senior Credit Facility.  As a result of the event of default, the Senior Secured Creditors have the

3   right to seek to charge additional default interest on the Debtors' outstanding principal and

4   interest under the Credit Agreement, and automatically charge additional default interest on any

5   overdue amount under the Secured Hedging Agreement.

6   **1.      April Default Notice.**

7   On April 1, 2009, the Debtors received an additional notice of default from the Original

8   Agent (the "April Default Notice").  The April Default Notice alleged that subsequent to the

9   Debtors' receipt of the February Default Notice, additional defaults and events of default had

10   occurred and were continuing under the terms of the Credit Agreement including, but not limited

11   to:  (i) the Debtors' failure to deliver to the Original Agent audited financial statements without a

12   going concern modification; (ii) the Debtors' failure to deliver to the Original Agent a certificate

13   of an independent certified public accountant in conjunction with the Debtors' financial

14   statement; and (iii) the occurrence of a default or breach under the Secured Hedging Agreement.

15   The April Default Notice also stated that in addition to the foregoing events of default that there

16   were additional potential events of default.

17   **2.      Swap Default Notice.**

18   On April 1, 2009, the Debtors also received a Notice of Event of Default and Reservation

19   of Rights ("Hedging Agreement Default Notice") in connection with an alleged event of default

20   under the Secured Hedging Agreement.  The Hedging Agreement Default Notice alleged that: (i)

21   an event of default exists due to the occurrence of an event of default under the Credit

22   Agreement; and (ii) that the Debtors failed to make payments to Wachovia with respect to one or

23   more transactions under the Secured Hedging Agreement.

24   The Debtors have not paid such overdue amounts and the applicable grace period to make

25   payments has expired.

26   Any default under the Secured Hedging Agreement automatically results in an additional

27   default interest of 1% on any overdue amounts under the Secured Hedging Agreement.  This

28   / / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

35

103000-001/956709_10.doc

1  default rate is in addition to the interest rate that would otherwise be applicable under the

2  Secured Hedging Agreement.

3      **3.      Early Termination Notice.**

4      On July 23, 2009, the Debtors received a Notice of Early Termination for Event of

5  Default (the "Early Termination Notice") from Wachovia in connection with an alleged event of

6  default that occurred under the Secured Hedging Agreement.  The Early Termination Notice

7  alleged that an event of default had occurred and was continuing pursuant to Section 5(a)(i) and

8  5(a)(vi)(1) of the Secured Hedging Agreement.  Section 5(a)(i) of the Secured Hedging

9  Agreement addressed payments and deliveries specified under the Secured Hedging Agreement,

10  and Section 5(a)(vi)(1) of the Secured Hedging Agreement addressed cross defaults.  The Early

11  Termination Notice provided that Wachovia designated an early termination date of July 27,

12  2009 in respect of all remaining transactions governed by the Secured Hedging Agreement,

13  including an interest rate swap transaction with a trade date of May 31, 2007.

14      On July 28, 2009, in connection with the Early Termination Notice, the Debtors received

15  a Notice of Amount Due Following Early Termination from Wachovia that claimed the amount

16  due and payable to Wachovia at such time under the Secured Hedging Agreement was $26.6

17  million, which included $4.4 million in accrued interest.  As of June 30, 2010, the interest rate

18  swap liability was $22.1 million, which equals the mark to market amount reflected as due and

19  payable on the Notice of Amount Due Following Early Termination described above.

20  Additionally, accrued interest as of June 30, 2010 included $5.6 million in accrued interest

21  related to the interest rate swap comprised of $4.4 million in accrued interest as reflected on the

22  Notice of Amount Due Following Early Termination, plus $1.2 million in default interest

23  pursuant to the Secured Hedging Agreement termination.

24  **E.    Prenegotiated Plan of Reorganization with Requisite Majority of Consenting
        Lenders.**

25      On July 12, 2010, a restructuring and lock-up letter agreement (the "Lockup"), was

26  entered into by the (i) Debtors and (ii) certain Senior Secured Creditors holding more than

27  66.67% in the aggregate of the face amount of the Secured Creditor Claims (the "Consenting

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

36

103000-001/956709_10.doc

Lenders"). The Plan was attached as an Exhibit to the Lockup.  As long as the Lockup has not terminated in accordance with its terms, each Consenting Lender agrees to timely vote its Secured Creditor Claims to accept the Plan.

**F.      Backstop Commitment Agreement.**

The Debtors have been in default under the Credit Agreement since February 2009 and have been unable to make interest payments on account of the Senior Secured Claims since December 2008.  In addition, unable to make the representations and warranties necessary to draw on its revolving credit facility, in June 2009 the Debtors voluntarily reduced the commitment thereunder from $20 million to $3 million.  As such, the Debtors have been without any significant working capital facility for over eighteen months.  Without access to a working capital facility and with no alternative source of liquidity readily available, the Debtors have, out of necessity conserved their Cash and have generally limited their capital expenditures over the past 18 months solely to the necessary maintenance of Riviera Las Vegas and Riviera Blackhawk.

The Consenting Lenders believe the $20 million Designated New Money Investment and $10 million Working Capital Facility, to be provided in connection with the Plan by participating Senior Secured Lenders and backstopped in full by the Backstop Lenders in accordance with the Backstop Commitment Agreement, will provide the Debtors with additional working capital for its ordinary course operations and adequate liquidity to make not only maintenance capital expenditures, but also long overdue capital improvements to its properties, all as determined by the New Board and the post-Substantial Consummation Date management team.

**G.      Significant Events During the Chapter 11 Cases.**

The Debtors have operated their respective businesses as debtors-in-possession.  The Bankruptcy Court has certain supervisory powers over the operations of the Debtors during the pendency of the Chapter 11 Cases.  These powers are generally limited to reviewing and ruling on any objections raised by a party-in-interest to business operations or proposed transactions of a Debtor.  Except as otherwise authorized by the Bankruptcy Court, the Debtors are required to give notice of any transactions not in the ordinary course of business and of the compromise of

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

37

103000-001/956709_10.doc

any controversy to parties-in-interest who request such notice. In addition, the Bankruptcy Court supervises the employment of attorneys, accountants and other professionals.

1.    **First Day Motions.**

General Ex Parte Applications. Concurrently with the filing of the Petition, the Debtors filed various First Day Motions designed to assist the Debtors in making a smooth transition into Chapter 11, including:

i.    Omnibus Declaration Of  Phillip B. Simons In Support Of The Debtors' First Day Motions [Docket No. 15];

ii.    Emergency Motion For Order Directing Joint Administration Of The Debtors' Chapter 11 Cases Under Federal Rule Of Bankruptcy Procedure 1015(b) [Docket No. 3];

iii.    Emergency Motion Pursuant To 11 U.S.C. §§ 105(a) And 366 For An Order Determining That Adequate Assurance Has Been Provided To The Utility Companies [Docket No. 13];

iv.    Emergency Application For Order Authorizing Maintenance Of Prepetition Cash Management System And Maintenance Of Prepetition Bank Accounts [Docket No. 8];

v.    Emergency Motion For Order (I) Authorizing Debtors To Pay Wages, Salaries, Benefits, Reimbursable Business Expenses, And Other Employee Obligations; And (II) Authorizing And Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations [Docket No. 9];

vi.    Emergency Application For Order Permitting Debtors To Honor Hotel Room And Other Customer Deposits And To Honor Travel Agent Commissions [Docket No. 10];

vii.    Emergency Motion For Order Authorizing Debtors To Honor Casino Chips And Other Gaming Liabilities [Docket No. 11];

viii.    Emergency Motion Of The Debtors For An Order: (I) Allowing Administrative Expense Status For Goods Received Within The Twenty Day Period Before The

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

38

103000-001/956709_10.doc

Petition Date, And (II) Authorizing, But Not Directing, The Debtors To Pay Such Obligations [Docket No. 12];

        ix.    Application For Order Authorizing The Employment Of The Garden City Group, Inc. As Claims Administrator And Noticing Agent [Docket No. 4]; and

        x.    Emergency Motion For Interim Approval Of Stipulation Authorizing Use Of Cash Collateral By Debtors And Granting Adequate Protection And Scheduling A Final Hearing To Approve Stipulation Authorizing Use Of Cash Collateral By Debtors (the "Cash Collateral Motion") [Docket No. 6].

These First Day Motions were heard on July 15, 2010, were generally approved, and corresponding orders were subsequently entered by the Bankruptcy Court.

**2.**        **Other Significant Motions and Post-Petition Events.**

a.    <u>Cash Collateral Stipulation.</u>

The Debtors filed the Emergency Cash Collateral Motion as a First Day Motion. In the Cash Collateral Motion, the Debtors sought (i) interim approval of a Stipulation Authorizing Use of Cash Collateral By Debtors and Granting Adequate Protection And Scheduling A Final Hearing To Approve Authorizing Use of Cash Collateral By Debtors (the "Stipulation") with Cantor Fitzgerald Securities, as administrative agent under the Credit Agreement (the "Agent"), and the Designated Consenting Lenders (as defined in the Lockup) authorizing the use of Cash Collateral and Disputed Cash Collateral (as these terms are defined in the Stipulation) and (ii) after full notice and hearing, a final order approving the Stipulation during the Chapter 11 Cases. On July 19, 2010, the Bankruptcy Court entered an interim order granting the Cash Collateral Motion, which permitted the Debtors to enter into the Stipulation to allow them to use Cash Collateral and Disputed Cash Collateral as necessary to satisfy ongoing post-petition obligations, and to facilitate an effective and orderly reorganization pending a final hearing on the Stipulation, and thereafter entered a final order granting the Cash Collateral Motion and approving the Stipulation on August 16, 2010 [Docket no. 157].

/ / /

/ / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

39

b.    Retention and Employment of Professionals.

Various applications were filed for employment of professionals in connection with the Chapter 11 Cases.  Such applications included:

      i.    Debtors' application to employ Gordon Silver as general bankruptcy counsel [Docket No. 75];

      ii.    Debtors' application to employ XRoads as their advisor [Docket No. 80];

      iii.    Debtors application to employ Ernst & Young as their auditor and tax services provider [Docket no. 96]; and

      iv.    Debtors' application to employ and compensate certain professionals in the ordinary course of business [Docket No. 19] (professionals covered by this application consist of approximately 13 outside professionals whom the Debtors employed prior to filing their Chapter 11 petitions, including law firms and accountants in various non-bankruptcy matters ranging from defending personal injury and workers' compensation suits, to providing advice on various general litigation and corporate related issues).

## VIII.
## DESCRIPTION OF THE PLAN

A.    **Overview of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders.  Besides permitting the rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly-situated creditors and similarly-situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

40

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any Person acquiring property under the plan, and any creditor of, or equity holder in, the debtor, regardless of whether such creditor or equity holder (i) is impaired under, or has accepted, the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the bankruptcy court's confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes.  A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against, or interest in, a debtor.  Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote on the plan.  Any classes that would receive a distribution of property under the plan, but are not unimpaired, will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan divides Claims and Equity Interests into various Classes and sets forth the treatment for each Class.  The Debtors are also required under Section 1122 of the Bankruptcy Code to place a Claim, and Equity Interests into a particular Class only if such Claim or Equity Interest is substantially similar to other Claims and Equity Interests in such Class.  The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Equity Interest will challenge the Plan's classifications and that the Bankruptcy Court will find that

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

41

different classifications are required in order for the Plan to be confirmed.  In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court, to make reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holders are ultimately deemed members.  Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  To the extent such changes to the Plan's classification scheme is violative of the Lockup, it could result in a default under the Lockup and the release of the Consenting Lenders to support the Plan.

The Debtors (and their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of securities under the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Equity Interests.  The Debtors will make all payments and other distributions under the Plan, unless otherwise specified.

**B.**     **Treatment of Unclassified Claims Under the Plan.**

**1.**     **Treatment of Administrative Claims.**

Except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each such Holder shall be paid in full and final satisfaction of such Claim, by the applicable Debtor, or after the Substantial Consummation Date, the applicable Reorganized Debtor (or otherwise satisfied in accordance with its terms), upon the latest of:  (i) the Effective Date or as soon thereafter as

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

42

practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the fourteenth (14th) Business Day after such Claim is Allowed or as soon thereafter as practicable; (iv) the date such Claim becomes due by its terms; and (v) such date as is agreed to by the Holder of such Claim and the applicable Debtor or applicable Reorganized Debtor.

**2.      Treatment of Priority Tax Claims.**

Except to the extent a Holder of an Allowed Priority Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim, if any, will, in full and final satisfaction of such Claim, be paid in full (or be treated in compliance with Section 1129(a)(9)(C) of the Bankruptcy Code) by the applicable Debtor, or after the Substantial Consummation Date, by the applicable Reorganized Debtor on the latest of (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the fourteenth (14th) Business Day after the date on which an order allowing such Claim becomes a Final Order; or (iv) such date as is agreed to by the Holder of such Claim and the applicable Debtor or the applicable Reorganized Debtor.

**C.      Classification and Treatment of Claims and Equity Interests Under the Plan.**

**1.      Treatment of Class 1 (Other Priority Claims).**

The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims, which consist of Other Priority Claims, will be unaltered by the Plan.  Each Allowed Class 1 Claim, if any, will be paid in full by the applicable Debtor prior to the Substantial Consummation Date or applicable Reorganized Debtor thereafter upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the 14th Business Day after such Claim becomes an Allowed Claim; and (iv) such date agreed upon by the Holder of such Claim and the applicable Debtor or applicable Reorganized Debtor.

Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims will be conclusively deemed to have accepted the Plan.  Therefore, the Holders of Class 1 Claims will not be entitled to vote on the Plan.

**2.      Treatment of Class 2 (Other Secured Claims).**

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

43

favorable treatment, each Holder of an Allowed Other Secured Claim, if any, shall, in full and final satisfaction of such Claim, be paid in full in Cash or otherwise left Unimpaired by the applicable Debtor or applicable Reorganized Debtor, as the case may be, upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the fourteenth (14th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor, and after the Substantial Consummation Date, the applicable Reorganized Debtor. Creditors in Class 2 are Unimpaired under the Plan, deemed to have accepted the Plan, and are not entitled to vote on the Plan.

**3.      Treatment of Class 3 (General Unsecured Claims).**

On the Substantial Consummation Date, each holder of an Allowed General Unsecured Claim, other than with respect to deficiency claims arising from the Senior Secured Claims, will receive from the applicable Reorganized Debtor, in full satisfaction of its Allowed Claim, payment in full thereof, but in no event shall the total payment to the Holders of allowed General Unsecured Claims exceed $3,000,000 in total; it being understood that if such total payment would exceed $3,000,000, Holders of Allowed General Unsecured Claims shall instead receive their Pro Rata share of $3,000,000 in full satisfaction of their Allowed General Unsecured Claims.  On the Effective Date, Debtors shall deposit $3.0  million in the Class 3 Reserve Fund. The Class 3 Reserve Fund shall be used exclusively to pay Allowed Class 3 Claims, subject to the Debtors and Reorganized Debtors' rights to seek Bankruptcy Court approval to withdraw funds from the Class 3 Reserve Fund if the Debtors and/or Reorganized Debtors determine that the Allowed Class 3 Claims aggregate less than $3 million. Holders of Class 3 Claim are Impaired under the Plan and are entitled to vote on the Plan.

**4.      Treatment of Class 4 (First Priority Senior Secured Claims).**

The First Priority Senior Secured Claims shall be Allowed and deemed to be Allowed Claims in an amount determined by the Agent, the applicable Holders of First Priority Senior Secured Claims and the Debtors or as determined by the Court by final order and shall not be subject to any right or legal or equitable defense of any Debtor.   On the Substantial

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

44

1    Consummation Date, the First Priority Senior Secured Claims shall be cancelled and each

2    existing Holder of such Claims shall receive in full and final satisfaction of such Claims a

3    portion of the Series A Term Loan in a principal amount equal to such First Priority Senior

4    Secured Claim.  Holders of Class 4 Claims are Impaired under the Plan and are entitled to vote

5    on the Plan.

6        **5.    Treatment of Class 5 (Senior Secured Claims).**

7        The Senior Secured Claims through the Petition Date shall be Allowed and deemed to be

8    Allowed in an amount determined by the Agent, the applicable Holders of Senior Secured

9    Claims and the Debtors or as determined by the Court by final order and shall not be subject to

10    any right or legal or equitable defense of any Debtor.  On the Substantial Consummation Date,

11    the Senior Secured Claims shall, subject to the right of Holders of Senior Secured Claims to

12    receive the consideration described in the last sentence of this paragraph on account thereof, be

13    cancelled and each Holder of such Claims shall receive in full and final satisfaction of such

14    Claims:  (i) a  portion of the Series A Term Loan in a principal amount up to such Holder's Pro

15    Rata share of $50,000,000 less the portion of the Series A Term Loan received by the Holders of

16    First Priority Senior Secured Claims and (ii) such Holder's Pro Rata share of 80.0% of the Class

17    B Shares subject to dilution under certain circumstances described herein.  Further, each Holder

18    of such Claims shall receive such Holder's Pro Rata share of an additional 13.0% of the Class B

19    Shares subject to dilution under certain circumstances described herein on (i) if the Partial New

20    Money Investment Alternative is effectuated as a result of the Designated Consenting Lenders

21    being unable to unanimously agree on the terms of the Series B Term Loan Budget on or before

22    the date that is 30 days after the entry of the order approving the adequacy of the Disclosure

23    Statement, the Substantial Consummation Date and (ii) if the Partial New Money Investment

24    Alternative is effectuated as a result of the Designated New Money Election not being made, the

25    Designated New Money Election Date.

26        Holder of Class 5 Claims are Impaired under the Plan and are entitled to vote on the Plan.

27    / / /

28    / / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

45

103000-001/956709_10.doc

1

### 6.    Treatment of Class 6 (510)(b) Claims).

Holders of Section 510(b) Claims shall not receive any distribution on account of such Claims.  On the Effective Date all Section 510(b) Claims shall be discharged.  Holders of Class 6 Claims are Impaired under the Plan, not entitled to vote on the Plan and deemed to have rejected the Plan.

### 7.    Treatment of Class 7 (Intercompany Claims).

On the Substantial Consummation Date, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims of any Debtor against any other Debtor shall either be reinstated, in full or in part, or cancelled and discharged, in full or in part, in which case such cancelled and discharged portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion. Holders of Class 7 Claims shall be either Impaired or Unimpaired, not entitled to vote on the Plan and deemed to have either rejected or accepted the Plan, as applicable.

### 8.    Treatment of Class 8 (Equity Interests In RHC).

On the Substantial Consummation Date, all Class 8 Equity Interests in RHC shall be cancelled and Holders of Class 8 Equity Interests shall not receive any distribution on account of such Equity Interests.  Holders of Class 8 Equity Interests in RHC are Impaired under the Plan, not entitled to vote on the Plan and deemed to have rejected the Plan.

### 9.    Treatment of Class 9 (Intercompany Equity Interests).

Except as otherwise provided in the Plan,  Intercompany Equity Interests shall be retained and the legal, equitable, and contractual rights to which the Holders of such Intercompany Equity Interests are entitled shall remain unaltered.  Holders of Class 9 Intercompany Equity Interests are Unimpaired under the Plan and are not entitled to vote on the Plan.

### 10.    Class 3 Effective Date Deposit.

On the Effective Date, Debtors shall establish the "Class 3 Reserve Fund for the exclusive benefit of the Holders of Allowed Class 3 Claims.  After the later of the Effective Date and the Bar Date, and subject to the provisions of Section 13.2 below, the Debtors and Reorganized Debtors, as applicable, reserve the right to seek Bankruptcy Court approval to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

46

withdraw funds from the Class 3 Reserve Fund if it determines that the Allowed Class 3 Claims aggregate less than $3 million.

**D.      Means For Implementation of the Plan.**

      **1.      Reorganized Debtors.**

Except as provided for in the Plan, the Reorganized Debtors shall continue to exist after the Substantial Consummation Date as separate entities in accordance with applicable law. Where applicable, the existing articles of incorporation and bylaws or articles of organization and operating agreements will continue in effect following the Substantial Consummation Date, except to the extent that such articles of incorporation and bylaws or articles of organization and operating agreements are amended in conformance with the Plan, or by proper corporate actions implemented after the Substantial Consummation Date.

      **2.      Post-Effective Date and Pre-Substantial Consummation Date Management and Operations.**

From the Effective Date until the Substantial Consummation Date, the Debtors will continue to be managed by the existing managers, officers and directors under their existing employment agreements regarding the management of operations, maintenance of working capital and utilization of cash flows of the Reorganized Debtors, all in accordance with applicable Gaming Laws and the Budget (as defined in the Cash Collateral Stipulation). The Debtors and, after the Substantial Consummation Date, Reorganized Debtors, shall be responsible for the payment of all Allowed Claims to be paid pursuant to the Plan which are not paid on or before the Substantial Consummation Date, as well as all Allowed Claims, including Taxes and Professional Fees, incurred by the Debtors.

      **3.      The Total New Money Investment Alternative and the Partial New Money Investment Alternative.**

The Plan provides for potential implementation of one of two financing alternatives: (1) the Total New Money Investment Alternative or (2) the Partial New Money Investment Alternative. In the event (a) the Designated Consenting Lenders have unanimously agreed upon the terms of the Series B Term Loan Budget on or before the date that is 30 days after the entry of the order approving the adequacy of this Disclosure Statement and (b) the Designated New

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

47

Money Election is made, the Total New Money Investment Alternative shall be effectuated hereunder. If, however, (x) the Designated Consenting Lenders are unable to unanimously agree on the terms of the Series B Term Loan Budget on or before the date that is 30 days after the entry of the order approving the adequacy of the Disclosure Statement or (y) the Designated Consenting Lenders unanimously so agree but the Designated New Money Election is not made, the Partial New Money Investment Alternative shall be effectuated hereunder instead of the Total New Money Investment Alternative.

**4.**    **Substantial Consummation Date Events and Designated New Money Election Date Events.**

a.    Substantial Consummation Date Event:

i.    The Working Capital Facility shall be consummated, (ii) the First Lien Credit Agreement shall be executed and delivered and (iii) each Senior Secured Lender will receive its ratable share of notes evidencing the Series A Term Loan and each Senior Secured Lender electing to participate in the Working Capital Facility will receive its ratable share of notes evidencing the Revolving Loans outstanding from time to time under the Working Capital Facility;

ii.    Reorganized RHC shall issue 100% of the Class A Shares to Riviera Voteco, L.L.C.; and

iii.    Reorganized RHC shall issue (i) 80% of the Class B Shares ratably to Holders of Senior Secured Claims, (ii) 7.0% of the Class B Shares ratably to those certain Senior Secured Lenders electing to participate in the Working Capital Facility and (iii) if the Partial New Money Investment Alternative is effectuated as a result of the Designated Consenting Lenders being unable to unanimously agree on the terms of the Series B Term Loan Budget on or before the date that is 30 days after the entry of the order approving the adequacy of the Disclosure Statement, 13.0% of the Class B Shares ratably to Holders of Senior Secured Claims.

b.    Designated New Money Election Date Events.

i.    In the event the Total New Money Investment Alternative is

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

effectuated, (i) the Series B Term Loan shall be consummated, (ii) the Second Lien Credit Agreement shall be executed and delivered and (iii) each Senior Secured Lender electing to participate in the Series B Term Loan will receive its ratable share of notes evidencing the Series B Term Loan, which shall be issued and delivered in accordance with the Credit Facilities, and penny warrants to purchase up to 10.0% of the Class B Shares (it being understood that such penny warrants shall result in dilution of the amount of Class B Shares received by all Holders of Senior Secured Claims under Section VIII.C.5 above and otherwise received by those certain Senior Secured Lenders as consideration for participating in the New Money Investment);

ii.    Riviera Voteco, L.L.C. shall issue (i) if the Total New Money Alternative is effectuated, (A) 80.0% of its membership interest (the "Voteco Interest") ratably to the Holders of Senior Secured Claims or their designees, as applicable, (B) 15.0% of the Voteco Interests ratably to those Holders of Senior Secured Claims (including, without limitation, the Backstop Lenders) electing to participate in the New Money Investment or their designees, as applicable, and (C) 5.0% of the Voteco Interests ratably to the Backstop Lenders in accordance with the Backstop Commitment Agreement or their designees, as applicable; or (ii) if the Partial New Money Investment Alternative is effectuated: (A) 93.0% of the Voteco Interest ratably to the Holders of Senior Secured Claims or their designees, as applicable, and (B) 7.0% of the Voteco Interests ratably to those Holders of Senior Secured Claims (including, without limitation, the Backstop Lenders) electing to participate in the New Money Investment or their designees, as applicable; provided, however, that in the case of both clause (i) and (ii) above, any such Holder (or, if applicable, designated Person) which fails to obtain necessary licenses under the Gaming Laws on or prior to the Designated New Money Election Date shall, instead of receiving Voteco Interest, receive penny warrants to purchase such Person's ratable share of the Voteco Interest immediately upon such Person becoming so licensed; and

iii.    Reorganized RHC shall issue, (i) if the Total New Money Investment Alternative is effectuated: (A) 8% of the Class B Shares ratably to those Holders of Senior Secured Claims electing to participate in the New Money Investment; and (B) 5% of the Class B Shares ratably to the Backstop Lenders in accordance with the Backstop Commitment

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

49

Agreement and (ii) if the Partial New Money Investment is effectuated as a result of the Designated New Money Election not being made, 13.0% of the Class B Shares ratably to Holders of Senior Secured Claims.

**5.      Post-Substantial Consummation Date Management of Reorganized Debtors.**

The Consenting Lenders will disclose, no later than two weeks prior to the Confirmation Hearing, the identity and affiliations of each Person proposed to serve on the New Board and each initial board of directors of each other Reorganized Debtor, and, to the extent such Person is an insider other than by virtue of being a director, the nature of any compensation for such Person.  The Consenting Lenders will further disclose at such time the identity of the Person proposed to be the Chief Executive Officer of Reorganized RHC.  The directors of Reorganized RHC will be selected by Voteco, which will hold 100% of the Class A Shares of Reorganized RHC.  Each such director and officer shall serve from and after the Substantial Consummation Date pursuant to applicable law (including, without limitation, gaming and licensing approvals) and the terms of the organizational documents of the applicable Reorganized Debtors.

**6.      No Corporate Action Required.**

As of the Effective Date and Substantial Consummation Date, as the case may be: (i) the adoption, execution, delivery and implementation or assignment of all contracts, leases, instruments, releases and other agreements related to or contemplated by the Plan; and (ii) the other matters provided for under or in furtherance of the Plan involving corporate action to be taken by or required of each Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the officers of each Debtor.  Without limiting the foregoing, the adoption of the new and/or amended organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors, and all other actions contemplated by or described in the Plan with respect thereto, shall be authorized and approved and be binding and in full force and effect in all respects (subject to the provisions of the Plan and the Confirmation Order), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule (other than filing such

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

organizational documents with the applicable governmental unit as required by applicable law) or the vote, consent, authorization or approval of any Person.

### 7. Effectuation of Transactions.

On the Effective Date, the Substantial Consummation Date or Designated New Money Election Date, as applicable, the appropriate officers of the Debtors and the Reorganized Debtors and members of their respective boards of directors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan to be effectuated on the Effective Date, the Substantial Consummation Date or the Designated New Money Election Date, as applicable, in the name of and on behalf of the Debtors and Reorganized Debtors, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

### 8. Debtors' Organizational Documents.

As of the Substantial Consummation Date, the certificates or articles of incorporation and by-laws or other organizational documents of each of the Debtors shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code, and shall; (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting, the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.

### 9. Dissolution.

On the Substantial Consummation Date, Debtors' affiliates Riviera Gaming Management, Inc. and Riviera Gaming Management of Colorado, Inc., shall be dissolved.

### E. Executory Contracts and Unexpired Leases.

### 1. Executory Contracts.

Except for Executory Contracts and Unexpired Leases specifically addressed in the Plan or set forth on the schedule of Rejected Executory Contracts and Unexpired Leases attached as

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

51

Schedule 7.1 thereto (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order only with the approval of the Debtors and the Requisite Consenting Lenders), all Executory Contracts and Unexpired Leases that exist on the Confirmation Date shall be deemed assumed by the applicable Debtor on the Effective Date. Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on Schedule 7.1 hereto, nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease hereunder.

2. **Approval of Assumption or Rejection.**

Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption by the applicable Debtor of each Executory Contract and Unexpired Lease to which a Debtor is a party not listed on Schedule 7.1, not otherwise provided for in the Plan and neither assumed, assumed and assigned nor rejected by separate order prior to the Effective Date; and (ii) rejection by the Debtor of each Executory Contract and Unexpired Lease to which such Debtor is a party listed on Schedule 7.1. Upon the Effective Date, each counter party to an assumed Executory Contract or Unexpired Lease shall be deemed to have consented to assumption contemplated by Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption.  To the extent applicable, all Executory Contracts or Unexpired Leases of Reorganized Debtors assumed pursuant to this Section 7 shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by the confirmation of the Plan.

/ / /

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

52

### 3.    Cure of Defaults.

The applicable Debtor shall Cure any defaults in respect of each Executory Contract or Unexpired Lease assumed pursuant to this Section 7 upon the latest of (i) the Effective Date or as soon thereafter as practicable; (ii) such dates as may be fixed by the Bankruptcy Court or agreed upon by such Debtor, and after the Substantial Consummation Date, the Reorganized Debtor; or (iii) the fourteenth (14th) Business Day after the entry of a Final Order resolving any dispute regarding (a) a Cure amount; (b) the ability of the Debtor or the Reorganized Debtor to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease assumed pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; or (c) any matter pertaining to assumption, assignment or the Cure of a particular Executory Contract or an Unexpired Lease.  Schedule 7.3 to the Plan lists the Debtors' proposed Cure amounts, if any, that will be paid as provided for above, which Schedule 7.3 may be amended up to and including the five (5) days prior to the commencement of the Confirmation Hearing.

Any party to an Executory Contract or Unexpired Lease who objects to the listed Cure amounts must file and serve an objection on Debtors counsel no later than thirty (30) days after the Effective Date. Failure to file and serve a timely objection shall be deemed consent to the Cure amounts listed on Schedule 7.3.  Any Cure amounts shall be the responsibility of the applicable Reorganized Debtor. If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of a Reorganized Debtor to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in Section 7 of the Plan, pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. Notwithstanding the foregoing, if, as of the date the Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the cure amount or adequate assurance for any particular Executory Contract or

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

53

103000-001/956709_10.doc

Unexpired Lease (or if the time period for a non-Debtor to object to the Cure has not yet lapsed), the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by the applicable Debtor.

**4.    Post-Petition Date Contracts and Leases.**

Executory Contracts and Unexpired Leases entered into, and other obligations incurred, after the Petition Date by a Debtor will be performed by the Debtor or Reorganized Debtor, as applicable, in the ordinary course of its business.

**5.    Bar Date.**

All proofs of Claims with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease must be filed not later than 30 days after the Effective Date, or else they will be forever barred.

**F.    Manner of Distribution of Property Under the Plan.**

**1.    Distributions.**

Each Debtor, and if applicable, Reorganized Debtor, shall be responsible for making Distributions described in the Plan. Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan shall be obtained from existing Cash balances, the operations of the Debtors and the Reorganized Debtors or the New Money Investment.  The Reorganized Debtors may also make such payments using Cash received from their subsidiaries through their consolidated cash management systems.  Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date or Substantial Consummation Date, as applicable.  The Debtors shall have no obligation to recognize any transfer of Claims or Equity Interest occurring on or after the Record Date.

**2.    No Recourse.**

No recourse shall ever be had, directly or indirectly, against the Debtors and the Reorganized Debtors or against any agent, attorney, accountant or other professional for the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

54

103000-001/956709_10.doc

Reorganized Debtors under the Plan, or by reason of the creation of any obligation, liability or indebtedness by the Debtors or Reorganized Debtors under the Plan for any purpose authorized by the Plan.    All such obligations, liabilities and indebtedness of the Debtors and the Reorganized Debtors will be enforceable only against, and be satisfied only out of, the Assets or such part thereof as shall under the terms of any applicable agreement be liable therefore or shall be evidence only of a right of payment out of such Assets.

     **3.**     **<u>Reserves.</u>**

     Each Debtor, and if applicable, each Reorganized Debtor will establish and maintain a Disputed Claim Reserve.

     **4.**     **<u>Statements.</u>**

     The Debtors and, if applicable, the Reorganized Debtors will maintain a record of the names and addresses of all Holders of Allowed General Unsecured Claims as of the Effective Date and all Holders as of the Record Date of Equity Interests of the Debtors for purposes of mailing Distributions to them.  The Debtors and the Reorganized Debtors may rely on the name and address set forth in the Debtors' Schedules and/or proofs of Claim and the ledger and records regarding Holders of Equity Interests as of the Record Date as being true and correct unless and until notified otherwise in writing.

**G.**     **<u>Conditions to Confirmation of the Plan, the Effective Date and the Substantial Consummation Date.</u>**

     **1.**     **<u>Condition to Confirmation.</u>**

     The following are conditions precedent to the Confirmation of the Plan:

     a.     The Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Lenders;

     b.     The Confirmation Order confirming the Plan shall be entered by the Bankruptcy Court no later than 135 days after the Petition Date; provided, further that notwithstanding this clause (b) the Company shall use reasonable best efforts to obtain entry of the Confirmation Order no later than 105 days after the Petition Date;

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

55

c.        The Confirmation Order shall (a) approve the Backstop Commitment Agreement, incorporating the terms thereof in the Plan, and (b) authorize the Debtors to perform under the Backstop Commitment Agreement and pay the fees and costs as provided for in the Backstop Commitment Agreement;

d.        The Bankruptcy Court shall have authorized the assumption and rejection of Executory Contracts and Unexpired Leases by the Reorganized Debtors as contemplated by the Plan; and

e.        The Designated Consenting Lenders in their sole and absolute discretion not having determined and notified the Debtors in writing no later than two (2) Business Days prior to the commencement of the Confirmation Hearing  that the aggregate amount of (a) Administrative Claims, (b) Other Priority Claims or (c) Other Secured Claims are unacceptable; and

f.        The Designated Consenting Lenders in their sole and absolute discretion not having determined that the assumption and rejection of Executory Contracts  pursuant to Sections 7.1 and 7.2 of the Plan is  unacceptable and so notifying the Debtors in writing.

**2.        Conditions to the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date:

a.        The Confirmation Order shall be a Final Order reasonably acceptable to the Debtors and the Requisite Consenting Lenders;

b.        No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending (including any appeal);

c.        The Plan Supplement, including any amendments, modifications or supplements thereto, shall be in form and substance acceptable to Debtors and the Requisite Consenting Lenders;

d.        Sufficient Cash and other Assets shall be set aside, reserved and withheld by each Debtor to make the distributions required by the Bankruptcy Code and the Plan;

e.        Amendments or modifications to the Plan, if any, shall be reasonably acceptable

103000-001/956709_10.doc

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

to the Debtors and Requisite Consenting Lenders; and

      f.     The Backstop Commitment Agreement shall continue to be in full force and effect.

**3.**     **Conditions to the Substantial Consummation Date.**

The following are conditions precedent to the Substantial Consummation Date:

a.     The Effective Date shall have occurred;

b.     All approvals as required for the transactions as set forth in the Plan and effectuating documents, including, without limitation, all required Gaming Approvals, have been obtained from the Governmental and Regulatory Authorities;

c.     None of the Designated Consenting Lenders or Reorganized Debtors are in material breach of the Plan or any other effectuating documents in effect from the Effective Date through the Substantial Consummation Date;

d.     The voting securities of Reorganized RHC shall be registered under the Exchange Act of 1934, as amended;

e.     The entire Working Capital Facility is available to Reorganized RHC;

f.     Amendment or modifications to the Plan, if any, shall be reasonably acceptable to the Debtors and Requisite Consenting Lenders; and

g.     The Designated Consenting Lenders in their sole and absolute discretion not having determined and notified the Debtors in writing no later than 5 Business Days prior to the Substantial Consummation Date that the aggregate amount of (a) Administrative Claims, (b) Other Priority Claims, or (c) Other Secured Claims are unacceptable.

**4.**     **Waiver of Conditions.**

The conditions set forth in Article 9 of the Plan may be waived (except for Section 9.4(a)) only by the Person whom is entitled to satisfaction of such condition (it being understood that the conditions contained in Section 9.1(a), Section 9.2 (a), (c) and (e) and Section 9.4(f) of the Plan may be waived only by the Requisite Consenting Lenders), without notice, leave or order of the Bankruptcy Court or any formal action other than a proceeding to confirm or consummate the Plan.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

57

103000-001/956709_10.doc

# IX.
## RISK FACTORS

In addition to risks discussed elsewhere in this Disclosure Statement, the Plan involves the following risks, which should be taken into consideration.

### A.    The Debtors Have No Duty to Update.

The statements in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein.  The delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.

### B.    Information Presented is Based on the Debtors' Books and Records, and is Unaudited.

While the Debtors have endeavored to present information fairly in this Disclosure Statement, there is no assurance that the Debtors' books and records upon which this Disclosure Statement is based are complete and accurate.  The financial information contained herein, however, has not been audited.

### C.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Will Vary.

Certain information in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and projections which may differ materially from actual future results.  There are uncertainties associated with all assumptions, projections and estimates, and they should not be considered assurances or guarantees of the amount of Claims in the various Classes that will be allowed.  The allowed amount of Claims in each Class, as well as Administrative Claims, could be significantly more than projected, which in turn, could cause the value of Distributions to be reduced substantially.

### D.    This Disclosure Statement Was Not Approved By the SEC.

Although a copy of this Disclosure Statement was served on the SEC and the SEC was given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approved it, this Disclosure Statement has not been registered under the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

Securities Act of 1933, as amended (the "Securities Act"), or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the Exhibits contained herein, and any representation to the contrary is unlawful.

**E.      No Legal or Tax Advice is Provided to You By This Disclosure Statement.**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Creditor or Holder of an Equity Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or Equity Interest.

**F.      No Admissions Made.**

Nothing contained herein shall constitute an admission of any fact or liability by any party (including the Debtors) or shall be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Equity Interests.

**G.      No Waiver of Right to Object or Right to Recover Transfers and Estate Assets.**

A Creditor's vote for or against the Plan does not constitute a waiver or release of any claims or rights of the Debtors (or any other party in interest) to object to that Creditor's Claim, or recover any preferential, fraudulent or other voidable transfer or Estate assets, regardless of whether any claims of the Debtors or their respective Estates are specifically or generally identified herein.

**H.      Bankruptcy Law Risks and Considerations.**

**1.      Confirmation of the Plan is Not Assured.**

Although the Debtors believe the Plan will satisfy all requirements for Confirmation, the Bankruptcy Court might not reach that conclusion.  It is also possible that modifications to the Plan will be required for Confirmation and that such modifications would necessitate a resolicitation of votes.

Confirmation requires, among other things, a finding by the Bankruptcy Court that it is not likely there will be a need for further financial reorganization and that the value of distributions to dissenting members of Impaired Classes of Creditors and Holders of Equity

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

Interests would not be less than the value of distributions such Creditors and Holders of Equity Interests would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code ("Chapter 7"). Although the Debtors believe that the Plan will not be followed by a need for further financial reorganization and that dissenting members of Impaired Classes of Creditors and Holders of Equity Interests will receive distributions at least as great as they would receive in a liquidation under Chapter 7, there can be no assurance that the Bankruptcy Court will conclude that these tests have been met. The Effective Date or the Substantial Consummation Date Might Be Delayed or Never Occur.

There is no assurance as to the timing of the Effective Date or Substantial Consummation Date or that they both will occur. If the respective conditions precedent to the Effective Date and Substantial Consummation Date have not occurred or been waived within the prescribed time frame, the Confirmation Order will be vacated. In that event, the Holders of Claims and Equity Interests would be restored to their respective positions as of the day immediately preceding the Confirmation Date, and the Debtors' obligations for Claims and Equity Interests would remain unchanged as of such day (except to the extent of any post-Effective Date payments). (See Section XVII.B.6.)

**2.      The Projected Value of Estate Assets Might Not Be Realized.**

In the Best Interests Analysis, the Debtors have projected the value of the Estates' assets that would be available for payment of expenses and distributions to Holders of Allowed Claims, as set forth in the Plan. The Debtors have made certain assumptions, as described in Section XVI.C which should be read carefully.

**3.      Allowed Claims in the Various Classes May Exceed Projections.**

The Debtors have also projected the amount of Allowed Claims in each Class in the Best Interests Analysis. Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected.

**4.      No Representations Outside of this Disclosure Statement are Authorized.**

No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

I.    **Gaming Law Risk Factors.**

    1.    **Multiple Gaming Regulatory Jurisdictions.**

The Debtors are subject to extensive state and local regulation in every jurisdiction in which they do business.

    2.    **Timely Approvals by Gaming Agencies Not Assured.**

Substantial consummation of the Plan and the events and restructuring to take place on or after the Substantial Consummation Date are conditioned upon costly and time-consuming licensing procedures described herein, and there is no assurance that the required approvals will be obtained on a timely basis, even if pursued in good faith and with due diligence.

    3.    **Key Employees and Other Individual Licensees.**

The Consenting Lenders have not yet determined the number, position or identity of the Persons who will need to be investigated and licensed, and any discussions herein regarding the same are generic in nature.

    4.    **Suitability for Licensing.**

Neither the Debtors nor the Designated Consenting Lenders have investigated or inquired into the suitability of any Person for licensing purposes. If any Person is found unsuitable, the remaining applicants must sever their connections and relationships with the unsuitable Person and cannot allow such Person, among other things, to exercise any voting rights or receive any distributions from any of the applicant entities. A Person who continues to associate with a licensed entity after a finding of unsuitability may be guilty of a criminal offense.

    5.    **Licenses Not Transferable.**

Licenses that are currently held are not transferable to successor entities. Even if an individual has been previously licensed or found suitable with a Debtor entity, he or she will need to reapply to be licensed or found suitable in connection with any newly-created entities

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

61

103000-001/956709_10.doc

that apply for gaming licenses.   There is no guarantee that such licenses will be issued or findings of suitability received.

**6.      Expenses of Investigation and Licensing.**

The burden and costs of proving suitability are on each individual applicant.  There is no assurance that all of the Persons who will need to be investigated and found suitable will cooperate in this regard or be licensed or found suitable on a timely basis.

**7.      Waivers Not Unavailable.**

Waivers from licensing requirements are often unavailable.   Even when they are available, they may be difficult to obtain.  A waiver from a licensing investigation requires an application for a waiver (such as an application for waiver as "institutional investor"), which is itself investigated and must be approved by Gaming Authorities before the waiver can be effective.

**8.      No Assurance of Favorable Outcome or Timing.**

There is no assurance that all of the required findings of suitability, licenses and approvals to substantially consummate the Plan will be obtained.  Gaming Authorities may deny an application for any cause they deem reasonable and such denial is normally not subject to judicial review.

There is no assurance as to the timing of the licensing process.  Such timing is within the sole discretion of the Gaming Authorities.  Each jurisdiction will establish its own timing. As such, there can be no assurance whatsoever that the Substantial Consummation Date will occur within six (6) months from the Effective Date or at any other time soon thereafter.

**9.      Adoption of Rules and Regulations.**

There is no assurance as to the potential changes in gaming rules and regulations that any jurisdiction may later adopt or any license conditions that any jurisdiction may impose for any of the participants in the restructuring should licensing be obtained.

**10.     Interference with Debtors' Gaming Operations Prohibited.**

Any effort to usurp control of the Debtors' operations, including any attempted influence over the Debtors' operations or any unauthorized sharing in the Debtors' gaming revenues, prior

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

62

103000-001/956709_10.doc

to final approval and licensing of the successor entities and of all relevant Persons associated with the successor entities, unless emergency approval is obtained in advance, could be viewed as a violation of gaming laws and could result in regulatory and criminal sanctions.

**11.    Continued Regulatory Supervision.**

Even if the necessary licenses, approvals, registrations, and findings of suitability are secured, Gaming Authorities have wide discretion in disciplining any licensee.  Such discipline may include substantial fines and revocation of licenses.  Gaming Authorities have wide discretion in determining what constitutes a violation and the amount of fines that may be imposed. Any taxes administered by Nevada Gaming Authorities that are not paid by Debtors (or unpaid gaming winnings) could also be assessed on the Reorganized Entities.

**12.    Legality of Gaming.**

The continuity of gaming operations in any jurisdiction depends on the political will of the local authorities and the respective state legislatures.  The Debtors cannot guarantee that gaming will not be phased out in any jurisdiction where it is currently legal.

**13.    Additional Competition.**

The legalization and introduction of gaming activities in any neighboring jurisdictions or in any feeder markets, such as the opening of additional tribal casinos, the introduction of additional commercial casinos in or adjacent to the jurisdictions where the Debtors' operations are currently located,  or the legalization of internet gaming could adversely affect the Debtors.

**J.    Risks Related to the Debtors' Business Operations.**

The following discussions of risks that relate to the Debtors' respective businesses should be read as also being applicable to the respective businesses of the Reorganized Debtors on and after the Substantial Consummation Date.

**1.    Effect of the Chapter 11 Cases.**

If the Chapter 11 Cases continue for a prolonged amount of time, the proceedings could adversely affect the Debtors' business and operations.  The longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers, suppliers and agents will lose confidence in the Debtors' ability to successfully reorganize their businesses and will seek to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

63

1    establish alternative commercial relationships.  Consequently, the Debtors might lose valuable

2    contracts in the course of the Chapter 11 Cases.

3         The Debtors rely on one-time and recurring conventions and conferences and activities

4    related thereto as a significant part of their business.  This segment of Riviera's business is highly

5    competitive with other hotels in Las Vegas.  In the event these event do not occur or are not

6    renewed because their competitors offer more favorable terms or for any other reason, including

7    the greater financial stability of the competitors, the Debtors' business, financial condition and

8    results of operations would be adversely affected.

9         So long as the Chapter 11 cases continue, the Debtors' senior management will be

10   required to spend a significant amount of time and effort dealing with the Debtors'

11   reorganization instead of focusing exclusively on business operations.  Prolonged continuation of

12   the Chapter 11 Cases will also make it more difficult to attract and retain management and other

13   key personnel necessary to the success and growth of the Debtors' businesses.  Other than Mr.

14   Vannucci, the Debtors do not have employment agreements with their executive officers.  If the

15   Debtors lose any of these executives, the Debtors' operations could be adversely affected.  In

16   addition, the Debtors compete with other potential employers for employees, and the Debtors

17   may not succeed in hiring and retaining the executives and other employees that the Debtors

18   need.  An inability to hire quality employees could have a material adverse effect on the Debtors'

19   business, financial condition and results of operations.

20        Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to

21   incur substantial costs for professional fees and other expenses associated with the proceedings.

22        While cash flow projections indicate that there will be sufficient cash flow to meet all

23   ordinary demands and to pay the professional fees and expenses, prolonged continuation of the

24   Chapter 11 Cases may require the Debtors to seek additional financing.  It may not be possible to

25   obtain additional financing during or after the Chapter 11 Cases on commercially reasonable

26   terms or at all.  If the Debtors require additional financing during the Chapter 11 Cases and are

27   unable to obtain it on reasonable terms or at all, the Debtors' chances of a successful

28   reorganization may be seriously jeopardized.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

64

**2.    The Volatility and Disruption of the Capital and Credit Markets and Adverse Changes in the Global Economy Have Negatively Impacted the Debtors' Ability to Access Financing.**

Due to the existing uncertainty in the capital and credit markets and current adverse changes in the global economy, the Debtors' access to capital may not be available on terms feasible to the Debtors, or on any terms whatsoever.

The Debtors have been in default under the Credit Agreement since February 2009 and has been unable to make interest payments on account of the Senior Secured Claims since December 2008.  In addition, unable to make the representations and warranties necessary to draw on its revolving credit facility, in June 2009 the Debtors voluntarily reduced the commitment thereunder from $20 million to $3 million.  As such, the Debtors have been without any working capital facility for over eighteen months.  Without access to a working capital facility and with no alternative source of liquidity readily available, the Debtors have, out of necessity conserved its cash and limited its capital expenditure over the past 18 months solely to the necessary maintenance of its properties.  The Designated New Money Investment and Working Capital Facility, in each case, to be provided in connection with the Plan by participating Senior Secured Lenders and backstopped in full by the Backstop Lenders, will provide the Debtors with additional working capital for its ordinary course operations and adequate liquidity to make not only maintenance capital expenditures, but also long overdue capital improvements to its properties, all as determined by the New Board and the post-Substantial Consummation Date management team.

**3.    The Gaming Industry Has Been Adversely Affected by the Economic Downturn.**

The gaming industry is experiencing sharply reduced demand.  The demand for gaming is highly sensitive to consumers' disposable incomes, and a general decline in economic conditions, including businesses downsizing their workforces, may lead to the Debtors' potential customers having less discretionary income with which to wager.  Many of the Debtors' customers have also experienced significant reductions in their savings as a result of recent investment losses.  These developments have led, and are likely to continue to lead, to a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

65

103000-001/956709_10.doc

1   reduction in the Debtors' revenues and have materially adversely affected the Debtors' operating

2   results, as the Debtors have fewer customers and the customers spend less than they historically

3   have.  While there have been governmental responses to these economic hardships, there can be

4   no assurance that this will restore the economy, consumer confidence and spending at all, or to

5   the point where it favorably impacts the gaming industry.

6        **4.**    **The Debtors May Experience a Loss of Market Share.**

7       The gaming industry is highly competitive.  There is substantial competition for gaming

8   customers with other hotel/casinos primarily along the Las Vegas Strip for the Riviera and in the

9   Blackhawk and Central City vicinity for Blackhawk.  If the Debtors' competitors operate more

10  successfully, other hotel/casino properties are enhanced or expended, or if additional competitors

11  are established in and around the vicinity of the Riviera and Blackhawk, the Debtors may lose

12  market share.

13      In Las Vegas, it is generally recognized that the marketplace has too much capacity in

14  both gaming floor footage as well as hotel rooms and related amenities.  There is no assurance

15  that this over-capacity will not continue to exist or worsen.  While it is not anticipated that

16  construction of the Fontainebleau or Echelon, which are located adjacent to the Riviera, will be

17  completed and open for business in the foreseeable future, the Cosmopolitan with approximately

18  2500 rooms and more than 100,000 square feet of casino floor space will open  later in 2010.

19  There is no assurance that additional hotel rooms will not become available before demand

20  increases sufficiently to meet supply.

21      Some Native American casinos in southern California allow customers at least 18 years

22  old to gamble, whereas the Debtors' gaming establishments require customers to be at least 21

23  years old.  This could lead to a reduced market for the Debtors as those Native American casinos

24  would have an earlier opportunity to create loyal customers.  If the Debtors' competitors are able

25  to retain these customers after they turn 21, thereby causing them to continue gambling at those

26  establishments rather than try the Debtors' establishments, the Debtors may experience reduced

27  market share.

28  / / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

66

103000-001/956709_10.doc

Also, Colorado Gaming Authorities have recently considered expanding Colorado's casino industry to other locations, which if happens, may be a significant negative impact on the business, financial condition and results of operations of Blackhawk.

**5.      Changes to Applicable Tax Laws Could Have a Material Adverse Effect on the Debtors' Financial Condition.**

The Debtors pay substantial taxes and fees in connection with their operations as gaming companies.  From time to time, federal, state and local legislators and other government officials have proposed and adopted changes in tax laws, or in the administration of those laws affecting the gaming industry.  It is not possible to determine the likelihood of changes in tax laws or in the administration of those laws.  If adopted, changes to applicable tax laws could have a material adverse effect on the Debtors' business, financial condition and results of operations.  Due to the continued pressures on the state legislatures to address shortfalls in their budgets associated with the current recession, there may be more support to look to increased taxation at all of the Debtors' gaming properties.  Any increase in taxes would impact the Debtors' future profitability.

The Debtors are subject to a variety of other rules and regulations, including zoning, environmental, construction and land-use laws, regulations and permits that govern the serving of alcoholic beverages.  Any changes to these laws could have a material adverse effect on the Debtors' business, financial condition and results of operations.

From time to time, legislators and special interest groups have proposed legislation that would expand, restrict or prevent gaming operations in the jurisdictions in which the Debtors operate.  Any such change to the regulatory environment or the adoption of new federal, state or local government legislation could have a material adverse effect on the Debtor's business.

**6.      The Debtors' Gaming Operations May Be Adversely Impacted if General Economic Conditions Continue to Decline.**

The Debtors' properties use significant amounts of electricity, natural gas and other forms of energy.  While no shortages of energy have been experienced, the substantial increases in the cost of electricity, natural gas and gasoline in the United States in general, and in southern California, southern Nevada, and central Colorado in particular, may negatively affect the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

67

1  Debtors' operating results.  In addition, further energy price increases in such areas could result

2  in a decline in disposable income of potential customers and a corresponding decrease in

3  visitation and spending at the Debtors' operations.  Gaming industry revenues are sensitive to

4  general economic conditions and are influenced by consumer confidence in the economy and

5  other factors.  An extended period of reduced discretionary spending could significantly harm the

6  Debtors' operations and the Debtors may not be able to lower their costs rapidly enough, or at

7  all, to offset a decrease in revenues.

8        **7.**      **Native American Gaming Operations.**

9        The Debtors' operations may be adversely impacted by expanded Native American

10  gaming operations in California and Colorado.

11        A significant source of customers for the Riviera is southern California.  The expansion

12  of Native American casinos in California continues to have an impact on casino revenues in

13  Nevada in general.  California's state officials have renegotiated certain compacts with Native

14  American tribes.  Some Native American casino compacts have been changed to allow for

15  additional slot machines.  While the effect of increased gaming in California, Colorado and other

16  states is difficult to predict, the Debtors' business may be significantly impacted.

17        **8.**      **Weather Conditions in Colorado.**

18        Adverse winter weather conditions in the Rockies and Denver area can have a material

19  adverse effect on the results of operations and financial condition of Blackhawk.  Adverse winter

20  weather conditions, particularly snowfall, can deter customers of Blackhawk from traveling or

21  make it difficult for them to frequent Blackhawk.  If Blackhawk were to experience prolonged

22  adverse winter weather conditions, the results of operations could be materially adversely

23  affected.

24        **9.**      **Evolving Gaming Technology.**

25        Gaming technology, devices and information systems are constantly evolving and

26  improving.  The Debtors may be unable to obtain slot machines or related technology from the

27  Debtors' third party supplier on a timely, cost-effective basis.

28  / / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

68

103000-001/956709_10.doc

The Debtors primarily rely on a limited number of gaming manufacturers and suppliers for their supply of slot machines and related technology. There is no assurance that the Debtors can obtain slot machines or related technology on a cost-effective basis. As a result, the Debtors may be forced to incur significant unanticipated costs to secure alternative third party suppliers or adjust the Debtors' operations.

# X.
## CERTAIN GAMING LAW CONSIDERATIONS

**A.    Introduction.**

As owners and operators of gaming facilities, the Debtors are subject to extensive regulation by Gaming Authorities. Licensing will be required for many Persons who will be associated with Reorganized RHC, and its gaming subsidiaries.

Additionally, while the regulatory requirements discussed herein would be substantially applicable to Reorganized RHC and its gaming subsidiaries, ROC and RBH (sometimes collectively referred to as the "Reorganized Entities"), no assurances can be provided as to the specific form of approval that any of the governmental authorities may adopt or license conditions that any jurisdiction may impose in the licensing process for the restructuring of the Reorganized Entities or any of the Persons associated with the Reorganized Entities.

This summary is provided only as background information for Persons voting on the Plan to make an informed voting decision. All parties in interest, including Creditors, that may be subject to the investigatory and licensing process are strongly urged to retain their own Nevada gaming law counsel with regard to their particular circumstances and the investigatory and licensing process. It should be noted that gaming laws and regulations are often complex and have been interpreted in ways that may not be apparent from an initial reading of them.

**B.    Background on Nevada Gaming Regulations.**

The acquisition, ownership and operation of casino gaming facilities in Nevada are subject to the Nevada Gaming Control Act and regulations promulgated thereunder (the "Nevada Act") together with various local regulations. Specifically, the Debtors' gaming operation in Nevada is subject to the licensing and regulatory control of the Nevada Gaming Commission, the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

69

103000-001/956709_10.doc

Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board (collectively, the "Nevada Gaming Authorities").  Liquor licensing is governed by laws in Clark County, Nevada,  where the Debtors' business is being conducted.  Changes in laws, regulations and procedures could adversely affect the gaming and liquor operations of the Debtors and the Reorganized Entities.

The laws, regulations, and supervisory procedures of the Nevada Gaming Authorities are based upon declarations of public policy concerning, among other things:

- the prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity;

- the establishment and maintenance of responsible accounting practices and procedures;

- the prevention of cheating and fraudulent practices;

- the maintenance of effective controls over the financial practices of casino licensees, including the establishment of minimum procedures for internal fiscal affairs and the safeguarding of assets and revenues, providing reliable recordkeeping, and requiring the filing of periodic reports with the Nevada Gaming Authorities; and

- providing a source of state and local revenues through taxation and licensing fees.

The Nevada Gaming Authorities may investigate any individual who has a material relationship or material involvement with a gaming licensee in order to determine whether such individual is suitable or should be licensed as a business associate of the licensee.  The Nevada Gaming Authorities require "persons"[11]  who seek to own or operate a gaming establishment or hold an ownership interest in these entities or in related holding companies to obtain gaming licenses prior to the consummation of such transaction and also require the company's officers, directors, key employees (as defined by law) and other individuals capable of exercising

/ / /

---

[11] As a legal matter, the definition of "person" in Nevada means a natural person, any form of business or social organization and any other nongovernmental legal entity, including a corporation, partnership, association, trust or unincorporated organization, as well as parent companies and persons that comprise the same.  The term, however, does not include a government, governmental agency or political subdivision of a government

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

70

significant influence over the activities of the licensees to demonstrate their suitability to be affiliated with such gaming enterprise.

A "finding of suitability" is comparable to licensing, and both require submission of detailed personal and financial information, followed by a thorough investigation. Changes in licensed positions must be reported to the Nevada Gaming Authorities.  In addition to their authority to deny an application for a finding of suitability or licensure, the Nevada Gaming Authorities have jurisdiction to disapprove a change in corporate position.  The burden of proving suitability is on the applicant and the investigation, which can be costly and time consuming, must be paid for by each applicant.

If the Nevada Gaming Authorities were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with the licensee, the licensee would have to sever all relationships with that person.  In addition, the Nevada Gaming Commission may require the licensee to terminate the employment of any person who refuses to file appropriate applications.  Determinations of suitability and licensing are not subject to judicial review in Nevada.

If it were determined that the licensee had violated the Nevada Act, the gaming licenses and approvals previously granted could be limited, conditioned, suspended or revoked, subject to compliance with certain statutory and regulatory procedures.  In addition, such persons could be subject to substantial fines for each separate violation of the Nevada Act.  In the event the licenses were revoked, as discussed below, the Nevada Gaming Commission could recommend that the appropriate court appoint a "supervisor" to operate the gaming properties.

Any acquisition of a licensed entity, including the assignment or transfer of its operating assets to a successor entity that intends to obtain a gaming license, will require similar review, approval and licensing by the Nevada Gaming Authorities.  Though an expedited investigative review of applicants is possible under some circumstances, the Nevada Act prohibits contracts which require the issuance of a new gaming license, if the agreement provides for a closing date sooner than 90 days.

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

71

103000-001/956709_10.doc

1    The placing of an investigatory item on an agenda for final approval is solely in the

2    discretion of the Nevada Gaming Authorities[12] and will not occur until the applicants have

3    submitted all information requested by the Nevada Gaming Authorities.  As a general rule, the

4    licensing process will not commence until all applications relating to a specific transaction have

5    been submitted to the Nevada Gaming Authorities  and are deemed complete.

6    In the licensing context, Nevada distinguishes between privately-owned and publicly-

7    traded gaming companies.  In a privately-owned company, except for approved institutional

8    investors all persons who hold any equity interest must be licensed prior to receiving that

9    interest.  Furthermore, the grant of an option to acquire an equity interest, including the issuance

10    of warrants convertible to an equity interest, must receive prior administrative approval from the

11    Chairman of the Nevada State Gaming Control Board.

12    The purported sale, assignment, transfer, pledge, exercise of an option to purchase or

13    other disposition of any security issued by a corporation, other than a publicly-traded

14    corporation, which holds a Nevada gaming license is void unless approved in advance by the

15    Nevada Gaming Commission.

16    This is in contrast with a company that has qualified under applicable securities laws and

17    is registered with the Nevada Gaming Commission as a publicly-traded corporation (a

18    "registered corporation").  In that instance, only those persons holding voting shares in excess of

19    ten percent and principal officers and directors are normally required to submit to the Nevada

20    licensing process.  Nevada law, though, requires any person who acquires more than five percent

21    of a registered corporation's voting securities to report the acquisition to the Nevada Gaming

22    Commission. A finding of suitability might be required at the over-five percent threshold if it is

23    determined that the person is capable of exercising significant influence over the affairs of the

24    registered corporation.  Nevada law also requires that beneficial owners of more than ten percent

25    of a registered corporation's voting securities apply to the Nevada Gaming Commission for a

26    / / /

---

27  [12] Additionally, various liquor and gaming Authorities have taken the position that it has the authority to approve all
28  persons owning or controlling the stock of any corporation that will possess a gaming license and other persons
having a significant involvement with the business, including its financial backers.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

72

finding of suitability within 30 days after the Chairman of the Nevada State Gaming Control Board mails a written notice requiring the application.

Under either public or private ownership, if at any time the Nevada Gaming Commission finds that an owner of an equity interest is unsuitable to continue to have an involvement in gaming, such owner must dispose of the security and the gaming licensee must abide by certain restrictions on its involvement with that person, as discussed below.

Under certain circumstances, an "institutional investor", as defined in the Nevada Act, may acquire up to 15% of a privately-owned company's equity securities or 25% of a registered corporation's voting securities, without being subject to licensure. However, in order to receive an institutional investor waiver from licensing, the investor must apply to the Nevada Gaming Commission, claiming special status as an "institutional investor." The application for the institutional investor waiver must contain certain information prescribed in the Nevada Act. An institutional investor must show that it is among a class of corporate entities that is either regulated by a governmental agency (such as a registered investment company or pension fund) or engages in business activities that the Nevada Gaming Commission has determined meet similar criteria.

The institutional investor must hold the securities in the ordinary course of its business "for investment purposes only." To receive such a waiver, the applicant must also complete detailed forms that contain a list of required documents and information and then await the results of a review process that is more limited in scope than a licensing investigation, before acquiring the securities.[13]

An institutional investor will be restricted in its participation in corporate matters. An institutional investor shall not be deemed to hold the interest "for investment purposes only" unless the interest was acquired and are held in the ordinary course of its business and not for the purpose of causing , directly or indirectly, the election of a majority of the members of the

---

[13] This type of waiver is available in both privately-owned and publicly-traded entities. However, an institutional investor holding voting securities in a publicly-traded company also enjoys greater flexibility in the kinds of activities that would be deemed "for investment purposes only," and may acquire voting shares prior to the grant of a waiver, up to the percentage ownership thresholds for registered corporations, previously discussed.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

73

board of directors, cause any change in the corporate charter, bylaws, management, policies or operations of the registered corporation or cause any other action which the Nevada Gaming Commission finds to be inconsistent with holding voting or equity securities for investment purposes only. Activities which are not deemed inconsistent with holding securities for investment purposes only include:

i. Voting, directly or indirectly, on all matters voted on by the holders of such voting security;

ii. Serving as a member of any committee of creditors or security holders in connection with a debt restructuring;

iii. Nominating any candidate for election or appointment to a board of directors or the equivalent in connection with a debt restructuring;

iv. Accepting an appointment or election as a member of the board of directors in connection with a debt restructuring and serving until the conclusion of the term;

v. Making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in management, policies or operations; and

vi. Such other activities as the Nevada Gaming Commission may determine to be consistent with such investment intent.

The grant of institutional investor status is discretionary and may be revoked if the Nevada Gaming Authorities deem that the investment intent has changed or the institutional investor has failed to comply with all conditions imposed. Applicants are required to pay the costs of their investigation. The requirements for an institutional investor to hold the interest "for investment purposes only" in a privately-owned company, are slightly more restrictive

If any stockholder or other person who is required to apply for licensing or suitability is found unsuitable by the Nevada Gaming Commission; it will be grounds for disciplinary action for the licensee to have any relationship with the denied person, or to:

i. pay that person any dividend or interest upon any securities, or any payment or distribution of any kind;

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

74

103000-001/956709_10.doc

ii.    allow that person to exercise, directly or indirectly, any voting right conferred through securities held by that person;

iii.    pay remuneration to that person for services rendered or otherwise; or

iv.    make any other payment or distribution of any kind, in respect of any such security or interest by way of, or pursuant to payment of principal, redemption, conversion, exchange or liquidation or any other transaction.

A licensee may be required to disclose to the Nevada State Gaming Control Board and the Nevada Gaming Commission the identities of all holders of its debt securities.  If it finds that the public interest will be served, the Nevada Gaming Commission may, in its absolute discretion, require the lender or holder of an evidence of indebtedness issued by the registered corporation  to file an application within 30 days after being requested to do so.

If the Nevada Gaming Commission finds that a holder of an equity interest or an evidence of indebtedness is unsuitable to continue ownership, involvement or any relationship with the licensee or affiliated company, that person must immediately offer the equity interest or evidence of indebtedness, as the case may be, to the issuing corporation for purchase.  The corporation must purchase the equity interest so offered, for cash at fair market value, within ten days after the date of the offer, or within such time and under such terms and conditions as the Nevada Gaming Commission may impose.  Similarly, the licensee must retire or restructure the indebtedness provided by a denied applicant within the time frame and under such terms as the Nevada Gaming Commission may require.

The Nevada Gaming Commission could request that a state court appoint a supervisor to operate any non-restricted[14] gaming establishment operated by a licensee, if the licenses held by the licensee are revoked, suspended or otherwise lapse.[15]   In such extraordinary circumstances, earnings generated by gaming operations during a supervisor's appointment (except for reasonable rental value) could be forfeited to the State of Nevada.  The occurrence of any of

---

[14] A non-restricted gaming establishment is any gaming establishment that has more than 15 slot machines.

[15] While gaming licenses are subject to a renewal process, this is merely a routine administrative matter and does not normally involve new licensing investigations in Nevada.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

75

1  these events could have a material adverse effect on a licensee's business, financial condition

2  and results of operations.  Any acquirer of Reorganized RHC would be subject to the same

3  regulations.

4      License fees and taxes, computed in various ways depending on the type of gaming

5  activity involved, are payable to the State of Nevada and to the counties and cities in which the

6  Nevada licensee's operations are conducted.[16] Any taxes administered by Gaming Authorities

7  that are not paid by the Debtors, as well as unpaid gaming winnings, could be assessed on the

8  Reorganized Entities.

9      Changes in control of Reorganized RHC through merger, consolidation, stock or asset

10  acquisitions, management or consulting agreements, or any act or conduct by a person whereby

11  that person obtains control (including foreclosure on pledged shares) may not occur without the

12  prior approval of the Nevada Gaming Commission.  As such, the restructuring and the changes

13  in ownership and control as provided in the Plan will require prior approval and licensing[17]  by

14  the Nevada Gaming Authorities.

15      Entities seeking to acquire control or ownership of a licensed corporation must meet a

16  variety of stringent standards of the Nevada Act.  Whether any acquisition is approved by the

17  Nevada Gaming Authorities is completely discretionary with them and is based on a variety of

18  factors, including the financial resources of the licensee, the personal suitability of its owners and

19  in some instances, the impact on the marketplace.  The transfer of any gaming devices from the

20  entities that currently own them will also require administrative approvals by the Nevada

21  Gaming Authorities.

22  / / /

23

24  [16] Depending upon the particular fee or tax involved, they are payable monthly, quarterly or annually and are based upon a percentage of the gross revenues received, the number of gaming devices operated or the number of table games operated.

25

26  [17] Similarly, a trustee's ability to foreclose upon pledged shares and other gaming collateral comprising gaming businesses is limited. Regulations of the Nevada Gaming Commission provide that no person may acquire an interest in a gaming licensee or enforce a security interest in the stock of a corporation which is the holder of a gaming license or which owns stock in such a corporation without the prior approval of the Nevada Gaming Commission. As such, neither the trustee nor any holder is permitted to operate or manage any gaming business or assets unless such person has been licensed.

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

76

103000-001/956709_10.doc

1    Any person who is licensed, required to be licensed, registered, required to be registered,

2    or is under common control with such persons or licensees, and who proposes to become

3    involved in a gaming venture outside Nevada, is required to deposit with the Nevada State

4    Gaming Control Board, and thereafter maintain, a revolving fund in the amount of $10,000 to

5    pay the expenses of investigation by the Nevada State Gaming Control Board of the licensees'

6    participation in foreign gaming.  The revolving fund is subject to increase or decrease in the

7    discretion of the Nevada Gaming Commission.  Thereafter, licensees are also required to comply

8    with reporting requirements imposed by the Nevada Act.

9    Licensees are also subject to disciplinary action by the Nevada Gaming Commission if

10   they knowingly violate any laws of the foreign jurisdiction pertaining to a gaming operation, fail

11   to conduct the foreign gaming operation in accordance with the standards of honesty and

12   integrity required of Nevada gaming operations, engage in activities or enter into associations

13   that are harmful to the State of Nevada or its ability to collect gaming taxes and fees, or employ,

14   contract with or associate with a person in the foreign operation who has been denied a license or

15   a finding of suitability in Nevada on the ground of personal unsuitability.

16   Upon their licensing, the Reorganized Entities and likely all of their holders of Equity

17   Interests and Persons having material associations with the Reorganized Entities will be subject

18   to the same or substantially the same regulations as RHC currently faces.  They will also be

19   subject to a costly and time-consuming investigatory, licensing, and approval process prior to the

20   Substantial Consummation Date.

21   Nevada state gaming laws and regulations can be reviewed at the website of the Nevada

22   Gaming Commission (http://gaming.nv.gov/).  Municipal gaming regulations for the jurisdictions

23   in which the Debtors do business can be located at the respective websites of Clark County

24   Nevada.

25   **C.    Relationship of Nevada Gaming Laws to Plan Transactions.**

26   Various transactions contemplated under the Plan will require approvals from the Nevada

27   Gaming Authorities, including, but not limited to the following. It is anticipated that Reorganized

28   RHC will continue to be a registered corporation and will issue 100% of the Class A Shares to

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1    Riviera Voteco, L.L.C. ("Voteco"), which will, as a consequence, be required to obtain approval

2    for an acquisition of control of Reorganized RHC, be registered as a holding company of

3    Reorganized RHC and be found suitable by the Nevada Gaming Commission as a controlling

4    shareholder of Reorganized RHC. The members of Voteco will be required to be found suitable

5    by the Nevada Commission in order for Voteco to obtain the foregoing approvals. Any such

6    member that is a business entity will be required to be registered as a holding company and

7    applicable rules will determine which of its owners, officers and directors, or the equivalent, will

8    be required to file applications and be found suitable. The proposed issuance of penny warrants

9    by Voteco, and any transfer of the same subsequent to issuance, will require the approval of

10   either the Chairman of the Nevada the Nevada Gaming Control Board or the Nevada Gaming

11   Commission . After the Penny warrants have been issued, Voteco will not be permitted to issue

12   membership interests in response to  exercise of the same, without the prior approval of the

13   Nevada Gaming Commission.

14            Based upon several precedents, the Designated Consenting Lenders anticipate that the

15   proposed holders of the Class B shares of Reorganized RHC will not be required to file

16   applications for registration and findings of suitability with the Nevada Gaming Authorities.

17   However, any beneficial owner of Reorganized RHC's voting or non-voting securities, regardless

18   of the number of shares owned, may be required to file an application, be investigated, and

19   obtain a finding of suitability as a beneficial owner of such securities if the Nevada Commission

20   has reason to believe that such ownership would otherwise be inconsistent with the declared

21   policies of the State of Nevada. The applicant must pay all costs of investigation incurred by the

22   Nevada Gaming Authorities in conducting any such investigation.

23   **D.    <u>Background on Colorado Gaming Regulations.</u>**

24            In 1990 Colorado voters passed amendments to the Colorado Constitution allowing

25   "limited gaming" in the historic mining towns of Central City, Black Hawk and Cripple Creek.[18]

26   The laws went into effect on October 1, 1991.  Until November 4, 2008, limited stakes gaming

27   _____

28   [18] "Limited Gaming" as amended, means the use of slot machines and the card games of blackjack and poker, as
well as, craps and roulette, each game having a maximum single bet of one hundred dollars.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

78

meant a maximum single bet of $5.00 on slot machines and in the card games of blackjack and poker.  On November 4, 2008, Colorado voters approved through a statewide referendum, subject to approval by each of the towns of Black Hawk, Central City and Cripple Creek with regards to casinos located in the respective towns, to (i) increase the maximum single bet up to $100.00, (ii) allow casinos to provide the table games of craps and roulette, and (iii) increase the permitted hours of operation to 24 hours per day effective July 2, 2009.  The towns of Black Hawk, Central City and Cripple Creek subsequently each approved increasing the maximum single get to $100, the addition of the table games of craps and roulette and increased permitted hours of operation to 24 hours per day.

In order to regulate the limited gaming allowed under the Colorado Limited Gaming Act of 1991 (the "Colorado Act"), the State of Colorado created the Division of Gaming ("Colorado Division") within the Department of Revenue to license, implement, regulate and supervise the conduct of limited gaming under the Colorado Act. The Director of the Colorado Division ("Colorado Director"), pursuant to regulations promulgated by, and subject to the review of, a five-member Colorado Limited Gaming Control Commission ("Colorado Commission" when taken together with the Colorado Division and the Colorado Director, are collectively, the "Colorado Gaming Authorities"), has been granted broad power to ensure compliance with the Colorado gaming laws and regulations (collectively, the "Colorado Regulations"). The Colorado Director may also conduct detailed background investigations of persons who loan money to, or otherwise provide financing to, a licensee.

The Debtors' gaming operations in Colorado, operated through RBH, are subject to licensing and regulatory control by the Colorado Commission, the Colorado Director and the City of Blackhawk.

The Colorado Act declares public policy on limited gaming to be that: (1) the success of limited stakes gaming is dependent upon public confidence and trust that licensed limited stakes gaming is conducted honestly and competitively, the rights of creditors of licensees are protected and gaming is free from criminal and corruptive elements; (2) public confidence and trust can be maintained only by strict regulation of all persons, locations, practices, associations and activities

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

79

103000-001/956709_10.doc

related to the operation of licensed gaming establishments and the manufacture or distribution of gaming devices and equipment; (3) all establishments where limited gaming is conducted and where gambling devices are operated, and all manufacturers, sellers ands distributors of certain gambling devices and equipment, must therefore be licensed, controlled and assisted to protect the public health, safety, good order and the general welfare of the inhabitants of the state to foster the stability and success of limited stakes gaming and to preserve the economy, policies and free competition in Colorado; and (4) no applicant for a license or other affirmative Colorado Commission approval has any right to the granting of the approval sought. Any license issued or other Colorado Commission approval granted pursuant to the provisions of the Colorado Act is a revocable privilege, and no holder acquires any vested rights therein.

The Colorado Commission is empowered to issue five types of gaming and gaming-related licenses, and has delegated authority to the Colorado Director to issue certain types of licenses and approve certain changes in ownership. The licenses are revocable and non-transferable. The failure or inability of RBH or the Debtors, or the failure or inability of others associated with RBH or the Debtors, to maintain necessary gaming licenses or approvals would have a material adverse effect on the Debtors operations. All persons employed by the Debtors, and involved, directly or indirectly, in gaming operations in Colorado also are required to obtain a Colorado gaming license. All licenses must be renewed every two years. As a general rule, under the Colorado Regulations, no person may have an "ownership interest" in more than three retail gaming licenses in Colorado. The Colorado Commission has ruled that a person does not have an ownership interest in a retail gaming licensee for purposes of the multiple license prohibition if:

i.       that person has less than a 5% ownership interest in an institutional investor that has an ownership interest in a publicly traded licensee or publicly traded company affiliated with a licensee;

ii.      a person has a 5% or more ownership interest in an institutional investor, but the institutional investor has less than a 5% ownership interest in a publicly traded licensee or publicly traded company affiliated with a licensee;

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

iii.    an institutional investor has less than a 5% ownership interest in a publicly traded licensee or publicly traded company affiliated with a licensee;

iv.    an institutional investor possesses voting securities in a fiduciary capacity for another person, and does not exercise voting control over 5% or more of the outstanding voting securities of a publicly traded licensee or of a publicly traded company affiliated with a licensee;

v.    a registered broker or dealer retains possession of voting securities of a publicly traded licensee or of a publicly traded company affiliated with a licensee for its customers and not for its own account, and exercises voting rights for less than 5% of the outstanding voting securities of a publicly traded licensee or publicly traded company affiliated with a licensee;

vi.    a registered broker or dealer acts as a market maker for the stock of a publicly traded licensee or of a publicly traded company affiliated with a licensee and exercises voting rights in less than 5% of the outstanding voting securities of the publicly traded licensee or publicly traded company affiliated with a licensee;

vii.    an underwriter is holding securities of a publicly traded licensee or publicly traded company affiliated with a licensee as part of an underwriting for no more than 90 days after the beginning of such underwriting if it exercises voting rights of less than 5% of the outstanding voting securities of a publicly traded licensee or publicly traded company affiliated with a licensee;

viii.    a book entry transfer facility holds voting securities for third parties, if it exercises voting rights with respect to less than 5% of the outstanding voting securities of a publicly traded licensee or publicly traded company affiliated with a licensee; or

ix.    a person's sole ownership interest is less than 5% of the outstanding voting securities of the publicly traded licensee or publicly traded company affiliated with a licensee.

Pursuant to Rule 4.5 of the Colorado Regulations, the Debtors are considered a "publicly traded corporation." The term "publicly traded corporation" includes corporations, firms, limited liability companies, trusts, partnerships and other forms of business organizations

The Colorado Act and regulations thereunder (the "Colorado Regulations") require that every officer, director, and stockholder of private corporations, or equivalent office or ownership

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

81

103000-001/956709_10.doc

holders for non-corporate applicants, and every officer, director or stockholder holding a 5% or greater interest or controlling interest in a publicly traded corporation, or owners of an applicant or licensee, shall be a person of good moral character and submit to a full background investigation conducted by the Division of Gaming and the Colorado Commission.   The Colorado Commission may require any person having an interest, of any kind, in a license to undergo a full background investigation and pay the cost of investigation in the same manner as an applicant.

Under the Colorado Regulations, any person or entity having any direct or indirect interest in a gaming licensee or an applicant for a gaming license, including, but not limited to, their security holders, may be required to supply the Colorado Commission with substantial information, including, but not limited to, background information, source of funding information, a sworn statement that such person or entity is not holding his or her interest for any other party, and fingerprints. Such information, investigation and licensing (or finding of suitability) as an "associated person" automatically will be required of all persons (other than certain institutional investors discussed below) which directly or indirectly beneficially own 10% or more of a direct or indirect beneficial ownership or interest in a licensee, through their beneficial ownership of any class of voting securities of the licensee. Those persons must report their interest within 10 days (including institutional investors) and file appropriate applications within 45 days after acquiring that interest (other than certain institutional investors discussed below). Persons (including institutional investors) who directly or indirectly beneficially own 5% or more (but less than 10%) of a direct or indirect beneficial ownership or interest in, any licensee, through their beneficial ownership of any class of voting securities of the licensee or any holding or intermediary company of the licensee, must report their interest to the Colorado Commission within 10 days after acquiring that interest and may be required to provide additional information and to be found suitable. (It is the current practice of the gaming regulators to require findings of suitability for persons beneficially owning 5% or more of a direct or indirect beneficial ownership or interest, other than certain institutional investors discussed below.) If certain institutional investors provide specified information to the Colorado

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

Commission within 45 days after acquiring their interest (which, under the current practice of the gaming regulators is an interest of 5% or more, directly or indirectly) and are holding for investment purposes only, those investors, in the Colorado Commission's discretion, may be permitted to own up to 14.99% of the Debtor through their beneficial ownership in any class of voting of securities of a licensee, before being required to be found suitable. All licensing and investigation fees will have to be paid by the person in question.

The Colorado Regulations define a "voting security" to be a security the holder of which is entitled to vote generally for the election of a member or members of the board of directors or board of trustees of a corporation or a comparable person or persons of another form of business organization.

The Colorado Commission also has the right to request information from any person directly or indirectly interested in, or employed by, a licensee, and to investigate the moral character, honesty, integrity, prior activities, criminal record, reputation, habits and associations of: (1) all persons licensed pursuant to the Colorado Act; (2) all officers, directors and stockholders of a licensed privately held corporation; (3) all officers, directors and stockholders holding either a 5% or greater interest or a controlling interest in a licensed publicly traded corporation; (4) all general partners and all limited partners of a licensed partnership; (5) all persons that have a relationship similar to that of an officer, director or stockholder of a corporation (such as members and managers of a limited liability company); (6) all persons supplying financing or loaning money to any licensee connected with the establishment or operation of limited gaming; (7) all persons having a contract, lease or ongoing financial or business arrangement with any licensee, where such contract, lease or arrangement relates to limited gaming operations, equipment devices or premises; and (8) all persons contracting with or supplying any goods and services to the gaming regulators.

In addition, under the Colorado Regulations, every person who is a party to a "gaming contract" (as defined below) or lease with an applicant for a license, or with a licensee, upon the request of the Colorado Commission or the Colorado Director, must promptly provide the Colorado Commission or Colorado Director all information that may be requested concerning

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

83

103000-001/956709_10.doc

financial history, financial holdings, real and personal property ownership, interests in other companies, criminal history, personal history and associations, character, reputation in the community and all other information that might be relevant to a determination of whether a person would be suitable to be licensed by the Colorado Commission. Failure to provide all information requested constitutes sufficient grounds for the Colorado Director or the Colorado Commission to require a licensee or applicant to terminate its "gaming contract" or lease with any person who failed to provide the information requested. In addition, the Colorado Director or the Colorado Commission may require changes in "gaming contracts" before an application is approved or participation in the contract is allowed. A "gaming contract" is defined as an agreement in which a person does business with or on the premises of a licensed entity.

The Colorado Commission and the Colorado Division have interpreted the Colorado Regulations to permit the Colorado Commission to investigate and find suitable persons or entities providing financing to or acquiring securities from a licensee. As noted above, any person or entity required to file information, be licensed or found suitable would be required to pay the costs thereof and of any investigation. Although the Colorado Regulations do not require the prior approval for the execution of credit facilities or issuance of debt securities, the Colorado regulators reserve the right to approve, require changes to or require the termination of any financing, including if a person or entity is required to be found suitable and is not found suitable. In any event, lenders, note holders, and others providing financing will not be able to exercise certain rights and remedies without the prior approval of the Colorado Commission. Information regarding lenders and holders of securities will be periodically reported to the Colorado Gaming Authorities.

Except under certain limited circumstances relating to slot machine manufacturers and distributors, every person supplying goods, equipment, devices or services to any licensee in return for payment of a percentage, or calculated upon a percentage, of limited gaming activity or income must obtain an operator license or be listed on the retailer's license where such gaming will take place.

/ / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

An application for licensure or suitability may be denied for any cause deemed reasonable by the Colorado Commission or the Colorado Director, as appropriate. Specifically, the Colorado Commission and the Colorado Director must deny a license to any applicant who, among other things: (1) fails to prove by clear and convincing evidence that the applicant is qualified; (2) fails to provide information and documentation requested; (3) fails to reveal any fact material to qualification, or supplies information which is untrue or misleading as to a material fact pertaining to qualification; (4) has been convicted of, or has a director, officer, general partner, stockholder, limited partner or other person who has a financial or equity interest in the applicant who has been convicted of, specified crimes, including the service of a sentence upon conviction of a felony in a correctional facility, city or county jail, or community correctional facility or under the state board of parole or any probation department within ten years prior to the date of the application, gambling-related offenses, theft by deception or crimes involving fraud or misrepresentation, is under current prosecution for such crimes (during the pendency of which license determination may be deferred), is a career offender or a member or associate of a career offender cartel, or is a professional gambler; or (5) has refused to cooperate with any state or federal body investigating organized crime, official corruption or gaming offenses. If the Colorado Commission determines that a person or entity is unsuitable to directly or indirectly own interests in one or more of the Debtor may be sanctioned, which may include the loss of our approvals and licenses.

The Colorado Commission does not need to approve in advance a public offering of securities but rather requires the filing of notice and additional documents prior to a public offering of (i) voting securities, and (ii) non-voting securities if any of the proceeds will be used to pay for the construction of gaming facilities in Colorado, to directly or indirectly acquire an interest in a gaming facility in Colorado, to finance the operation of a gaming facility in Colorado or to retire or extend obligations for any of the foregoing. The Colorado Commission may, in its discretion, require additional information and prior approval of such public offering.

In addition, the Colorado Regulations prohibit a licensee or affiliated company thereof, from paying any unsuitable person any dividends or interest upon any voting securities or any

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

85

103000-001/956709_10.doc

payments or distributions of any kind (except as set forth below), or paying any unsuitable person any remuneration for services or recognizing the exercise of any voting rights by any unsuitable person. Further, under the Colorado Regulations, the Debtors may repurchase its voting securities from anyone found unsuitable at the lesser of the cash equivalent to the original investment or the current market price as of the date of the finding of unsuitability unless such voting securities are transferred to a suitable person (as determined by the Colorado Commission) within sixty (60) days after the finding of unsuitability. A licensee or affiliated company must pursue all lawful efforts to require an unsuitable person to relinquish all voting securities, including purchasing such voting securities. The staff of Colorado Division has taken the position that a licensee or affiliated company may not pay any unsuitable person any interest, dividends or other payments with respect to non-voting securities, other than with respect to pursuing all lawful efforts to require an unsuitable person to relinquish non-voting securities, including by purchasing or redeeming such securities. Further, the regulations require anyone with a material involvement with a licensee, including a director or officer of a holding company, to file for a finding of suitability if required by the Colorado Commission.

Because of their authority to deny an application for a license or suitability, the Colorado Commission and the Colorado Director effectively can disapprove a change in corporate position of a licensee and with respect to any entity which is required to be found suitable, or indirectly can cause a licensee or any affiliated company to suspend or dismiss managers, officers, directors and other key employees or sever relationships with other persons who refuse to file appropriate applications or who the authorities find unsuitable to act in such capacities.

Generally, a sale, lease, purchase, conveyance or acquisition of any interest in a licensee is prohibited without the Colorado Commission's prior approval. However, in the case of a publicly traded corporation, persons may acquire an interest (even, under current staff interpretations, a controlling interest) without the Colorado Commission's prior approval, but such persons may be required to file notices with the Colorado Commission and applications for suitability (as discussed above) and the Colorado Commission may, after such acquisition, find such person unsuitable and require them to dispose of their interest. Under some circumstances,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

licensees may not sell any interest in its Colorado gaming businesses without the prior approval of the Colorado Commission.

A licensee is required to provide information and file periodic reports with the Colorado Division, including identifying those who have a 5% or greater ownership, financial or equity interest in the licensee, or who have the ability to control the licensee, or who have the ability to exercise significant influence over the licensee, or who loan money or other things of value to a licensee, or who have the right to share in revenues of limited gaming, or to whom any interest or share in profits of limited gaming has been pledged as security for a debt or performance of an act. A licensee, and any parent company or subsidiary of a licensee, who has applied to a foreign jurisdiction for licensure or permission to conduct gaming, or who possesses a license to conduct foreign gaming, is required to notify the Colorado Division. Any person licensed by the Colorado Commission and any associated person of a licensee must report criminal convictions and criminal charges to the Colorado Division.

The Colorado Commission has broad authority to sanction, fine, suspend and revoke a license for violations of the Colorado Regulations. Violations of many provisions of the Colorado Regulations also can result in criminal penalties.

The Colorado Constitution currently permits gaming only in a limited number of cities and certain commercial districts in such cities.

The Colorado Constitution permits a gaming tax of up to 40% on adjusted gross gaming proceeds, and authorizes the Colorado Commission to change the rate annually. The current gaming tax rate is 0.25% on adjusted gross gaming proceeds of up to and including $2.0 million, 2% over $2.0 million up to and including $5.0 million, 9% over $5.0 million up to and including $8.0 million, 11% over $8.0 million up to and including $10.0 million, 16% over $10.0 million up to and including $13.0 million and 20% on adjusted gross gaming proceeds in excess of $13.0 million. The City of Black Hawk has imposed an annual device fee of $750 per gaming device and may revise it from time to time. The City of Black Hawk also has imposed other fees, including a business improvement district fee and transportation fee, calculated based on the number of devices and may revise the same or impose additional such fees.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1    Each Colorado Casino must meet specified architectural requirements, fire safety

2  standards and standards for access for disabled persons. Each Colorado Casino also must not

3  exceed specified gaming square footage limits as a total of each floor and the full building. Each

4  Colorado Casino may permit only individuals 21 or older to gamble in the casino. No Colorado

5  Casino may provide credit to its gaming patrons.  Each Colorado Casino must comply with

6  Colorado's Gambling Payment Intercept Act, which governs the collection of unpaid child

7  support costs on certain cash winnings from limited gaming.

8    The sale of alcoholic beverages is subject to licensing, control and regulation by the

9  Colorado liquor agencies. All persons who directly or indirectly hold a 10% or more interest in,

10  or 10% or more of the issued and outstanding capital stock of, through their ownership in a

11  holder such a license, must file applications and possibly be investigated by the Colorado liquor

12  agencies. The Colorado liquor agencies also may investigate those persons who, directly or

13  indirectly, loan money to or have any financial interest in liquor licensees. In addition, there are

14  restrictions on stockholders, directors and officers of liquor licensees preventing such persons

15  from being a stockholder, director, officer or otherwise interested in some persons lending

16  money to liquor licensees and from making loans to other liquor licensees. All licenses are

17  revocable and transferable only in accordance with all applicable laws. The Colorado liquor

18  agencies have the full power to limit, condition, suspend or revoke any liquor license and any

19  disciplinary action could (and revocation would) have a material adverse effect upon the

20  operations Debtors casino in Colorado. RBH holds a retail gaming tavern liquor license for its

21  casino, hotel and restaurant operations.

22    Persons directly or indirectly interested in RBH or Debtors may be limited in certain

23  other types of liquor licenses in which they may have an interest, and specifically cannot have an

24  interest in a retail liquor license (but may have an interest in a hotel and restaurant liquor license

25  and several other types of liquor licenses). No person can hold more than three retail gaming

26  tavern liquor licenses. The remedies of certain lenders may be limited by applicable liquor laws

27  and regulations.

28  / / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

88

103000-001/956709_10.doc

1    Colorado state gaming laws and regulations can be reviewed at the website of the

2    Colorado Department of Revenue, Division of Gaming at

3    http://www.colorado.gov/cs/Satellite/Rev-Gaming/RGM/1213781235687. Colorado liquor laws

4    may be found at http://www.colorado.gov/revenue/liquor. Municipal regulations for Blackhawk

5    can be reviewed at www.cityofblackhawk.org.

6    **E.    Relationship of Colorado Gaming Laws to Plan Transactions.**

7    Various transactions contemplated under the Plan will require approvals, but not prior

8    approvals, from the Colorado Gaming Authorities, consisting of the Colorado Limited Gaming

9    Control Commission and the Colorado Division of Gaming, including, but not limited to the

10   following. It is anticipated that Reorganized RHC will continue to be a registered corporation

11   and will issue 100% of the Class A Shares to Riviera Voteco, L.L.C. ("Voteco"), which will, as a

12   controlling shareholder of Reorganized RHC, be required after receiving such shares to submit

13   an application and be found suitable by the Colorado Gaming Authorities.  The managers and

14   directors, or the equivalent, of Voteco will also be required to submit applications and be found

15   suitable by the Colorado Gaming Authorities.  Members of Voteco with a greater than 5%

16   interest in Voteco will also be required to submit applications and be found suitable by the

17   Colorado Gaming Authorities.  With regard to any such member that is a business entity,

18   applicable rules will determine which of its owners, officers and directors, or the equivalent, will

19   be required to file applications and be found suitable.

20   The proposed issuance by Voteco of penny warrants, and any transfer of the same

21   subsequent to issuance, will not necessarily require approval by the Colorado Gaming

22   Authorities, but any person or entity that subsequently seeks to exercise such penny warrants to

23   obtain actual membership interests may be required to submit an application and be subject to a

24   finding of suitability, particularly if such interests exceed 5% of the total membership interests.

25   The Colorado Gaming Regulations define a "voting security" to be a security the holder

26   of which is entitled to vote generally for the election of a member or members of a board of

27   directors or board of trustees of a corporation or a comparable person or persons of another form

28   of business organization.  As the proposed holders of the Class B shares of Reorganized RHC

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

89

103000-001/956709_10.doc

will not have such entitlement, the Designated Consenting Lenders believe there is no mandatory obligation in the Colorado Gaming Regulations for the holders of such shares to file applications for findings of suitability with the Colorado Gaming Authorities. However, the Colorado Gaming Authorities have discretion to require any beneficial owner, either direct or indirect, of Reorganized RHC's voting or non-voting securities, regardless of the number of shares owned, to file an application, be investigated, and obtain a finding of suitability.  With regard to any such beneficial owner that is required to file an application that is a business entity, applicable rules will determine which of its owners, officers and directors, or the equivalent, will be required to file applications , be investigated, and be found suitable.  The applicant must pay all costs of investigation incurred by the Colorado Gaming Authorities in conducting any such investigation.

F.    **Summary of Gaming Regulatory Risks Under the Plan.**

1.      The Debtors are subject to extensive state and local regulation in every jurisdiction in which they do business.

2.      The substantial consummation of the Plan and the events and restructuring to take place on or after the Substantial Consummation Date are conditioned upon costly and time-consuming licensing procedures described above, and there is no assurance that the required approvals will be obtained on a timely basis, even if pursued in good faith and with due diligence.

3.      The Debtors and the Consenting Lenders have not determined the number, position or identity of the Persons who will need to be investigated and licensed, and any discussions herein regarding the same are generic in nature.

4.      The Debtors and the Designated Consenting Lenders have not investigated or inquired into the suitability of any prospective applicant for licensing purposes.  If any Person is found unsuitable, the remaining applicants must sever their connections and relationships with the unsuitable Person and cannot allow such Person, among other things, to exercise any voting rights or receive any distributions from any of the applicant entities.  A Person who continues to associate with a licensed entity after a finding of unsuitability may be guilty of a criminal offense.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

5.      Licenses that are currently held are not transferable to successor entities.  Even if an individual has been previously licensed or found suitable with a Debtor entity, he or she will need to reapply to be licensed or found suitable in connection with any newly-created entities that apply for gaming licenses.  There is no guarantee that such licenses will be issued or findings of suitability received.

6.      The burden and costs of proving suitability are on each individual applicant. There is no assurance that all of the Persons who will need to be investigated and found suitable will cooperate in this regard or be licensed or found suitable on a timely basis.

7.      Waivers from licensing requirements are often unavailable or difficult to obtain. A waiver from a licensing investigation (such as an institutional investor waiver) requires an application.  Such an application will itself trigger an investigation and must be approved by Gaming Authorities before the waiver can be effective.

8.      There is no assurance that all of the required findings of suitability, licenses and approvals to substantially consummate the Plan will be obtained.  The Gaming Authorities may deny an application for any cause they deem reasonable and such denial is normally not subject to judicial review.

9.      There is no assurance as to the timing of the licensing process, which is within the sole discretion of the Gaming Authorities.  Each of the Gaming Authorities will establish its own timing. As such, there can be no assurance that the Substantial Consummation Date will occur within six months from the Effective Date or at any other time soon thereafter.

10.      There is no assurance as to the potential changes in gaming regulations that any jurisdiction may later adopt or any license conditions that any jurisdiction may impose for any of the participants in the restructuring, if licensing is obtained in the first place.

11.      Any effort to usurp control of the Debtors' operations, including any attempted influence over the Debtors' operations or any unauthorized sharing in the Debtors' gaming revenues, prior to final approval and licensing of the successor entities and of all relevant Persons associated with the successor entities could be deemed a violation of gaming laws and result in regulatory and criminal sanctions, unless prior emergency approval is obtained.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

12.     Even if the necessary licenses, approvals, registrations, and findings of suitability are obtained, Gaming Authorities have wide discretion in disciplining any licensee. Such discipline may include substantial fines and revocation of licenses. Gaming Authorities have wide discretion in determining what constitutes a violation and the amount of fines that may be imposed. Any taxes administered by Gaming Authorities that are not paid by the Debtors (or unpaid gaming winnings) could also be assessed on the Reorganized Entities.

13.     The continuity of gaming operations in any jurisdiction depends on the political will of the local authorities and the respective state legislatures. The Debtors cannot guarantee that gaming will not be phased out in any jurisdiction where it is currently legal.

14.     The legalization and introduction of gaming activities in any neighboring jurisdictions or in any feeder markets, such as the opening of additional tribal casinos, the introduction of additional commercial casinos in or adjacent to the jurisdictions where the Debtors' operations are located, or the legalization of internet gaming could adversely affect the Debtors and the Reorganized Entities.

## XI.
## CERTAIN SECURITIES LAW CONSIDERATIONS

### A.     U.S. Securities Law Matters.

The Debtors intend that all equity securities to be issued in conjunction with the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in Section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption set forth in Section 4(2) of the Securities Act or Regulation D promulgated under the Securities Act by the United States Securities and Exchange Commission (the "SEC").

Reorganized RHC may, as determined in it sole discretion, seek a no-action letter from the SEC regarding the offering of any of equity securities to be issued in conjunction with the Plan pursuant to the registration exemption provided under Section 1145 of the Bankruptcy Code. Additionally, the Debtors may include in the proposed Confirmation Order a determination as to the availability of (or the Debtors may seek some other determination by the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1    Bankruptcy Court) the exemption under Section 1145(a)(1) of the Bankruptcy Code for the

2    issuance of the (i) Class A Shares, (ii) the Class B Shares, (iii) the penny warrants for up to 10%

3    of the Class B Shares distributed ratably to those Senior Secured Lenders who elect to participate

4    in the Designated New Money Investment and Working Capital Facility and (iv) the penny

5    warrants for Voteco Interests distributed to those Senior Secured Lenders who have not obtained

6    necessary licenses under the Gaming Laws, subject, in each case, to approval by the Bankruptcy

7    Court.  If the Bankruptcy Court does not find that Section 1145(a)(1) is applicable to the

8    issuance of any of such securities under the Plan, the  Debtors believe that any such issuance of

9    such securities would be exempt pursuant to Section (4)(2) of the Securities Act, as a transaction

10   by an issuer not involving any public offering, and equivalent exemptions in state securities laws

11   or under Regulation D.  Regulation D is a non-exclusive safe harbor promulgated by the SEC

12   under the Securities Act related to, among others, section 4(2) of the Securities Act. If Section

13   1145(a)(1) of the Bankruptcy Code is not applicable to any such securities, then any disclosure

14   contained in Section XI.C would also be applicable to such securities.  The Debtors reserve the

15   right to issue any such securities pursuant to a registration statement fulfilling applicable

16   Securities Law Registration requirements as if such requirements applied.

17   **B.      Section 1145 of the Bankruptcy Code.**

18              Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under

19   a Chapter 11 plan of reorganization from the registration requirements of Section 5 of the

20   Securities Act of 1933, as amended (the "Securities Act") and state securities laws (collectively

21   with registration under the Securities Act, "Securities Law Registration") if three principal

22   requirements are satisfied: (i) the securities must be offered and sold under a plan of

23   reorganization and must be securities of a debtor, of an affiliate participating in a joint plan with

24   a debtor, or of a successor to a debtor under the plan; (ii) the recipients of the securities must

25   hold claims against or interests in a debtor; and (iii) the securities must be issued in exchange (or

26   principally in exchange) for the recipient's claims against or interests in a debtor.

27              To the extent that any securities to be issued in conjunction with the Plan qualify under

28   Section 1145(a)(1) of the Bankruptcy Code, they may be resold by the holders thereof without

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

93

103000-001/956709_10.doc

1  Securities Law Registration unless, as discussed below, the holder is an "underwriter" with

2  respect to those shares.  Nevertheless, holders of such securities are advised to consult with their

3  own counsel as to the availability of such exemption, or any other exemption, from Securities

4  Law Registration and as to any applicable requirements or conditions for such availability, even

5  if such holders are not underwriters.

6      Section 1145(b)(1) of the Bankruptcy Code defines "underwriter," for purposes of this

7  analysis, as one who (i) purchases a claim against, or interest in, a debtor with a view to

8  distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell

9  securities offered or sold under a plan for the holders of such securities, (iii) offers to buy

10  securities offered or sold under a plan from persons receiving such securities, if the offer to buy

11  is made with a view to distribution of such securities and under an agreement made in connection

12  with the plan, with the consummation of the plan, or with the offer or sale of securities under the

13  plan, or (iv) is an "issuer" of the securities, as that term is used in Section 2(a)(11) of the

14  Securities Act.

15      A person that is not an issuer will not be deemed an underwriter with respect to securities

16  received under Section 1145(a)(1) of the Bankruptcy Code if such person transfers those

17  securities in "ordinary trading transactions."  There is no authoritative definition of "ordinary

18  trading transactions" under Section 1145 of the Bankruptcy Code; however, this term has been

19  the subject of interpretive letters from the staff of the SEC.  Generally according to such letters,

20  the staff of the SEC views ordinary trading transactions as those that do not involve (i) concerted

21  activity by recipients of securities under a plan of reorganization, or by distributors acting on

22  their behalf, in connection with the sale of such securities, (ii) use of informational documents in

23  connection with the sale other than the disclosure statement relating to the plan, any amendments

24  thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934,

25  as amended (the "Exchange Act"), or (iii) payment of special compensation to brokers or dealers

26  in connection with the sale, other than the compensation that would be paid pursuant to an arms'-

27  length negotiation between a seller and a broker or dealer, each acting unilaterally, not greater

28  / / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

94

103000-001/956709_10.doc

than the compensation that would be paid for a routine, similar-sized sale of similar securities of a similar issuer.

However, the reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(a)(11) of the Securities Act includes as underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code provides that there is a rebuttable presumption that a creditor who receives more than 10% of the voting securities of an issuer under a plan of reorganization is an underwriter under Section 1145(b)(1) of the Bankruptcy Code. Additionally, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed a "control person" of such debtor or successor and therefore an underwriter, particularly if such position is coupled with ownership of a significant percentage of the voting securities of such issuer.

With respect to any securities to be issued in conjunction with the Plan without Securities Law Registration in reliance on Section 1145(a)(1) of the Bankruptcy Code, resales of such shares by underwriters would not be exempt from Securities Law Registration by Section 1145 of the Bankruptcy Code. Under certain circumstances, holders of such equity securities who are underwriters may be entitled to resell their shares under the limited safe harbor resale provisions of Rule 144 under the Securities Act ("Rule 144"), to the extent available, and in compliance with applicable state and foreign securities laws. Generally, Rule 144 provides that persons who are affiliates of an issuer who resell securities will not be deemed underwriters if certain conditions are met. These conditions include the requirement that current public information be available with respect to the issuer, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the sale of the securities meet certain manner of sale limitations and that a notice of the sale be filed with the SEC. RHC as a Reorganized Debtor intends to comply with the reporting requirements of the Exchange Act, which is one of

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

95

103000-001/956709_10.doc

the methods contemplated by Rule 144 as satisfying the current public information requirement. Nevertheless, RHC cannot assure that adequate current public information will exist with respect to RHC to allow reliance on the safe harbor provisions of Rule 144.

Besides Rule 144, there may be other exemptions from Securities Law Registration on which underwriters could rely if they wish to sell the securities they received pursuant to Section 1145(a)(1) of the Bankruptcy Code. Persons who are underwriters would need to consult with their own counsel as to the availability of any other such exemptions.

Any person entitled to receive any securities to be issued in conjunction with the Plan as described above, and whom RHC considers to be an underwriter based on facts then known to RHC, will receive certificates bearing the restrictive legend set forth in Section XI.E. unless prior to RHC's issuance of those securities, such person or entity delivers to RHC (i) an opinion of counsel satisfactory to RHC to the effect that the securities to be received by such person or entity are not subject to the restrictions applicable to underwriters under Section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act, and (ii) a certification that such person or entity is not an underwriter under Section 1145 of the Bankruptcy Code. If such persons or entities deliver those two items to RHC before RHC issues those securities, RHC will issue certificates without a legend.

The determination of whether a particular person is an underwriter can be highly complex and subjective, and it is ultimately the responsibility of such person to make this determination (for which the Debtors recommend consultation with such person's own counsel) and to comply with laws relating to underwriters, to the extent applicable. Consequently, if RHC does not place a restrictive legend on any securities described above, the absence of the legend should not be construed as a determination that the recipient of those securities is not an underwriter.

Any record holder of securities described above that bear the restrictive legend may instruct the transfer agent for such securities to remove the legend or to transfer the shares to a new holder without the legend at such time as (i) those shares are sold pursuant to an effective registration statement under the Securities Act, (ii) such holder delivers to RHC an opinion of counsel satisfactory to RHC to the effect that such shares are no longer subject to the restrictions

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

96

103000-001/956709_10.doc

applicable to underwriters under Section 1145 of the Bankruptcy Code or (iii) such holder delivers to RHC an opinion of counsel satisfactory to RHC to the effect that such shares are no longer subject to the restrictions set forth in the legend due to an applicable exemption from Securities Law Registration and such shares may be sold without Securities Law Registration, in which event the shares issued to the transferee will not bear the restrictive legend.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY ARE UNDERWRITERS AND WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

**C.      Section 4(2) of the Securities Act and Regulation D.**

The Debtors believe that the offer and sale of any securities to be issued in conjunction with the Plan by RHC or Riviera Voteco, L.L.C., as the case may be, to which the exemption provided under Section 1145 of the Bankruptcy Code is not applicable will be exempt from Securities Law Registration pursuant to the nonpublic offering exemption under Section 4(2) of the Securities Act or Regulation D and equivalent exemptions under state securities laws.

Securities issued pursuant to the exemption provided by Section 4(2) of the Securities Act, or Regulation D promulgated thereunder, are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law.

Securities offered and sold pursuant to Section 4(2) of the Securities Act may be publicly resold if and when they are registered under the Securities Act (and under any state securities law that require registration) or if an exemption from registration is available to the holder of such securities, such as pursuant to the resale provisions of Rule 144 under the Securities Act, and

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

97

103000-001/956709_10.doc

such holder demonstrates the availability of such exemption to the reasonable satisfaction of the issuer of those securities.

**D.    Exchange Act Registration of Class B Shares.**

Following the issuance of the Class B Shares, Reorganized RHC shall, as soon as reasonably practicable, file with the SEC a registration statement for the Class B Shares on Form 8-A or Form 10 (as determined in Reorganized RHC's reasonable discretion) under the Securities Exchange Act of 1934, unless the SEC advises Reorganized RHC that the Class B Shares will be registered under such Act in the absence of such filing.

**E.    Restrictive Legend.**

Certificates evidencing the securities to which the exemption provided under Section 1145 of the Bankruptcy Code is applicable that are issued to persons whom RHC considers to be underwriters under Section 1145(b)(1) of the Bankruptcy Code, and certificates (including warrant certificates) evidencing the securities that are issued pursuant to the other exemptions from Securities Law Registration described in Section XI.C. will bear the following restrictive legend (unless in the case of securities to which the exemption provided under Section 1145 of the Bankruptcy Code is applicable, the recipients of such securities satisfy the requirements specified in Section XI.B. for the issuance of those shares without a legend):

> THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT OR THE COMPANY RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

/ / /

/ / /

/ / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

98

# XII.
## POST-SUBSTANTIAL CONSUMMATION DATE OPERATIONS

**A.**     **Title to Property; Discharge; Injunction.**

    **1.**     **Vesting of Assets.**

    Subject to and as provided for in the Plan, the Assets shall be vested and/or transferred to and by the Reorganized Debtors on the Substantial Consummation Date, free and clear of all Liens, Claims, charges or other encumbrance, except for Lien securing the obligations under the Credit Facilities.  On and after the Substantial Consummation Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

    **2.**     **Preservation of Litigation Claims.**

    In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided herein, on the Substantial Consummation Date all Litigation Claims shall be assigned and transferred to the Reorganized Debtors.  The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtors as of the Substantial Consummation Date.

    **3.**     **Settlement of Litigation Claims.**

    At any time after the Confirmation Date and before the Substantial Consummation Date, notwithstanding anything in the Plan to the contrary, the Debtors may settle any or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 and the consent of the Requisite Consenting Lenders (such consent not to be unreasonably withheld).  After the Substantial Consummation Date, the Reorganized Debtors may, and shall have the exclusive right to, compromise and settle any Claims against them and claims they may have against any other Person or entity, including, without limitation, the Litigation Claims,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

without notice to or approval from the Bankruptcy Court, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtors as of the Effective Date.

**4.     Discharge.**

**On the Effective Date, Debtors shall be discharged and released from any and all Claims in Classes 1, 2 and 6 to the fullest extent provided in Sections 524 and 1141 of the Bankruptcy Code.   On the Substantial Consummation Date, the Debtors shall be discharged and released from any and all of the Claims and Equity Interests, including those in Classes 3, 4, 5, 7, and 8 to the fullest extent provided in Sections 524 and 1141 of the Bankruptcy Code.  The Discharge shall be to the fullest extent provided under Section 1141(d)(1)(A) and (B) and other applicable provisions of the Bankruptcy Code.  Except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtors or any of their assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims.**

**5.     Injunction.**

**From and after the Effective Date for Classes 1, 2, and 6, and as of the Substantial Consummation Date for Classes 3, 4, 5, 7, 8 and 9, all entities are permanently enjoined from commencing or continuing in any manner, any cause of action released or to be released pursuant to the Plan or the Confirmation Order.**

**Except as otherwise expressly provided in the Plan, the Plan Supplement or related documents, or in obligations issued pursuant to the Plan, all entities who have held, hold or may hold Claims or Equity Interests that have been released pursuant to Section XII.A.6 or Section XIIA.7, discharged pursuant to Section XII.A.4, or are subject to exculpation pursuant to Section XII.B are permanently enjoined, from and after the Substantial Consummation Date, from taking any of the following actions:   (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

connection with or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such entities on account of or in connection with or with respect to any such Claims or Equity Interests; (3) creating, perfecting or enforcing any encumbrance of any kind against such entities or the property or estate of such entities on account of or in connection with or with respect to any such Claims or Equity Interests; and (4) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan.

The rights afforded in the Plan and the treatment of all Claims and Interests therein shall be in exchange for and in complete satisfaction of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors or any of their Assets, property or Estates.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant thereto from and after the Effective Date for Classes 1, 2, and 6, and as of the Substantial Consummation Date for Classes 3, 4, 5, 7. 8 and 9, all Claims shall be fully released and discharged, and the Equity Interests shall be cancelled, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code.

All entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their respective successors and assigns and each of their assets and properties, any other Claims or interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

6.    Debtors' Releases.

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

the Plan, on and after the Substantial Consummation Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and their respective Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, or and their respective Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.

7.  **Third Party Release.**

As of the Effective Date for Classes 1, 2, and 6, and as of the Substantial Consummation Date for Classes 3, 4, 5, 7, 8 and 9, each Holder of a Claim or an Equity Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties (to the extent allowed by applicable law) from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever,

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

102

**including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party  that constitutes willful misconduct or gross negligence.  Notwithstanding anything contained herein or otherwise, no Backstop Lender shall be deemed to have released any Defaulting Backstop Lender (as defined in the Backstop Commitment Agreement) from any such Claim, Interest, obligation, right, suit, damage, Cause of Action, remedy and liability whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise.**

**B.**    **Exculpation.**

From and after the Substantial Consummation Date, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim or obligation, Cause of Action or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Chapter 11 Cases.  No Holder of a Claim or Equity Interest, or any other party-in-interest, including their respective agents, employees, representatives, financial

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

103

advisors, attorneys or Affiliates, shall have any right of action against any Exculpated Party relating to, or arising out of the Exculpated Claims, except for their willful misconduct and gross negligence.  Notwithstanding anything contained herein or otherwise, no Backstop Lender shall be deemed to have released or exculpated any Defaulting Backstop Lender from any such Exculpated Claim or obligation, Cause of Action or liability for any Exculpated Claim.

**C.**      **Director and Officer Liability Insurance.**

As of the Substantial Consummation Date Reorganized RHC will obtain sufficient tail coverage under a directors and officers' liability insurance policy (the "D&O Liability Insurance Policy", and, together with all insurance policies for directors and officers' liability maintained by the Debtors as of the Petition Date, the "D&O Liability Insurance Policies") for the current and former directors and officers for a period of six (6) years.   As of the Substantial Consummation Date, the Reorganized Debtors shall assume all of the D&O Liability Insurance Policies pursuant to Section 365(a) of the Bankruptcy Code, and RHC will assume and, if applicable, assign to Reorganized Debtors all of the D&O Liability Insurance Policies pursuant to Section 365(a) of the Bankruptcy Code.   Entry of the Confirmation Order will constitute approval by the Bankruptcy Court of Debtors' foregoing assumption and assumption and assignment by Reorganized Debtors of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by Debtors and Reorganized Debtors under the Plan as to which no proof of Claim need be filed.

**D.**      **Indemnification.**

All indemnification provisions currently in place (whether in the by-laws, articles or certificates of incorporation, articles of limited partnership, limited liability company agreements, board resolutions (or resolutions of similar bodies) or employment contracts) for the current directors, officers, employees, attorneys, other professionals and agents of the Debtors, and such current directors and officers of the Debtors' respective Affiliates, in each case, who

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104

103000-001/956709_10.doc

will continue in such capacities or similar capacities after the Effective Date, shall be assumed and shall survive effectiveness of the Plan. Nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such indemnification provisions.

## XIII.
## RETENTION OF JURISDICTION

**A.    Jurisdiction.**

The Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases, and Reorganized Debtors after the Effective Date as is legally permissible, including jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest or Disputed Claim or Disputed Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Disputed Claims and Equity Interests or Disputed Equity Interests;

2.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.    Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor or Reorganized Debtor is a party and to hear, determine and, if necessary, liquidate any Claims arising therefrom or Cure amounts related thereto;

4.    Ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

5.    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications or motions involving any Debtors or Reorganized Debtors that are pending on the Effective Date or commenced thereafter as provided for by the Plan;

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

105

103000-001/956709_10.doc

6.     Enter any necessary or appropriate orders to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, this Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

7.     Decide or resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of any Final Order, the Plan, the Confirmation Order or any Person's obligations incurred in connection with any Final Order, the Plan or the Confirmation Order;

8.     Modify the Plan pursuant to Section 1127 of the Bankruptcy Code and Section 12.1 of the Plan or modify any contract, instrument, release or other agreement or document created in connection with the Plan, this Disclosure Statement, the Confirmation Order, or the Reorganized Debtors; or remedy any defect or omission or reconcile any inconsistency in any Final Order, the Plan, the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, this Disclosure Statement or the Confirmation Order, as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

9.     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of any Final Order, the Plan or the Confirmation Order, except as otherwise provided in the Plan;

10.     Enter and implement any necessary or appropriate orders if a Final Order or the Confirmation Order is modified, stayed, reversed, revoked or vacated;

11.     Determine any other matters that may arise in connection with, or relate to, the Plan, any Final Order, this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, this Disclosure Statement, any Final Order or Confirmation Order, except as otherwise provided in the Plan;

12.     Enter an order closing the Chapter 11 Cases;

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

13.     Hear and decide Litigation Claims and any other claim or cause of action of the Debtors or Reorganized Debtors; and

14.     Decide or resolve any matter over which the Bankruptcy Court has jurisdiction pursuant to Section 505 of the Bankruptcy Code.

## XIV.
## MODIFICATION AND AMENDMENT OF THE PLAN

Prior to Confirmation, Debtors may alter, amend or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time, provided such amendment or modification has been approved by the Requisite Consenting Lenders.  After the Confirmation Date and prior to the Substantial Consummation Date, the Debtors may, under Section 1127(b), (c) and (d) of the Bankruptcy Code, alter, amend or modify the Plan or institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, and to make appropriate adjustments and modifications to the Plan or the Confirmation Order as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially adversely affect the treatment of Holders of Claims under the Plan and the Requisite Consenting Lenders approve any such alteration, amendment or modification.

## XV.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

### A.     Introduction.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan (including, for example, Holders of Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims).  The following summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Department of the Treasury regulations promulgated thereunder ("Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

Changes in such rules or new interpretations thereof may have a retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No assurance can be given that legislative or administrative changes or court decisions will not be forthcoming which would require significant modification of the statements in this section. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any tax aspects of the Plan. Therefore, no assurance can be given as to the position the IRS will take on the tax consequences of the transactions that are to occur in connection with the Plan.

This summary does not address foreign, state or local tax consequences, nor does it address the U.S. federal income tax consequences of the Plan to the particular circumstances of any Holder, Holders that are not "United States persons" (as such term is defined in the IRC) or Holders subject to special income tax rules (including, for example, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers, tax-exempt organizations (including pension funds), persons holding a Claim as part of an integrated transaction, constructive sale, straddle, hedge or conversion transaction, persons that are related to RHC for tax purposes within the meaning of IRC Section 267 after the Substantial Consummation Date, and investors in pass-through entities).

This discussion assumes that the various debt and other arrangements to which Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This discussion also assumes that Holders of Claims hold such Claims as "capital assets" (as defined by the IRC).

The following discussion is a general summary of certain U.S. federal income tax aspects of the Plan and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim. EACH HOLDER OF A CLAIM AFFECTED BY THE PLAN SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1    THAT HOLDER'S CLAIM, INCLUDING UNDER ANY APPLICABLE STATE, LOCAL OR

2    FOREIGN LAW.

3        IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR

4    230 AND THE REQUIREMENTS IMPOSED BY THE IRS, HOLDERS OF CLAIMS ARE

5    HEREBY NOTIFIED THAT: (i) ANY DISCUSSION OF TAX ISSUES CONTAINED OR

6    REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN

7    TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAX-

8    RELATED PENALTIES THAT MAY BE IMPOSED UNDER THE IRC; AND (ii) THIS

9    DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OF THE

10   PLAN.   EACH HOLDER SHOULD SEEK ADVICE BASED ON THE HOLDER'S

11   PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

12   **B.    Tax Consequences to the Debtors.**

13       Set forth below in this Section is a discussion of certain tax consequences to the Debtors

14   in connection with the effectuation of the Plan.

15       **1.    Cancellation of Indebtedness Income.**

16           a.    COD Income—General Rule.

17       RHC will realize cancellation of indebtedness ("COD") income in connection with the

18   effectuation of the Plan.  In general, a debtor realizes COD income upon satisfaction of its

19   outstanding indebtedness for total consideration less than the amount of such indebtedness.  The

20   amount of consideration paid to a creditor generally equals the sum of (i) Cash, (ii) the fair

21   market value of any property (other than debt), and (iii) the issue price of any new indebtedness

22   of the debtor issued, in each case, given in satisfaction of such indebtedness.  Applying these

23   rules to the current transactions, the amount of COD income realized by RHC will equal the

24   excess of the adjusted issue price of the Claims immediately prior to the time such Claims are

25   cancelled (including any RHC debt that is cancelled without payment and any accrued but

26   unpaid interest) over the sum of the issue price of the New Series A Notes, the fair market value

27   of the Class B Shares and the amount of Cash paid.

28   / / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

109

b.    COD Income—Issue Price and Adjusted Issue Price.

The computation of COD income to be recognized by RHC with respect to the First Priority Senior Secured Claims and Senior Secured Claims depends on the "adjusted issue price" of the debt represented by such claims immediately prior to their cancellation.   These concepts are related to the original issue discount ("OID") rules of the IRC which are discussed below.

Under the OID rules, the "issue price" of debt depends on how the debt is issued.  The issue price of debt issued for Cash is the price at which a substantial amount of the debt is sold.  The issue price of a publicly-traded debt instrument issued for property (other than Cash) is the fair market value of the debt instrument, determined as of the issue date.  If a debt instrument that is not publicly-traded is issued for publicly-traded property (other than Cash), the issue price of the debt instrument is equal to its fair market value, determined with respect to the trading prices of such publicly-traded property.  The issue price of a debt instrument that is not publicly traded and that is issued in exchange for property (other than Cash) that is not publicly traded is the stated principal amount of such debt instrument, as long as the instrument provides for adequate stated interest (i.e., interest at least equal to certain rates published monthly by the IRS).

A debt instrument will be considered publicly traded for U.S. federal income tax purposes if it is traded on an "established market" at any time during the 60-day period ending 30 days after the issue date.  In general, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if: (i) it is listed on (a) a qualifying national securities exchange, (b) certain qualifying interdealer quotation systems or (c) certain qualifying foreign securities exchanges; (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions; or (iii) price quotations are readily available from dealers, brokers or traders.  In general, an issuer's determination of issue price is binding on all holders of the applicable debt, other than a holder that explicitly discloses its inconsistent treatment in a statement attached to its timely-filed tax return for the taxable year in which the

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

110

103000-001/956709_10.doc

1    debt was issued.  While a complete analysis has not been completed at this point in time, it does

2    not appear that the Senior Secured Credit Facility or the Series A Term Loan notes will be

3    considered to be publicly traded for U.S. federal income tax purposes.

4    The "adjusted issue price" of a debt instrument is the issue price of the debt as adjusted

5    for OID.  Generally, a debt instrument is treated as having OID if its "stated redemption price at

6    maturity" exceeds its "issue price" by more than a de minimis amount.  A debt instrument's

7    stated redemption price at maturity includes all principal and interest payable over the term of

8    the debt, other than "qualified stated interest."  Stated interest is "qualified stated interest" if it is

9    unconditionally payable in Cash or in property (other than debt instruments of the issuer) at least

10   annually.  Holders of a debt instrument that is issued with OID are generally required to include

11   any OID in income over the term of the debt instrument in accordance with a constant yield-to-

12   maturity method, regardless of whether the holder is a cash or accrual method taxpayer, and

13   regardless of whether and when the holder receives Cash payments of interest on the note (other

14   than Cash attributable to qualified stated interest).  The adjusted issue price of a debt instrument

15   is the debt instrument's issue price as increased by any OID that has accrued with respect to such

16   debt instrument and decreased by any payments on the debt instrument other than payments of

17   qualified stated interest.

18   With respect to the outstanding Senior Secured Credit Facility which was issued without

19   OID, the adjusted issue price of that debt should be its stated principal amount.

20   c.    Exceptions to COD Income Inclusion.

21   RHC expects to be able to take advantage of two exceptions under the IRC to the

22   requirement for recognizing COD income.  First, COD income is not realized to the extent that

23   the payment of the liability would have given rise to a deduction.  Accordingly, RHC will not be

24   required to realize COD income with respect to any accrued but unpaid interest to the extent that

25   it has not deducted such interest.

26   Second, a debtor is not required to include any COD income in gross income if the debtor

27   is under the jurisdiction of a court in a bankruptcy case and the discharge of debt occurs pursuant

28   to that proceeding.  However, a debtor in bankruptcy that recognizes COD income is required to

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

111

103000-001/956709_10.doc

1    reduce its tax attributes by the amount of COD income that it excluded from gross income.  Such

2    COD income will reduce certain tax attributes of the debtor generally in the following order: (i)

3    net operating losses ("NOLs") and NOL carryovers; (ii) general business credits; (iii) minimum

4    tax credits; (iv) capital loss carryovers; (v) tax basis of property; (vi) passive loss and credit

5    carryovers; and (vii) foreign tax credit carryovers.  The reduction to tax attributes is made after

6    the determination of tax for the taxable year in which the discharge of indebtedness occurs.

7    However, a debtor may elect to first reduce the tax basis in its depreciable assets.

8         At this point in time, the amount of COD income is unknown, due to the fact that certain

9    Holders of Senior Secured Claims will receive Class B Shares along with the Series A Term

10   Loan notes and due to the fact that the fair market value of the Class B Shares cannot be known

11   until after the Substantial Consummation Date.  The fair market value of the Class A Shares or

12   Voteco Interests also cannot be determined until the Substantial Consummation Date, but the

13   Debtors do not believe that any material value should be attributed to the Class A Shares or the

14   Voteco Interests. However, the IRS may take a contrary position. The amount of tax attributes

15   required to be reduced will therefore depend on the fair market value of the Class B Shares, the

16   fair market value of the Class A Shares, the issue price of the Series A Term Loan notes (which,

17   as discussed above, should equal the stated principal amount because the Senior Secured Credit

18   Facility and the Series A Term Loan notes should not be treated as publicly traded for U.S.

19   federal income tax purposes), and the extent to which the amount of General Unsecured Claims

20   exceeds the amount of cash issued in satisfaction of such Claims.  However, the Debtors expect

21   that they will have significant NOL carryovers remaining after the Substantial Consummation

22   Date, subject to various limitations discussed below in Section X.V.B.2.

23        **2.       Limitation of Net Operating Loss Carryovers and Other Tax Attributes.**

24        Under IRC Section 382, if a corporation, such as RHC, undergoes an "ownership

25   change," the corporation's ability to use its losses that relate to a period prior to such change in

26   ownership to offset future taxable income is generally subject to an annual limitation (the

27   "Annual Limitation").

28   / / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

The amount of NOL carryovers that will be available to the Reorganized Debtors as of the Substantial Consummation Date is based on a number of factors, including the following: (i) the amount of tax losses incurred by the Debtors in 2010 and 2011 and (ii) the amount of COD income incurred by the Debtors in connection with the Plan. As of this point in time, the amount of NOLs that RHC will have as of the Substantial Consummation Date is unknown. However, the Debtors anticipate that, after taking the above factors into account, the Reorganized Debtors will have estimated NOL carryovers following the Substantial Consummation Date potentially exceeding $20 or $40 million, depending on whether the Total New Money Investment Alternative or partial New Money Investment Alternative is effectuated. Such NOL carryforwards will be subject to the Annual Limitation discussed below.

The Reorganized Debtors' subsequent utilization of any losses, NOL carryovers and certain other tax attributes may be restricted as a result of and upon the Substantial Consummation Date. Following the Substantial Consummation Date, the Debtors anticipate that any remaining NOLs, tax credit carryovers and certain other tax attributes allocable to periods prior to the Substantial Consummation Date (collectively, "Pre-Change Losses") may be subject to the Annual Limitation under IRC Section 382 as a result of an "ownership change." As discussed below, the issuance of the Class A Shares and the Class B Shares pursuant to the Plan is expected to result in an "ownership change" of the Reorganized Debtors for these purposes due to the fact that all Equity Interests of RHC will be cancelled, the Holders of the Senior Secured Claims will receive all Class B Shares, and that all Class A Shares will be issued to Voteco. Accordingly, the use by RHC of its NOL carryovers will be subject to the Annual Limitation unless an exception to the general rules of IRC Section 382 applies. Additionally, some of the Debtors' NOL carryovers are already subject to significant IRC Section 382 limitations from prior ownership changes.

a.      General Section 382 Annual Limitation.

In general, the amount of the Annual Limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments)

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (3.99% for the month of September 2010). Any unused Annual Limitation may be carried forward, resulting in an increase in the Annual Limitation in the subsequent taxable year.  The Annual Limitation may be increased by the amount of certain recognized built-in gains.

However, if the corporation does not meet the continuity of business requirement (i.e., continuing its historic business) or use a significant portion of its historic assets in a new business for two years after the ownership change, the Annual Limitation resulting from the ownership change will be reduced to zero (which may be increased in certain instances).

b.    Ownership Change.

An "ownership change" occurs under IRC Section 382 if the percentage of stock of the corporation owned actually or constructively by one or more "5-percent shareholders" increases by more than 50 percentage points on any "testing date" (taking into account all relevant adjustments as of the end of a "testing date") as compared to the lowest percentage of stock of the corporation owned by those 5-percent shareholders at any time during the statutory "testing period" (which is in general the past three years or, if shorter, since the last ownership change). Generally, a "testing date" is any date there is any change in the ownership of common stock that affects the percentage stock ownership of a 5-percent shareholder.

A "5-percent shareholder" is one who owns at least five percent of the stock of the corporation (not including certain nonvoting nonparticipating preferred stock) at any time during the testing period, and all stock owned by shareholders who are not 5-percent shareholders (hereinafter referred to as "public shareholders") is generally treated as being owned by one 5-percent shareholder.  Generally, such changes in the ownership of common stock are based on the direct stock ownership of individuals in the loss corporation and the constructive stock ownership of individuals in the loss corporation through intervening entities is taken into account by disregarding such entities.

c.    Bankruptcy Exceptions.

An exception to the foregoing Annual Limitation rules generally applies when so-called

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

"qualified creditors" of a debtor company in a Chapter 11 proceeding receive, in respect of "qualified indebtedness," at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in Chapter 11) pursuant to a confirmed Chapter 11 bankruptcy plan (referred to as the "382(l)(5) Exception").

Indebtedness of the loss corporation is qualified indebtedness if: (i) it was held by the same creditor for at least 18 months prior to the date of the bankruptcy filing, or (ii) it arose in the ordinary course of the loss corporation's trade or business and has been held by the person who at all times held the beneficial interest in such indebtedness. Moreover, a loss corporation may treat a creditor as a qualified creditor if the creditor receives less than five percent of the stock of the reorganized corporation immediately after the ownership change, absent actual knowledge that the creditor had not owned the indebtedness for the requisite period.

Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the taxable year prior to and including the effective date of the plan of reorganization, with respect to all debt converted into stock in the Chapter 11 reorganization. Further, if the 382(l)(5) Exception applies and the Debtors undergo another "ownership change" within two years after the Substantial Consummation Date, then the Debtors' Pre-Change Losses would be effectively eliminated in their entirety. It is uncertain whether the Debtors will qualify for the 382(l)(5) Exception.

If the 382(l)(5) Exception does not apply due to the Debtors failing to meet the requirements for such exception or electing not to utilize the 382(l)(5) Exception, the so-called "insolvency exception" under IRC Section 382(l)(6) may apply (the "382(l)(6) Exception"). In the event that the 382(l)(6) Exception applies, a debtor corporation that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the Bankruptcy. The 382(l)(6) Exception differs from the general rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

before the events giving rise to the ownership change.  Additionally, the 382(l)(6) Exception differs from the 382(l)(5) Exception as follows: (i) the debtor corporation is not required to reduce their NOLs by the amount of interest deductions claimed within the prior three-year period; and (ii) the debtor may undergo an "ownership change" within two years without triggering the effective elimination of its NOLs.

For purposes of the 382(1)(6) Exception, a corporation whose assets generally have a fair market value greater than their tax basis (a "net unrealized built-in gain") is permitted to increase its Annual Limitation during the five years immediately after the "ownership change" by an amount equal to the depreciation deductions that a hypothetical purchaser of a debtor's assets would have been permitted to claim if it had acquired the debtor's assets in a taxable transaction. At this point in time, while the Debtors' analysis has not yet been completed, the Debtors believe that their assets may have a net unrealized built-in gain.

As stated above, it is uncertain whether the Debtors will qualify for the 382(l)(5) Exception. The Debtors anticipate that the use of their Pre-Change Losses after the Substantial Consummation Date will be subject to the loss rules discussed above, taking into account the 382(l)(6) Exception.

### 3.    Alternative Minimum Tax.

In general, the alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax.  When computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. Even though a corporation otherwise might be able to offset all of its taxable income for regular U.S. federal income tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an "ownership change" within the meaning of IRC Section 382 and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

116

103000-001/956709_10.doc

1    reduced for certain AMT purposes to reflect the fair market value of such assets as of the change

2    date.

3        Any AMT that a corporation pays generally will be allowed as a nonrefundable credit

4    against its regular U.S. federal income tax liability in future taxable years when the corporation

5    is no longer subject to the AMT.

6    **C.    Tax Consequences to Certain Holders of Claims and Equity Interests.**

7        **1.    Consequences to Holders of Class 3 Claims (General Unsecured Claims).**

8        Pursuant to the Plan, the Holders of General Unsecured Claims will be paid in Cash;

9    provided, however, if the total payment to the Holders of General Unsecured Claims exceeds

10   $3,000,000, such Holders will receive their Pro Rata share of the $3,000,000.  The receipt of

11   Cash in satisfaction of a General Unsecured Claim should be treated as a taxable exchange under

12   IRC Section 1001, except to the extent that any amount received by a Holder of a surrendered

13   claim under the Plan is attributable to accrued but unpaid interest (as discussed in Section

14   XV.C.4 below). If a Holder receives Cash in satisfaction of its Claim in an amount that is less

15   than such Holder's Claim, such Holder will generally recognize loss for U.S. federal income tax

16   purposes in an amount equal to the difference between the amount of Cash and the Holder's

17   adjusted tax basis in the Claim.  The character of such loss as capital or ordinary in nature will be

18   determined by a number of factors, including: (i)  the tax status of the Holder; (ii) the nature of

19   the Claim in such Holder's hands; (iii) whether the Claim constitutes a capital asset in the hands

20   of the Holder and (iv) whether and to what extent the Holder has previously claimed a bad debt

21   deduction with respect to its Claim.  The deductibility of any loss for U.S. federal income tax

22   purposes may be subject to certain limitations.

23       **2.    Consequences to Holders of Class 4 Claims (First Priority Senior Secured**
     **Claims).**

24

25   In connection with the exchange of a Holder's First Priority Senior Secured Claims for its

     Pro Rata share of Series A Term Loan (to be evidenced by the Series A Term Loan notes) under

26   the Plan, the Debtors intend to take the position that the First Priority Senior Secured Claims

27   relate to a claim for interest and fees under the Term Loans and Revolving Credit Loans and any

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

117

103000-001/956709_10.doc

periodic payments and interest under the Secured Hedging Agreement, as applicable. Although the IRS may assert a different position, the discussion in this Section assumes that the Debtors' position will be respected.

To the extent that any of the Series A Term Loan notes received in exchange for the First Priority Senior Secured Claims is allocable to accrued but untaxed interest, such Holder may recognize ordinary income (See Section XV.C.4. below for further information). Additionally, to the extent that any of New Series A notes received in exchange for the First Priority Senior Secured Claims is allocable to fees, such Holder may recognize ordinary income. If a Holder has already included such interest in income, such Holder will have a loss to the extent the issue price of the Series A Term Loan notes is less than the interest accrued. To the extent that any of the New Series A notes received in exchange for the First Priority Senior Secured Claims is allocable to periodic payments due under the Secured Hedging Agreement, and the Holder has not previously included in taxable income such periodic payments, the Holder may recognize ordinary income. A Holder's tax basis in the Series A Term Loan notes received should equal the issue price of the Series A Term Loan notes as of the Substantial Consummation Date. A Holder's holding period for Series A Term Loan notes should commence as of the day following the Substantial Consummation Date.

**3.    Consequences to Holders of Class 5 Claims (Senior Secured Claims).**

Senior Secured Claims consist of (i) Claims under the Senior Secured Credit Agreement, which has a term of seven years with respect to the Term Loans in the principal amount of $225,000,000 and a term of five years with respect to the Revolving Credit Loan in the principal amount of $2,500,000, and (ii) Claims relating to the Secured Hedging Agreement and not otherwise classified as First Priority Senior Secured Claims (the "Secured Hedging Claims"). Senior Secured Claims do not include any Claims consisting of First Priority Senior Secured Claims.

Pursuant to the Plan, Senior Secured Claims will be exchanged for (i) their Pro Rata share of Series A Term Loan, evidenced by Series A Term Loan notes (less the amount received by the holders of First Priority Senior Secured Claims), (ii) Class B Shares and (iii) Voteco Interests.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

118

103000-001/956709_10.doc

For purposes of this discussion, it is assumed that Holders of the Senior Secured Claims will be treated, for U.S. federal income tax purposes, as receiving Class A Shares in connection with the cancellation of the Senior Secured Claims despite the fact that the Class A Shares will be held by Voteco and that such Holders will receive a certain share of Voteco Interests depending on whether the Total New Money Alternative is effectuated or the Partial New Money Investment Alternative is effectuated. Although the IRS may assert a position different from the proposed characterization discussed above, the discussion in this Section assumes that the Debtors' position will be respected.

The U.S. federal income tax consequences to Holders of Senior Secured Claims first depends on whether the Senior Secured Claims, the Series A Term Loan notes, the Class A Shares and the Class B Shares are treated as stock or "securities" of Reorganized RHC for purposes of the reorganization provisions of the IRC, and therefore whether the Debtors' restructuring qualifies as a tax-free reorganization. The Class A Shares and Class B Shares are common stock of Reorganized RHC which will be issued pursuant to the transactions under the Plan and characterized as stock for purposes of the reorganization rules. However, the Senior Secured Claims and Series A Term Loan notes are not stock of Reorganized RHC and therefore would need to qualify as "securities" in order for the exchange to qualify for tax-free treatment.

The determination of whether a debt instrument constitutes a "security" is based on all of the facts and circumstances. Various authorities have held that term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security for U.S. federal income tax purposes. Such authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. Numerous other factors are taken into account in determining whether a debt instrument is a security, including, without limitation: (i) the security for payment; (ii) the creditworthiness of the obligor; (iii) the subordination or lack thereof to other creditors; (iv) the right to vote or otherwise participate in the management of the obligor and convertibility of the instrument into an equity interest of the obligor; (v) whether payments of

/ / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

119

103000-001/956709_10.doc

interest are fixed, variable or contingent; and (vi) whether such payments are made on a current basis or accrued.

The Senior Secured Claims, excluding the Secured Hedging Claims, likely constitute securities for U.S. federal income tax purposes. The Secured Hedging Claims likely would not constitute securities for U.S. federal income tax purposes. Although the matter is subject to uncertainty, the Series A Term Loan notes likely do not constitute securities.

If the Senior Secured Claims, excluding the Secured Hedging Claims, are characterized as securities of Reorganized RHC, the exchange of the Senior Secured Claims (excluding the Secured Hedging Claims) for Class A Shares, Class B Shares and Series A Term Loan notes should qualify as a recapitalization under IRC Section 368(a)(1)(E). However, in the event that the Series A Term Loan notes are not treated as securities for U.S. federal income tax purposes, the Series A Term Loan notes should be considered "other property" (i.e., boot) in an amount equal to the fair market value of the Series A Term Loan notes. The Debtors believe that the Series A Term Loan should have a fair market value approximately equal to its stated principal amount. If the Series A Term Loan notes are not treated as securities for U.S. federal income tax purposes, a Holder of a Senior Secured Claim, excluding the Secured Hedging Claims, generally will recognize gain (but not loss) with respect to the receipt of the Series A Term Loan notes, but not in excess of the amount of gain realized on the exchange. In addition, a Holder of Senior Secured Claims may recognize ordinary income to the extent that Class A Shares, Class B Shares or Series A Term Loan notes are treated as received in satisfaction of accrued but unpaid interest on such Senior Secured Claims. (See Section XV.C.4 below for further information.) However, the Debtors are taking the position that there should be no accrued interest associated with the Senior Secured Claims, as all accrued interest is allocated to First Priority Senior Secured Claims.

Assuming the Series A Term Loan notes are not treated as securities, each Holder of a Series A Term Loan note should obtain a tax basis in the Class A Shares and Class B Shares (which should be Pro Rata) equal to the tax basis of the Senior Secured Claims (other than the Secured Hedging Claims) surrendered, decreased by the fair market value of the Series A Term

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1    Loan notes received and increased by the amount of any taxable gain recognized in the

2    recapitalization. Each Holder should obtain a tax basis in the Series A Term Loan notes equal to

3    the fair market value of the Series A Term Loan notes. The holding period for the Class A Shares

4    and Class B Shares should include the holding period for the Senior Secured Claims exchanged

5    for such Class A Shares and the Class B Shares. The holding period for the Series A Term Loan

6    notes should commence as of the day following the Substantial Consummation Date.

7        As discussed above, the Secured Hedging Claims should not constitute "securities" for

8    U.S. federal income tax purposes. Holders of such Claims will be treated as exchanging Secured

9    Hedging Claims for Series A Term Loan notes, Class A Shares and Class B Shares in a taxable

10   exchange under IRC Section 1001. Accordingly, such Holders should recognize gain or loss

11   equal to the difference between: (i) the sum of the issue price of the Series A Term Loan notes

12   and fair market value of the Class A Shares and Class B Shares and (ii) the Holder's adjusted

13   basis in the Secured Hedging Claims exchanged therefor. The issue price of the Series A Term

14   Loan notes generally should equal the stated principal amount of such notes because the Secured

15   Hedging Claims should not be considered publicly-traded property for U.S. federal income tax

16   purposes and the Debtors do not expect that the Series A Term Loan notes will be considered

17   publicly-traded property for U.S. federal income tax purposes. Such Holder should obtain a tax

18   basis in the Series A Term Loan notes, Class A Shares and Class B Shares equal to the fair

19   market value of the Series A Term Loan notes, Class A Shares and Class B Shares, respectively.

20   The holding period for the Series A Term Loan notes, Class A Shares and Class B Shares should

21   commence as of the day following the Substantial Consummation Date.

22       In addition, the Series A Term Loan notes should not be treated as issued with OID

23   because their issue price should not be less than their principal amount.

24       **4.    <u>Accrued Interest.</u>**

25       To the extent that any amount received by a Holder of a surrendered Claim under the

26   Plan is attributable to accrued but unpaid interest and such amount has not previously been

27   included in the Holder's gross income, such amount would be taxable to the Holder as ordinary

28   interest income.  Conversely, a Holder of a surrendered Claim may be able to recognize a

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

121

103000-001/956709_10.doc

deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instrument constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. The extent to which the consideration received by a Holder of a surrendered Claim will be attributable to accrued interest on the debt constituting the surrendered Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. As discussed above, the Debtors intend to take the position that any payment of First Priority Senior Secured Claims is on account of interest, and any payment of Senior Secured Claim is on account of principal.

**5.    Market Discount.**

Under the "market discount" provisions of IRC Sections 1276 through 1278, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Claim may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the debt constituting the surrendered Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if the Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (as discussed above) of a debt that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

/ / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

122

103000-001/956709_10.doc

6.   **Consequences To Holders Of Class 8 Equity Interests (Equity Interests In RHC).**

Pursuant to the Plan, Holders of Equity Interests in RHC will have such Equity Interests cancelled and will not receive any distribution.  Holders of Equity Interests, which are being cancelled under the Plan, will generally be entitled to claim a worthless stock deduction for U.S. federal income tax purposes (assuming that the taxable year of the Substantial Consummation is the same taxable year in which such stock first became worthless and that such Holder did not previously claim worthless stock deduction with respect to any Equity Interests in RHC) in an amount equal to such Holder's adjusted basis in Equity Interests. A worthless stock deduction is a deduction allowed to a Holder of a corporation's stock, which is a capital asset, for the taxable year in which such stock became worthless, in the amount of the loss resulting from such worthlessness.

7.   **Consequences of Holding Working Capital Facility Notes.**

Holders of notes evidencing the Working Capital Facility under the First Lien Credit Agreement ("Working Capital Facility Notes") will be required to include qualified stated interest (as described in Section XV.B.1. above) in income in accordance with the holders' regular method of accounting.  Additionally, such holders will receive Class B Shares and will receive Voteco Interests, or in certain circumstances penny warrants to acquire Voteco Interests (the "Voteco Warrants"), in connection with participating in such loan.  As previously discussed, it is assumed that the receipt of the Voteco Interests will be treated as receiving Class A Shares from Reorganized RHC and that such Class A Shares (as well as the Voteco Warrants) have only nominal value.  Additionally, it is assumed that the receipt of the Class B Shares by such holders of the Working Capital Facility Notes will not be characterized as being received as part of a commitment fee.  However, the IRS may take a different position.

As discussed in Section XV.B.1. above, a debt instrument will be treated as issued with OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a de minimis amount.  The Working Capital Facility Notes will be treated as issued with OID because the stated redemption price of the Working Capital Facility Notes will exceed the issue price of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

the Working Capital Facility Notes by more than a de minimis amount due to the issuance of the Class B Shares, as more fully discussed below.  Holders of debt instruments with OID are generally required to include OID in income over the term of the debt in accordance with a constant yield-to-maturity method, regardless of whether the holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives Cash payments of interest on the debt (other than Cash attributable to qualified stated interest).  Accordingly, a holder of such debt instrument could be treated as receiving interest income in advance of a corresponding receipt of Cash.  Any OID that a holder includes in income will increase the holder's tax basis in its debt.  A holder of debt with OID will not be separately taxed on the receipt of Cash payments with respect to previously-taxed OID, but will reduce its tax basis in such debt by the amount of such payments.

In the case of any debt instrument and an option, security or other property issued together as an investment unit, the issue price of the entire investment unit is allocated between the two components based on their relative fair market values. For U.S. federal income tax purposes, the debt and property components of an investment unit are treated separately.  In this case, Reorganized RHC will issue Working Capital Facility Notes with Class B Shares and Class A Shares (or Voteco warrants) to Holders of Senior Secured Claims who participate in making the Working Capital Facility, as part of an investment unit.

The investment unit is valued as of the date of issuance. The amount of OID associated with the debt instrument (the Working Capital Facility) is the portion of the value of the investment unit allocated to the Class B Shares as of the date of issuance, assuming the Class A Shares (or Voteco Warrants) have no value.  Depending on the value of the Class B Shares, the amount of OID could be substantial.

**8.    Consequences of Holding Series B Term Loan Notes.**

Holders of notes evidencing the Series B Term Loan under the Second Lien Credit Agreement ("Series B Term Notes") will be required to include qualified stated interest (stated interest that is required to be paid in Cash at least annually) in income in accordance with the Holders' regular method of accounting.  Additionally, such Holders will receive Class A Shares,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1    Class B Shares, and warrants to purchase Class B Shares ("B Warrants").  For purposes of this

2    Section, it is assumed that the receipt of the Voteco Interests will be treated as being received

3    solely in connection with participating in the Working Capital Facility.  However, there is no

4    guaranty that the IRS will not take a different position.

5        The U.S. federal income tax consequences of holding the Series B Term Notes should be

6    treated similarly to the Working Capital Facility notes, discussed in Section XV.C.7 above, and

7    the B Warrants, Class B Shares, Class A Shares and the Series B Term Notes will be treated as

8    an investment unit for purposes of calculating the issue price of the Series B Term Loan notes.

9        **9.    <u>Information Reporting and Backup Withholding.</u>**

10        Certain payments, including payments in respect of accrued interest or OID, are generally

11    subject to information reporting by the payer to the IRS.  Moreover, such reportable payments

12    are subject to backup withholding under certain circumstances.  Under the IRC's backup

13    withholding rules, a Holder may be subject to backup withholding at the applicable rate

14    (currently, 28%) with respect to certain distributions or payments pursuant to the Plan, unless the

15    Holder (i) falls within certain exempt categories (which generally include corporations) and,

16    when required, demonstrates this fact or (ii) provides a correct U.S. taxpayer identification

17    number and certifies under penalty of perjury that the Holder is a U.S. Person, the taxpayer

18    identification number is correct and that the Holder is not subject to backup withholding because

19    of a failure to report all dividend and interest income.

20        Backup withholding is not an additional tax. Amounts withheld under the backup

21    withholding rules may be credited against a taxpayer's U.S. federal income tax liability, and a

22    taxpayer may obtain a refund of any excess amounts withheld under the backup withholding

23    rules by filing an appropriate claim for refund with the IRS.

24        ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD CONSULT THEIR

25    TAX ADVISORS TO DETERMINE THE PARTICULAR TAX CONSEQUENCES TO THEM

26    OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE

27    AMOUNT AND TIMING OF ANY INCOME OR LOSS SUFFERED AS A RESULT OF ANY

28    CANCELLATION OF THE CLAIMS OR EQUITY INTERESTS HELD BY SUCH PERSON,

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

125

1    WHETHER SUCH INCOME OR LOSS IS ORDINARY OR CAPITAL, AND THE TAX

2    EFFECT OF ANY RIGHT TO, AND RECEIPT OF, ANY EQUITY INTERESTS IN

3    EXCHANGE FOR CLAIMS OR EQUITY INTERESTS.

4        THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS

5    NOT TAX ADVICE. THE TAX CONSEQUENCES ARE, IN MANY CASES, UNCERTAIN

6    AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.

7    ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT

8    THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME TAX AND OTHER TAX

9    CONSEQUENCES OF THE PLAN.

**XVI.**
**CONFIRMATION OF THE PLAN**

**A.    Confirmation of the Plan.**

Pursuant to Section 1128(a) of the Bankruptcy Code, the Bankruptcy Court will hold a hearing regarding confirmation of the Plan at the United States Bankruptcy Court for the District of Nevada, Las Vegas, 300 Las Vegas Blvd. South, Las Vegas, NV 89102, commencing on November 8, 2010, at 10:30 a.m. (PDT).

**B.    Objections to Confirmation of the Plan.**

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a plan of reorganization.  Any objections to confirmation of the Plan must be in writing, must state with specificity the grounds for such objections and must be filed with the Bankruptcy Court and served upon the following parties so as to be received on or before the time fixed by the Bankruptcy Court:

Counsel for the Debtors:              Gordon Silver
                                      3960 Howard Hughes Parkway, 9th Floor
                                      Las Vegas, Nevada 89169
                                      Telephone:  702-796-5555
                                      Facsimile:  702-369-2666
                                      Email:  tfell@gordonsilver.com
                                      Attn:  Thomas H. Fell, Esq.

/ / /

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

126

| | |
|---|---|
| Counsel to the Designated Consenting Lenders: | Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, New York  10019<br>Telephone: 212-403-1000<br>Facsimile:  212-403-2000<br>Email: SKCharles@wlrk.com; MSBenn@wlrk.com<br>Scott K. Charles, Esq. & Michael S. Benn, Esq. |
| Counsel to the Administrative Agent: | Cadwalader, Wickersham & Taft LLP<br>One World Financial Center<br>New York, NY  10281<br>Telephone: 212-504-6747<br>Facsimile:  212-504-6666<br>Email:  scott.greenberg@cwt.com<br>Scott J. Greenberg, Esq. |
| Counsel to the Committee: | Stutman Treister & Glatt PC<br>1901 Avenue of the Stars, 12th Floor<br>Los Angeles, CA  90067-6013<br>Telephone: 310-228-5600<br>Facsimile: 310-228-5788<br>Email:  ekarasik@stutman.com<br>Eve H. Karasik Esq. |
| Office of the United States Trustee: | Office Of The United States Trustee<br>300 S. Las Vegas Blvd., Suite 4300<br>Las Vegas, NV 89101<br>Telephone: 702-388-6600<br>Facsimile:  702-388-6658<br>Email: Edward.M.McDonald@usdoj.gov<br>Edward M. McDonald, Esq. |

## C.    The Best Interest Test and Feasibility of the Plan.

For the Plan to be confirmed, it must satisfy the requirements discussed below.

### 1.    Best Interest of Creditors.

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, for the Plan to be confirmed, it must provide Holders of Allowed Claims or Allowed Equity Interests with at least as much under the Plan as they would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each Impaired Class requires that each Holder of an Allowed Claim or Allowed Equity Interest in such Class either: (i) accepts the Plan; or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7. The Bankruptcy Court will determine whether the value to be

1    received under the Plan by the Holders of Allowed Claims in each Class of Creditors or Holders

2    of Allowed Equity Interests equals or exceeds the value that would be allocated to such Holders

3    in a liquidation under Chapter 7.  The Debtors believe that the Plan meets the Best Interest Test

4    and provides value which is not less than what would be recovered by each Holder of an

5    Impaired Claim or Impaired Equity Interest in a Chapter 7 proceeding for each of the Debtors.

6            2.    **Valuation.**

7            In connection with certain matters relating to the Plan, the Debtors, in conjunction with

8    their advisors, performed financial and market analyses with respect to the value of the Debtors

9    on a going concern basis.  Regarding the Riviera Las Vegas, the Debtors also commissioned an

10   appraisal of the real property on which the Riviera Hotel & Casino is located.  The real property

11   consists of approximately 26.2 acres.  The appraised market value is $157.2 million as of June 9,

12   2010, or approximately $6.0 million an acre[19].  The appraised value of the real property exceeds

13   the Debtors' estimated value of the Riviera Las Vegas on a going concern basis.

14           Regarding Riviera Black Hawk, the Debtors and their advisors performed financial and

15   market analyses and market surveys which effort resulted in various market data which, in

16   conjunction with financial projections prepared by management concerning the future financial

17   performance of the Riviera Black Hawk, was used to estimate its market value on a going

18   concern basis.  It is estimated that the Riviera Black Hawk's going concern value falls within a

19   range of $54.0 million and $62.7 million.  Together with estimated values of Riviera Las Vegas,

20   corporate overhead and excess Cash, the total estimated value of the Estates fall within a range

21   of $207.8 million and $231.1 million.

22           3.    **Liquidation Analysis.**

23           The Liquidation Analysis attached as Exhibit B hereto summarizes the Debtors' best

24   estimate of recoveries by Creditors and Holders of Allowed Equity Interests in the event of

25   liquidation of the Debtors as of April 30, 2011.

26   _____
     [19]  The appraiser assumed a "normal" marketing period of twelve (12) to twenty-four (24) months.  The appraiser
27   was also asked to provide an opinion of value assuming a sale of the real property under the "forced-sale"
     conditions.  The appraiser concluded that under conditions similar to those likely to be imposed in a Chapter 7
28   liquidation, a discount of approximately thirty percent (30%) was appropriate, resulting in "forced-sale"
     liquidation value of approximately $110 million.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

128

103000-001/956709_10.doc

Generally, to determine what Holders of Allowed Claims and Allowed Equity Interests in each Impaired Class would receive if the Debtors were liquidated, the Bankruptcy Court must determine what funds would be generated from the liquidation of the Debtors' Assets and properties in a Chapter 7 liquidation case for each Debtor, which for unsecured Creditors would consist of the proceeds from the disposition of the Assets of each of the Debtors, augmented by the unencumbered Cash held by each of the Debtors upon the completion of the liquidation, assuming that the Trustee will continue to operate the Debtors' business until the completion of the liquidation.   Such Cash amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Claims and Other Priority Claims as may result from the termination of the Debtors' businesses in each of the Chapter 7 cases and the use of Chapter 7 for the purpose of liquidation.[20]

In a Chapter 7 liquidation, holders of allowed claims  receive distributions based on the liquidation of the non-exempt assets of a debtor.  However, there are no exempt assets in these Chapter 11 Cases, and, as such, the distributions would include the same Assets being collected and liquidated under the Plan, namely the interests of the Debtors in the Assets.  However, the proceeds from the collection and sale of property of the Estates available for distribution to Creditors would be first reduced by the satisfaction of any liens and security interests in the Assets, costs of sale, any commission payable to the Chapter 7 trustee, the trustee's attorneys' and accounting fees, as well as the administrative costs of the Chapter 7 estate.  In a Chapter 7 case, the Chapter 7 trustee would be entitled to seek a sliding-scale commission based upon the funds distributed by such trustee to secured creditors.

The Debtors are licensed for various forms of gaming operations in Nevada and Colorado.  In the event of a conversion to Chapter 7, the trustee and the Debtors may not be allowed to continue gaming operations, given the change in management which would occur with the appointment of one or more Chapter 7 trustees.  What may be the most important

---

[20] While the respective Holders of First Priority Senior Secured Claims and Senior Secured Claims are owed by all of the Debtors jointly and severally, the Holders of Allowed General Unsecured Claims must look to the particular Debtors who are obligated on their Claims for recovery.  As the Liquidation Analysis indicates, there is a wide variance in available Assets among the various Debtors.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

129

103000-001/956709_10.doc

1    assumption underlying the Liquidation Analysis is that the Debtors continue their gaming

2    operations.  Any cessation or interruption of these operations will have a material impact upon

3    the value of the Assets and the proceeds which will then be obtained from the liquidation of the

4    Assets.

5        After the satisfaction of any liens and security interests in liquidated proceeds,

6    Administrative Claims that may arise in Chapter 7 cases or result from the Chapter 11 Cases

7    would be paid in full from the liquidation proceeds before the balance of those proceeds would

8    be made available to pay unclassified Claims, Allowed Other Priority Claims, Allowed General

9    Unsecured Claims, Allowed 510(b) Claims, Allowed Intercompany Claims and Allowed

10    Intercompany Equity Interests in each Chapter 7 case.

11        In addition, the Debtors are doubtful that a Chapter 7 trustee in each Chapter 7 case

12    would pursue any Litigation Claims as vigorously as the Reorganized Debtors, or be able to

13    identify the Litigation Claims that are cost-effective to pursue as prudently as the Reorganized

14    Debtors who have the benefit of the knowledge and information that they previously obtained.

15        The distributions from the liquidation proceeds would be paid Pro Rata according to the

16    amount of the aggregate Claims held by each Creditor in each Chapter 7 case in accordance with

17    the distribution scheme of the Bankruptcy Code.  The Debtors believe that the most likely

18    outcome under Chapter 7 would be the application of the "absolute priority rule."  Under that

19    rule, no junior Creditor in a Chapter 7 case may receive any distribution until all senior Creditors

20    are paid in full, with interest, and no Holder of an Equity Interest may receive any distribution

21    until all Creditors are paid in full.

22        The Debtors have determined that Confirmation will provide each Holder of an Allowed

23    Claim or Equity Interest with not less of a recovery than it would receive if each of the  Debtors

24    were liquidated under Chapter 7.  In liquidation under Chapter 7, as set forth for each of the

25    Debtors in the Liquidation Analysis, the recoveries for Administrative Claims, Other Secured

26    Claims, First Priority Senior Secured Claims, Other Priority Claims, General Unsecured Claims,

27    Senior Secured Claims, 510(b) Claims, Intercompany Claims and Intercompany Equity Interests

28    / / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

130

103000-001/956709_10.doc

would vary, but would not exceed the projected recoveries under the Plan. Holders of Equity Interests in RHC would receive nothing in a Chapter 7 liquidation or under the Plan.

### 4.    Feasibility.

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors (the "Feasibility Test"). For the Plan to meet the Feasibility Test, the Bankruptcy Court must find that the Reorganized Debtors will possess the resources and working capital necessary to meet their obligations under the Plan.

To demonstrate the feasibility of the Plan, the Debtors prepared the Financial Projections attached hereto as Exhibit D. The Financial Projections demonstrate that the Debtors are capable of satisfying the obligations proposed under the Plan, including the payment of debt service on the Series A Term Loan, Series B Term Loan and New Money Investment as well as the amounts due to holders of Allowed General Unsecured Claims.

In addition, as can be seen from the financial reports of the Debtors since the Petition Date through August 20, 2010, a summary of which is included as Exhibit F (the "Cash Receipt and Usage") the Debtors have generated revenues and incurred expenses as anticipated, and had Cash on hand of $23,700,000 versus a projected Cash on hand of $21,286,000. As such, the Debtors are capable of meeting all Cash demands under the Plan.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES OF THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY INDEPENDENT ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

131

103000-001/956709_10.doc

COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the statutory requirements for Confirmation.

**5.     Confirmation of the Plan Without Acceptance By All Impaired Classes:  The "Cramdown" Alternative.**

Section 1129(b) of the Bankruptcy Code provides that a plan of reorganization may be confirmed even if it has not been accepted by all Impaired classes, as long as at least one Impaired class of claims has accepted it. Consequently, the Bankruptcy Court may confirm the Plan at the Debtors' request notwithstanding the Plan's rejection by Impaired Classes, as long as at least one Impaired Class has accepted the Plan and the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted it.

A plan will be deemed not to discriminate unfairly under the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan will be deemed fair and equitable as to a class of secured claims that rejects the plan if the plan provides (i)(a) that the holders of claims in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim in such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (ii) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on such proceeds as described

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

132

103000-001/956709_10.doc

under clause (i) or (ii) of this paragraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (w) for each holder of a claim included in the rejecting class to receive or retain on account of such claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (x) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects the plan if the plan provides that (y) each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (z) the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of Holders of Equity Interests under Class 8 are not being solicited because such Holders are not entitled to receive or retain under the Plan any interest or property on account of their Equity Interests.  Such Class therefore is deemed to have rejected the Plan.  The Debtors are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to Class 8, notwithstanding such Class' deemed rejection of the Plan.  The Debtors also may seek confirmation as to other Classes that reject the Plan.  Notwithstanding the deemed rejection of the Plan by Class 8, the Debtors believe that under all of the relevant facts and circumstances, Class 8 is being treated fairly and equitably under the Bankruptcy Code.  The Debtors therefore believe the Plan may be confirmed despite its deemed rejection by that Class.

**6.** **Accepting Impaired Class.**

Since at least one Class of Claims is Impaired under the Plan, in order for the Plan to be confirmed, the Plan must be accepted by at least one Impaired Class of Claims (not including the votes of Insiders of any Debtor).

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

133

### 7. Acceptance of the Plan.

For an Impaired Class of Claims to accept the Plan, those representing at least two-thirds in amount and a majority in number of the Allowed Claims voted in that Class must be cast for acceptance of the Plan.

### 8. Allowed Claims.

You have an Allowed Claim if: (i) you or your representative timely files a proof of Claim and no objection has been filed to your Claim within the time period set for the filing of such objections; (ii) you or your representative timely files a proof of Claim and an objection is filed to your Claim upon which the Bankruptcy Court has ruled and allowed your Claim; (iii) your Claim is listed by any of the Debtors in their respective Schedules or any amendments thereto (which are on file with the Bankruptcy Court as a public record) as liquidated in amount and undisputed and no objection has been filed to your Claim; or (iv) your Claim is listed by any Debtor in its Schedules as liquidated in amount and undisputed and an objection was filed to your Claim upon which the Bankruptcy Court has ruled to allow your Claim. Under the Plan, the deadline for filing objections to Claims is 120 days following the Effective Date. If your Claim is not an Allowed Claim, it is a Disputed Claim and you will not be entitled to vote on the Plan unless the Bankruptcy Court temporarily or provisionally allows your Claim for voting purposes pursuant to Bankruptcy Rule 3018. If you are uncertain as to the status of your Claim or Equity Interest or if you have a dispute with any Debtor, you should check the Bankruptcy Court record carefully, including the Schedules of each Debtor, and seek appropriate legal advice. Neither the Debtors nor their professionals can advise you about such matters. Pursuant to the Stipulation Authorizing Use of Cash Collateral by the Debtors and Granting Adequate Protection (as approved by the Bankruptcy Court), the First Priority Senior Secured Claims and Senior Secured Claims are allowed and Holders thereof are not required to file proofs of Claim.

### 9. Impaired Claims and Impaired Equity Interests.

Impaired Claims and Impaired Equity Interests include those whose legal, equitable or contractual rights are altered by the Plan, even if the alteration is beneficial to the Creditor or Holder of the Equity Interest, or if the full amount of the Allowed Claims will not be paid under

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

134

103000-001/956709_10.doc

1    the Plan.  Holders of Claims which are not Impaired under the Plan will be deemed to have

2    accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and the Debtors need not

3    solicit acceptance of the Plan by Holders of such Unimpaired Claims.  Holders of Claims or

4    Equity Interests which are to receive nothing under the Plan will be deemed to have voted to

5    reject the Plan.  Consequently, only Impaired Holders of Claims in Class 3, Class 4 and Class 5

6    are entitled to vote on the Plan.

7         **10.**    **Voting Procedures.**

8            a.    <u>Submission of Ballots.</u>

9    All Creditors entitled to vote will be sent a ballot, together with instructions for voting,

10    and a copy of this approved Disclosure Statement which includes a copy of the Plan.  You should

11    read the ballot carefully and follow the instructions contained therein.  Please use only the ballot

12    that was sent with this Disclosure Statement.

13    You should complete your ballot and return it as follows:

14            The Garden City Group, Inc.

15            Attn:  Riviera Bankruptcy Administration
             P.O. Box 9650

16            Dublin, Ohio 43017-4950

17    **TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS**

18    **LISTED ABOVE BY 5:00 P.M., EASTERN DAYLIGHT TIME, ON OCTOBER 29, 2010.**

19            b.    <u>Incomplete Ballots.</u>

20    Unless otherwise ordered by the Bankruptcy Court, ballots which are signed, dated and

21    timely received, but on which a vote to accept or reject the Plan has not been indicated, will be

22    counted as a vote for the Plan.

23            c.    <u>Withdrawal of Ballots.</u>

24    You may not withdraw or change your ballot after it is cast unless the Bankruptcy Court

25    permits you to do so after notice and a hearing to determine whether sufficient cause exists to

26    permit the withdrawal or change.

    / / /

27    / / /

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

1

d.    Questions and Lost or Damaged Ballots.

2

If you have questions concerning these voting procedures, if your ballot is damaged or

3

lost, or if you believe you should have received a ballot but did not receive one, you may contact:

4
5
6
7

Gordon Silver
Attn: Thomas H. Fell, Esq.
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, NV 89169
Telephone:  (702) 796-5555
Facsimile:  (702) 369-2666
E-mail: tfell@gordonsilver.com

8

9

**XVII.**
**MISCELLANEOUS**

10

**A.    Post-Effective Date Objections to Claims or Equity Interests.**

11

After the Effective Date, objections to Claims or Equity Interests (other than Allowed

12

Claims and Equity Interests) shall be made and objections to Claims and Equity Interests (other

13

than Allowed Claims or Equity Interests) made previous thereto shall be pursued, upon

14

consultation with the Committee, by the Debtors or any other party properly entitled to do so

15

after notice to the Debtors and approval by the Bankruptcy Court.  After the Substantial

16

Consummation Date, objections to Claims or Equity Interests (other than Allowed Claims or

17

Equity Interests) shall be made and objections to Claims and Equity Interests (other than

18

Allowed Claims or Equity Interests) made previous thereto shall be pursued, upon consultation

19

with the Committee, by the Reorganized Debtors or any other party properly entitled to do so

20

after notice to the Reorganized Debtors and approval by the Bankruptcy Court.  Any objections

21

made after the Effective Date to Claims (other than Allowed Claims) arising prior to the Petition

22

Date shall be filed and served not later than one hundred and twenty (120) days after the

23

Effective Date, and any objections to Claims (other than allowed Claims) arising after the

24

Effective Date and up to and including the Substantial Consummation Date and to Equity

25

Interests (other than Allowed Equity Interests) shall be filed and served not later than one

26

hundred and twenty (120) days after the Substantial Consummation Date; provided, however,

27

that such period may be extended by order of the Bankruptcy Court for good cause shown.

28

/ / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

136

103000-001/956709_10.doc

**B.**     **Resolution of Objections After Effective Date; Distributions.**

    **1.**     **Resolution of Objections.**

From and after the Effective Date, the Reorganized Debtors may litigate to judgment, propose settlements of, or withdraw objections to, all pending or filed Disputed Claims and Disputed Equity Interests and may settle or compromise any Disputed Claim or Disputed Equity Interest without notice and a hearing and without approval of the Bankruptcy Court.

    **2.**     **Distributions.**

In order to facilitate Distributions to Holders of Allowed Claims, and only to the extent there are Disputed Claims in any Class, the Debtors or Reorganized Debtors as applicable, shall set aside such amounts of Assets as the Debtors or Reorganized Debtors determine in consultation with and upon the approval of the Requisite Consenting Lenders, in the Disputed Claim Reserve for potential payments or Distributions to Holders of such Disputed Claims, less such Claims or portion thereof otherwise payable by insurance policies then in effect provided that any set aside involving the Class 3 Claims Reserve shall be effected in consultation with the Committee.  If any Debtor or Reorganized Debtor or Committee wishes to deposit or hold a lesser amount  and is unable to reach agreement with the Holder of the Disputed Claim or Disputed Equity Interest in the amount to be deposited or held, the Bankruptcy Court will fix the amount after notice and hearing.  Upon Final Order with respect to a Disputed Claim, the Holder of such Disputed Claim, to the extent it has been determined to hold an Allowed Claim, shall receive from the respective Debtor or Reorganized Debtor, in each case first out of the Disputed Claims Reserve applicable to such Claim, that payment or Distribution to which it would have been entitled if the portion of the Claim so Allowed had been Allowed as of the Effective Date or Substantial Consummation Date, as applicable.  Such payment or distribution shall be made as soon as practical after the order allowing the Claim has become a Final Order.

    **3.**     **Late-Filed Claims.**

No Claim filed after the Bar Date or, as applicable, the Administrative Claim Bar Date, will be allowed.  After the Bar Date or the Administrative Claim Bar Date, as applicable, no Creditor will be permitted to amend any Claim to increase the claimed amount.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

137

103000-001/956709_10.doc

### 4. Effectuating Documents; Further Transactions; Timing.

Each officer of any Debtor or Reorganized Debtor will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and to take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any Equity Interests issued, transferred or canceled pursuant to the Plan. All transactions that are required to occur on the Effective Date under the Plan will be deemed to have occurred simultaneously. The Debtors and Reorganized Debtors are authorized and directed to do such acts and execute such documents as are necessary to implement the Plan.

### 5. Exemption From Transfer Taxes.

Pursuant to Section 1146(a) of the Bankruptcy Code, the (i) issuance, distribution, transfer or exchange of Estate property; (ii) creation, modification, consolidation or recording of any deed of trust or other interest, the securing of additional indebtedness by, in furtherance of, or in connection with, the Plan or the Confirmation Order; (iii) making, assignment, modification or recording of any lease or sublease; or (iv) making, delivery or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, Confirmation Order or any transaction contemplated above, or any transactions arising out of, contemplated by or in any way related to the foregoing will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or similar tax or governmental assessment.

### 6. Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is withdrawn or revoked or if the Bankruptcy Court denies confirmation of the Plan, then the Plan will be null and void and nothing in the Plan will constitute a waiver or release of any Claims or Equity Interests nor will such withdrawal or revocation prejudice the rights of any Debtor or any other Person in any further proceedings involving any Debtors. If the Plan is withdrawn or revoked or if the Bankruptcy Court denies confirmation of the Plan, nothing in the Plan will be deemed an admission of any sort.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

If the Substantial Consummation Date does not occur within six (6) months following the Effective Date, then upon notification by the Debtors to the Bankruptcy Court: (i) the Confirmation Order will be vacated; (ii) no additional Distributions under the Plan will be made, except that Distributions pursuant to unclassified Allowed Administrative Claims, Allowed Class 1 Claims and Allowed Class 2 Claims (collectively, "Excepted Claims") will continue unaffected; (iii) the Debtors and all Holders of Claims (except for Holders of Excepted Claims) will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) the Debtors' obligations with respect to Claims will remain unchanged (except to the extent of any post-Effective Date payments and contingency payments pursuant to Excepted Claims), and nothing in the Plan will (y) constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other Person or (z) prejudice the rights of the Debtors or any Person in any further proceedings involving the Debtors.

### 7. **Binding Effect.**

The Plan will be binding upon, and will inure to the benefit of, the Debtors and their Estates, the Reorganized Debtors, and Holders of all Claims and Equity Interests, and their respective successors and assigns.

### 8. **Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable or as provided in any contract, instrument, release or other agreement entered into in connection with the Plan or in any document which remains unaltered by the Plan, the rights, duties and obligations of the Debtors and any other Person arising under the Plan will be governed by the internal laws of the State of Nevada without giving effect to the choice of law provisions of Nevada law.

### 9. **Modification of Payment Terms.**

The Debtors and Reorganized Debtors reserve the right to modify the treatment of any Allowed Claim or Allowed Equity Interest in any manner adverse only to the Holder of such

/ / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

139

103000-001/956709_10.doc

Allowed Claim or Allowed Equity Interest at any time after the Effective Date upon the prior written consent of that Holder.

### 10.    Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution will, to the extent permitted by law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### 11.    Means of Cash Payment.

Payments of Cash pursuant to the Plan will be in U.S. dollars and will be made, in the sole discretion of the Debtors or Reorganized Debtors, as the case may be, by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or Reorganized Debtors.  Cash payments to foreign Creditors may be made, at the option of the Debtors or Reorganized Debtors in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 12.    Providing for Claims Payments.

Distributions to Holders of Allowed Claims will be made by the Debtors or Reorganized Debtors, as the case may be: (i) at the addresses set forth on the proofs of Claim filed by such Holders (or at the last known addresses of such Holders if no proof of Claim is filed or if the Debtors have been notified of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of Claim; or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address.  Distributions to Holders of Allowed Equity Interests will be made to such Holders as of the Record Date.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder will be made unless and until the Disbursing Agent is notified of such Holder's current address, at which time all missed Distributions will be made to such Holder without interest.  Amounts in respect of undeliverable Distributions made through the Disbursing Agent will be returned to the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

Debtors or Reorganized Debtors, as applicable, until such Distributions are claimed.  All claims for undeliverable Distributions must be made on or before the second anniversary of the Effective Date.    After such date, all unclaimed property will revert to the Debtors and Reorganized Debtors, as applicable, and the Claim of any Holder or successor to such Holder with respect to such property will be discharged and forever barred notwithstanding any escheat laws to the contrary.  Nothing in the Plan will require the Debtors, the Reorganized Debtors, or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim or Allowed Equity Interest.

**13.    Set-Offs.**

The Debtors or Reorganized Debtors may, but will not be required to, set off or recoup against any Claim or Equity Interest and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim or Equity Interest (before any Distribution is made on account of such Claim or Equity Interest), claims of any nature that the applicable Debtors or Reorganized Debtors may have against the Holder of such Claim or Equity Interest, to the extent such Claims or Equity Interests may be set off or recouped under applicable law.  However, neither the failure to do so nor the allowance of any Claim or Equity Interest under the Plan will constitute a waiver or release by the Debtors or Reorganized Debtors of any such Claim against such Holder.

**14.    Notices.**

Any notice required or permitted to be given under the Plan must be in writing and served by: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii) reputable overnight courier service, freight prepaid, addressed as follows:

If to the Debtors:                                Riviera Holdings Corporation
                                                      Attn: Tullio Marchionne, Esq.
                                                      2901 Las Vegas Blvd. So., 4th Floor
                                                      Las Vegas, NV 89109

With a copy to:                                  Gordon Silver
                                                      Attn:  Gerald M. Gordon, Esq.
                                                      3960 Howard Hughes Parkway, 9th Floor
                                                      Las Vegas, NV  89169
                                                      (702) 796-5555

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

141

### 15.    Statutory Committee.

Any Statutory Committee will terminate on the later of the Substantial Consummation Date and the conclusion of the claims objection process and will thereafter have no further responsibilities in respect of the Chapter 11 Cases, except with respect to the preparation or filing of applications for compensation and reimbursement of expenses.

### 16.    Severability.

If any provision of the Plan is determined by the Bankruptcy Court to be invalid, illegal or unenforceable or the Plan is determined to be not confirmable pursuant to Section 1129 of the Bankruptcy Code, the Bankruptcy Court, at the request of the Debtors, will have the power to alter and interpret such provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the provision held to be invalid, void or unenforceable, and such provision will then be applicable as altered or interpreted.   The remainder of the Plan will remain in full force and effect and will not be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 17.    Withholding and Reporting Requirements.

In connection with the Plan and all instruments and Equity Interests issued in connection therewith and Distributions thereon, the Reorganized Debtors will comply with all withholding and reporting requirements imposed by any taxing authority and all Distributions will be subject to any such withholding and reporting requirements.   The Reorganized Debtors will be authorized to take any and all action that may be necessary to comply with such withholding and recording requirements.  Each Holder of an Allowed Claim or Allowed Equity Interest that has received a Distribution will have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income and withholding tax, on account of such Distribution.

/ / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

142

103000-001/956709_10.doc

### 18.   Cramdown.

If any Impaired Class is determined to have rejected the Plan in accordance with Section 1126 of the Bankruptcy Code, the Debtors may invoke the provisions of Section 1129(b) of the Bankruptcy Code to satisfy the requirements for Confirmation.  The Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

### 19.   Quarterly Fees to the United States Trustee.

Prior to the Substantial Consummation Date, the Debtors, and after the Substantial Confirmation Date, the Reorganized Debtors shall pay all quarterly fees payable to the Office of the United States Trustee after Consummation, consistent with applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

## XVIII.
## ALTERNATIVES TO THE PLAN

The Debtors believe that the Plan provides Creditors and Holders of Equity Interests the best and most complete form of recovery available.  As a result, the Debtors believe that the Plan serves the best interests of all Creditors and parties-in-interest in the Chapter 11 Cases.

In formulating and developing the Plan, the Debtors explored numerous alternatives.  The Debtors believe not only that the Plan fairly adjusts the rights of various Classes of Creditors and Holders of Equity Interests and enables the Creditors and Holders of Equity Interests to realize the greatest sum possible under the circumstances, but also that rejection of the Plan in favor of some theoretical alternative method of reconciling the Claims and Equity Interests of the various Classes would require, at the very least, an extensive and time-consuming negotiation process and would not result in a better recovery for any Class.  It is not atypical for bankruptcy proceedings involving substantial entities to continue for months or years before a plan of reorganization is consummated and payments are made.

### A.   Alternative Plans of Reorganization.

Under the Bankruptcy Code, a debtor has an exclusive period of 120 days and an additional vote solicitation period of 60 days from the entry of the order for relief during which

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

143

1   time, assuming that no trustee has been appointed by the Bankruptcy Court, only a debtor may

2   propose a plan of reorganization.  After the expiration of the initial 180-day period and any

3   extensions thereof, the Debtors or any other party-in-interest may propose a different plan, unless

4   the Bankruptcy Court has extended the exclusivity periods.

5   **B.**      **Liquidation Under Chapter 7.**

6          If a plan of reorganization cannot be confirmed, the Chapter 11 Cases may be converted

7   to Chapter 7 cases, in which a trustee would be elected or appointed to liquidate the assets of

8   each Debtor for distribution to Creditors and Holders of Equity Interests in accordance with the

9   priorities established by the Bankruptcy Code.  For a discussion of the effect that a Chapter 7

10  liquidation would have on recovery by Creditors, see Section XVI.C., "The Best Interest Test

11  And Feasibility Of The Plan."

12         As previously stated, the Debtors believe that liquidation under Chapter 7 would result in

13  a substantially reduced recovery of funds by the Estates because of:  (i) the risk that some or all

14  of the Debtors may cease or lose business: (ii) additional administrative expenses involved in the

15  appointment of one or more trustees for the Debtors and attorneys and other professionals to

16  assist such trustee(s); (iii) a forced liquidation of the Debtors' businesses will result in the receipt

17  of reduced sales proceeds;  and (iv) additional expenses and Claims, some of which would be

18  entitled to priority, which would be generated during the liquidation and from the rejection of

19  leases and other executory contracts in connection with a cessation or forced sale of the Debtors'

20  operations.  Accordingly, the Debtors believe that Holders of certain Classes of Claims or Equity

21  Interests will receive substantially smaller distributions in a Chapter 7 liquidation than under the

22  Plan.

**XIX.**
**PREFERENCE AND OTHER AVOIDANCE ACTIONS**

A bankruptcy trustee (or the entity as a debtor-in-possession) may avoid as a preference a

transfer of property made by a debtor to a creditor on account of an antecedent debt while a

debtor was insolvent, where that creditor receives more than it would have received in a

liquidation of the entity under Chapter 7 had the payment not been made, if (i) the payment was

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

144

103000-001/956709_10.doc

1    made within 90 days before the date the bankruptcy case was commenced or (ii) the creditor is

2    found to have been an "insider," as defined in the Bankruptcy Code, within one year before the

3    commencement of the bankruptcy case.  A debtor is presumed to have been insolvent during the

4    90 days preceding the commencement of the case.

5        A bankruptcy trustee (or the entity as a debtor-in-possession) may avoid as a fraudulent

6    transfer a transfer of property made by a debtor within two years (and under applicable Nevada

7    law, four years) before the date the bankruptcy case was commenced if the debtor (i) received

8    less than reasonably equivalent value in exchange for such transfer and (ii) was insolvent on the

9    date of such transfer or became insolvent as a result of such transfer, such transfer left the debtor

10    with an unreasonably small capital, or the debtor intended to incur debts that would be beyond

11    the debtor's ability to pay as such debts matured.

12        Although the Debtors have not fully analyzed various potential preference or other

13    avoidance actions, it is possible that some pre-Petition transactions may be avoidable.

14    / / /

15    / / /

16    / / /

17    / / /

18    / / /

19    / / /

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

145

## XX.
## RECOMMENDATION AND CONCLUSION

The Plan provides the best possible recovery for all parties-in-interest. Accordingly, the Debtors recommend that all Creditors and Holders of Equity Interests who are entitled to vote on the Plan should vote to accept the Plan.

DATED this 16th day of September, 2010.

Riviera Holdings Corporation, a Nevada corporation,

By: _____

Its: _____

Riviera Operating Corporation, a Nevada corporation

By: _____

Its: _____

Riviera Black Hawk, Inc., a Colorado corporation

By: _____

Its: _____

**PREPARED AND SUBMITTED BY:**

GORDON SILVER

By: _____
    GERALD M. GORDON, ESQ.
    THOMAS H. FELL, ESQ.
    3960 Howard Hughes Pkwy., 9th Floor
    Las Vegas, Nevada 89169
    Attorneys for the Debtors

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103000-001/956709_10.doc

146